# EXHIBIT A

# CIRCUIT COURT SUMMONS

# NASHVILLE, TENNESSEE

## STATE OF TENNESSEE
## DAVIDSON COUNTY
## 20 ᵀᴴ JUDICIAL DISTRICT

Service ID 583783

RED HOUSE MEDICAL BILLING MI LLC

Plaintiff

vs.

CHANGE HEALTHCARE, INC.
REGISTERED AGENT UNITED AGENT GROUP INC
5865 RIDGEWAY CENTER PKWY SUITE 395
MEMPHIS, TN 38120

Defendant

CIVIL ACTION
DOCKET NO. 26C525
Method of Service:
Certified Mail

To the above named Defendant:

You are summoned to appear and defend a civil action filed against you in the Circuit Court, 1 Public Square, Room 302, P.O. Box 196303, Nashville, TN 37219-6303 , and your defense must be made within thirty (30) days from the date this Summons is served upon you. You are further directed to file your defense with the Clerk of the Court and send a copy to the Plaintiff's attorney at the address listed below.

In case of your failure to defend this action by the above date, judgment by default will be rendered against you for the relief demanded in the Complaint.

ISSUED: 02/23/2026

JOSEPH P. DAY
Circuit Court Clerk
Davidson County, Tennessee

By: *C Follett*

Deputy Clerk

ADDRESS OF PLAINTIFF'S ATTORNEY OR PLAINTIFF:

JAMES GERARD STRANCH, IV
223 ROSA L. PARKS AVENUE
STE. 200
NASHVILLE, TN 37203

---

NOTICE TO THE DEFENDANT:

Tennessee law provides a Ten Thousand and 00/100 Dollars ($10,000.00) debtor's equity interest personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the Clerk of the Court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized, you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

---

## CERTIFICATION

STATE OF TENNESSEE )
COUNTY OF DAVIDSON )

I, Joseph P. Day, Clerk of the Circuit Court in the State and County aforesaid, do hereby certify this to be a true and correct copy of the original summons issued in this case.



JOSEPH P. DAY, CLERK

By: _C Follett_      D.C.

 To request an ADA accommodation, please contact Trey Collier at (615) 880-3309

## CIRCUIT COURT SUMMONS

### NASHVILLE, TENNESSEE

## STATE OF TENNESSEE
## DAVIDSON COUNTY
## 20TH JUDICIAL DISTRICT

Service ID 583783

RED HOUSE MEDICAL BILLING MI LLC

Plaintiff

vs.

CHANGE HEALTHCARE, INC.
REGISTERED AGENT UNITED AGENT GROUP INC
5865 RIDGEWAY CENTER PKWY SUITE 395
MEMPHIS, TN 38120

Defendant

CIVIL ACTION
DOCKET NO. 26C525
Method of Service:
Certified Mail

## RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify and return, that on the _____ day of _____, 20___, I sent, postage prepaid by registered return receipt mail or certified return receipt mail, a certified copy of the Summons and a copy of the Complaint/Petition in Docket No. 26C525 to the Defendant, CHANGE HEALTHCARE, INC. . On the _____ day of _____, 20___, I received the return receipt for said registered or certified mail, which had been signed by _____ on the _____ day of _____, 20___. Said return receipt is filed with the original Summons Return and both documents are being sent herewith to the Circuit Court Clerk for filing.

SWORN TO AND SUBSCRIBED BEFORE ME, ON THIS PERSON

_____ DAY OF _____, 20____.

_____
PLAINTIFF, PLAINTIFF'S ATTORNEY or OTHER

AUTHORIZED BY STATUTE TO SERVE PROCESS

_____ NOTARY PUBLIC or _____DEPUTY CLERK
MY COMMISSION EXPIRES: _____

 To request an ADA accommodation, please contact Trey Collier at (615) 880-3309

## IN THE CIRCUIT COURT OF DAVIDSON, COUNTY, TENNESSEE
## AT NASHVILLE

RED HOUSE MEDICAL BILLING MI LLC,

        Plaintiff,

v.

CHANGE HEALTHCARE INC.,

        Defendant.

CASE NO.: _____

JURY TRIAL DEMANDED

### COMPLAINT

Plaintiff Red House Medical Billing MI LLC. ("Plaintiff"), by and through the undersigned counsel, brings this complaint for damages and injunctive relief against Defendant Change Healthcare Inc. ("Defendant" or "Change"). Plaintiff makes the following allegations based upon personal knowledge as to its own actions and upon information and belief as to all other matters:

### NATURE OF THE ACTION

1. Across the United States, entities processing healthcare billing claims have been placed in serious and continuing financial peril because of a data breach on Change Healthcare's information systems. Entities, like Plaintiff are independent revenue cycle management ("RCM") vendors and partners which provide billing, claims submission, reimbursement, and accounts receivable services to healthcare providers, to facilitate Defendant's medical services.

2. Like other RCM companies, Plaintiff has struggled with disruptions to its routine operations, and has experienced significant decline in revenue attributed to Defendant's failures. This has resulted in cognizable damages for which Plaintiff seeks redress.

3. A ransomware group claims to have accessed Change's servers and seized six terabytes of critical confidential and highly sensitive information, resulting in network outages that

have already impacted millions of patients and physicians across the country.[1] On February 21, 2024, Change disclosed that it was the subject of this massive data breach whereby hackers known as "ALPHV/Blackcat" ("Blackcat") gained unauthorized access to its networks (the "Data Breach").

4. Blackcat, also known as ALPHV, is a notable cybergroup that infiltrates healthcare institutions' internal servers through vulnerabilities in their networks. The group uses "ransomware to identify and attack 'high-value victim institutions[.]'"[2] According to the Department of Justice, Blackcat typically steals victims' data and encrypts the institution's data, networks, and servers, blocking the institution from accessing them. The group then demands the institution pay a ransom in exchange for the keys to decrypt the institution's network and servers. In exchange for ransom, Blackcat also offers a promise that it will not publish the institution's data to Blackcat's site on the Dark Web. Still, even when ransoms are paid, this data often ends up on the Dark Web. Blackcat has emerged as the second most prolific ransomware-as-a-service variant in the world.[3]

5. Blackcat accessed, copied, and exfiltrated highly sensitive information stored on Change's servers for millions of individuals, including active US military/navy personnel identifiable information, medical records, dental records, payment information, claims

---

[1] Steve Adler, *UnitedHealth Group Confirms Data Stolen in Change Healthcare Ransomware Attack*, THE HIPAA JOURNAL (Mar. 29, 2024), https://www.hipaajournal.com/change-healthcare-responding-to-cyberattack.

[2] James Farrell, *Change Healthcare Blames 'Blackcat' Group for Cyber Attack That Disrupted Pharmacies and Health Systems*, FORBES (Feb. 29, 2024, 1:18 PM), https://www.forbes.com/sites/jamesfarrell/2024/02/29/change-healthcare-blames-blackcat-group-for-cyber-attack-that-disrupted-pharmacies-and-health-systems/?sh=589769fc1c4d.

[3] *Justice Department Disrupts Prolific ALPHV/Blackcat Ransomware Variant*, DOJ (Dec. 19, 2023), https://www.justice.gov/opa/pr/justice-department-disrupts-prolific-alphvblackcat-ransomware-variant.

2

information, patients' information (such as phone numbers, addresses, Social Security numbers, emails, etc.), insurance records, and more ("PHI").[4] Blackcat also encrypted portions of Change's network, rendering them unusable.

6. Blackcat has also shared the stolen data with other criminal affiliates.

7. Defendant reportedly paid a ransom of $22 million to Blackcat, but one of Blackcat's affiliates claimed to still have a copy of the stolen data and that it was not paid its share of the ransom.[5]

8. The fallout from this Data Breach has and will continue to wreak havoc on the healthcare industry. As a subsidiary of one of the largest healthcare insurers, Change Healthcare processes 15 billion transactions annually, "touching one in three U.S. patient records."[6] But to stop the cybersecurity wound from bleeding further, Change decided to take certain systems offline. One of these systems was the Change Healthcare platform ("Change Platform"). This platform provides, among other things, a revenue and payment cycle management service that connects payers, providers, and patients within the U.S. healthcare system.[7] The Change Platform is widely used among practitioners and health services providers, including Plaintiff.

9. Without the Change Platform, the healthcare industry—including Defendant's RCM operations—was immobilized. Patients were stuck in prescription purgatory without access

---

[4] *MMRG Notifies Patients of Cybersecurity Incident*, BUSINESS WIRE (Feb. 6, 2024, 5:30 PM), https://www.businesswire.com/news/home/20240206060527/en.

[5] Steve Adler, *UnitedHealth Group Confirms Data Stolen in Change Healthcare Ransomware Attack*, THE HIPAA JOURNAL (Mar. 29, 2024), https://www.hipaajournal.com/change-healthcare-responding-to-cyberattack.

[6] Nicole Sganga & Andres Triay, *Cyberattack on UnitedHealth still impacting prescription access: "These are threats to life,"* CBS NEWS (Feb. 29, 2024, 9:00 PM), https://www.cbsnews.com/news/unitedhealth-cyberattack-change-healthcare-prescription-access-still-impacted.

[7] *Revenue Cycle Management*, CHANGE HEALTHCARE, https://www.changehealthcare.com/revenue-cycle-management (last visited June. 13, 2024).

3

to their vital medications. This was especially disruptive to elderly patients who have a fixed income and cannot afford medications without insurance, as well as individuals with chronic illnesses who face life-threatening symptoms without their medication. Change's network outage is jeopardizing the health of millions of Americans.

10. Though the Data Breach resulted in the theft of millions of patient records, those patients are hardly the only victims. Rather, the ripple effect of the Data Breach is also hampering not only healthcare providers' practices, but also the essential operations of RCM companies, like Plaintiff.

11. Indeed, this is especially true not only for providers, but for RCM companies, through which medical services cannot reasonably be processed and paid without Defendant's processes. According to John Riggi, national advisor for cybersecurity and risk at the American Hospital Association, "… [T]his cyberattack has affected every hospital in the country one way or another."[8] Many providers are having trouble verifying patient eligibility and coverage, filing claims, and billing patients.[9] This leaves small and mid-sized practices especially vulnerable without normal cash flow to sustain operations. These healthcare practices have received little, if any, reimbursement from insurers for patient visits. Without these reimbursements, small and mid-sized practices face financial ruin. Indeed, Plaintiff has faced significant financial hardship, has had to take out expensive loans, and has lost significant business because of the time that Plaintiff has had to dedicate to responding to the Breach.

---

[8] Nicole Sganga & Andres Triay, *Cyberattack on UnitedHealth still impacting prescription access: "These are threats to life,"* CBS NEWS (Feb. 29, 2024, 9:00 PM), https://www.cbsnews.com/news/unitedhealth-cyberattack-change-healthcare-prescription-access-still-impacted.

[9] Associated Press, *Minnetonka Based United Healthcare Hacked,* KNSI (Feb. 29, 2024, 5:46 PM), https://knsiradio.com/2024/02/29/minnetonka-based-united-healthcare-hacked/.

4

12. Indeed, vendors like Plaintiff rely on their ability to submit and process claims for its provider clients to generate their own revenue. Because the Change Healthcare 2024 breach disrupted electronic claims submissions and related clearing house functions, Plaintiff and other similar companies could not bill for their own services tied to those claims.

13. Change is responsible for the Data Breach because it failed to implement reasonable security procedures and practices and failed to disclose material facts surrounding its deficient security protocols. Indeed, the Associated Press recently explained that Change failed to implement one of the most basic and industry standard cybersecurity safeguards, multi-factor authentication, and that the failure was the cause of the Breach.[10] As is detailed further below, the CEO of Change Healthcare's parent company admitted to Congress that the Data Breach was caused by the failure to implement and enforce multi-factor authentication—a basic industry standard cybersecurity safeguard.

## PARTIES

14. Plaintiff Red House Medical Billing MI LLC is a Michigan limited liability company with its principal place of business at 28345 Beck Road, Wixom, Michigan 48393.

15. Defendant Change Healthcare Inc. is a Delaware corporation with its principal place of business at 424 Church Street, Suite 1400, Nashville, Tennessee.

## JURISDICTION AND VENUE

16. This Court has jurisdiction over this under pursuant to Tenn. Code Ann. § 16-11-102. Further, the actions giving rise to this action occurred in this County, including Defendant's

---

[10] Tom Murphy, *Change Healthcare cyberattack was due to a lack of multifactor authentication, UnitedHealth CEO Says*, Associated Press (May 1, 2024), https://apnews.com/article/change-healthcare-cyberattack-unitedhealth-senate-9e2fff70ce4f93566043210bdd347a1f.

decisions not to implement the reasonable, industry standard cybersecurity safeguards that it was legally obligation to implement and maintain.

17. Moreover, this Court has personal jurisdiction over Change because it maintains and operates its headquarters in this County.

18. Venue is this County pursuant to Tenn. Code Ann. § 20-4-101 because the claims presented here arose in this County and Defendant resides here.

## FACTUAL ALLEGATIONS

19. Change Healthcare is a healthcare technology company that provides data-driven and analytics-driven solutions for clinical, financial, administrative, and patient management to healthcare providers.[11] It holds itself out as providing "data and analytics, plus patient engagement and collaboration tools" to "providers and payers [to] optimize workflows, access the right information at the right time, and support the safest and most clinically appropriate care."[12] Change is one of the largest processors of prescription medications in the United States and handles billing for more than 67,000 pharmacies across the country through which it handles 15 billion healthcare transactions annually.[13]

20. In the regular course of business, Change stores patients' highly sensitive health information collected from myriad clients like Medicare, pharmacies, healthcare providers, and so on. This includes patients' full names, phone numbers, addresses, Social Security numbers, emails,

---

[11] *OptumInsight and Change Healthcare Combine to Advance a More Modern, Information and Technology-Enabled Health Care Platform*, OPTUM (Jan. 6, 2021), https://www.optum.com/en/about-us/news/page.hub.optuminsight-change-healthcare-combine.html.

[12] *The Change Healthcare Platform*, CHANGE HEALTHCARE, https://www.changehealthcare.com/platform (last visited Mar. 1, 2024).

[13] Zack Whittaker, *UnitedHealth confirms ransomware gang behind Change Healthcare hack amid ongoing pharmacy outages*, TECHCRUNCH (Feb. 29, 2024, 9:15 AM) https://techcrunch.com/2024/02/29/unitedhealth-change-healthcare-ransomware-alphv-blackcat-pharmacy-outages/.

6

medical records, dental records, payment information, claims information, insurance records, and much more.

21.     Given the amount and sensitive nature of the data it stores, Change maintains a privacy policy describing how confidential and personal information is used and disclosed: "[w]e implement and maintain organizational, technical, and administrative security measures designed to safeguard the data we process against unauthorized access, destruction, loss, alteration, or misuse. These measures are aimed at providing on-going integrity and confidentiality of data, including your personal information."

22.     Given its representations and experience handling highly sensitive PHI and in operating in the healthcare industry, Change understand the gravity of the harms that Plaintiff would suffer if Change failed to properly protect the PHI it collected. Indeed, Change knew that the PHI it collected would make it a target and would increase the likelihood of a Data Breach that could and would take its systems offline-systems that its provider customers depended on for their livelihood.

23.     Notwithstanding this knowledge, Defendant failed to have proper cybersecurity systems in place, such as multifactor authentication, and failed to have reasonable policies in place for how to operate in the event of an attack.

### *Plaintiff's Role as an Independent Revenue Cycle Management Company*

24.     Plaintiff operates as an independent revenue cycle management ("RCM") company providing billing, claims submission, reimbursement, and accounts receivable services to healthcare providers.

25.     RCM companies serve as outsourced billing departments for medical practices and specialty providers. They are responsible for preparing and submitting insurance claims, verifying patient eligibility, tracking reimbursement, correcting denials, managing resubmissions, and

7

reconciling payments. RCM companies generate revenue by charging fees tied to the claims they submit and the reimbursement they secure on behalf of their provider clients.

26. To perform these services, RCM companies rely upon stable electronic claims transmission pathways and payment processing systems that connect providers to payors. These electronic transaction systems are not optional conveniences; they are the core infrastructure through which claims are transmitted and reimbursement revenue flows.

27. Plaintiff integrated its billing operations and workflows with Change Healthcare's transaction processing systems in order to submit claims and receive payment data on behalf of its provider clients. Plaintiff's ability to generate revenue depended upon the uninterrupted functioning of those systems.

28. When Change's systems became unavailable following the Data Breach, Plaintiff was unable to timely submit claims, process reimbursements, or maintain normal billing workflows. Because Plaintiff's compensation is directly tied to the submission and collection of claims, disruption of claims processing directly impaired Plaintiff's revenue generation, client relationships, and financial stability.

29. The interruption of Change's transaction infrastructure foreseeably disrupted not only healthcare providers but also independent RCM companies whose business operations depend upon reliable claims connectivity.

### *The Data Breach*

30. On February 21, 2024, in an SEC filing, UnitedHealth Group announced that "a suspected nation-state associated cyber security thread actor had gained access to some of the Change Healthcare information technology systems."[14] After detecting the breach, UHG claimed

---

[14] *UnitedHealth Group Incorporation Form 8-K*, SEC (Feb. 21, 2024), https://www.sec.gov/Archives/edgar/data/731766/000073176624000045/unh-20240221.htm.

8

to have "proactively isolated the impacted systems from other connecting systems..."[15] UHG also said it was "working with law enforcement" and allegedly "notified customers, clients and certain government agencies" of the breach.[16] UnitedHealth Group disclosed that the "network interruption [was] specific to Change Healthcare..."[17]

31. Blackcat disclosed that the exfiltrated data includes millions of: "active US military/navy personnel PII," "medical records," "dental records," "payments information," "Claims information," "Patients PII including Phone numbers/addresses/SSN/emails/etc...," "3000+ source code files for Change Health solutions...," "Insurance records," and "many many more." Blackcat warned UHG that "you are walking on a very thin line be careful you just might fall over."

32. The Change Platform was disconnected following the Data Breach. Through the Change Platform, healthcare providers—who have paid for this service—submit insurance claims. These claims are sent to health insurance companies to evaluate and process. Providers then receive reimbursement payments from the insurance company.

33. Because of the Breach, the Change Platform remained inoperable for weeks.

34. The Change Platform handles 15 billion healthcare transactions (or about one-in-three U.S. patient records). That means that the normal method of transmitting claims for payment has been disrupted for a huge swath of providers' claims. Moreover, many providers *only* use Change for claims submission, meaning that for those providers, the impact has been to completely stop the flow of payments.

---

[15] *Id.*
[16] *Id.*
[17] *Id.*

9

35. As a result, revenue cycle management companies, like Plaintiff, lost their ability to bill and submit claims on behalf of their provider clients during the outage period. Thus, Plaintiff could not bill for its services tied to those claims.

36. The potential impact of the Data Breach is enormous, and its effects have delt a significant blow to Plaintiff's financial stability.

### *UnitedHealth Group CEO Confirms Lack of Multi-Factor Authentication Caused the Breach*

37. UnitedHealth Group's Chief Executive Officer, Andrew Witty, testified on May 1, 2024, in a hearing before the U.S. Senate's Committee on Finance, which is available to stream at https://www.finance.senate.gov/hearings/hacking-americas-health-care-assessing-the-change-healthcare-cyber-attack-and-whats-next.

38. Defendant UnitedHealth Group, whose revenue last year alone was $324 billion, owns Change Healthcare.

39. Although UnitedHealth Group had acquired Change Healthcare a year and a half earlier, and knew that its technology systems were old and out-of-date, it still failed to implement multi-factor authentication—even though such implementation can be accomplished in a matter of days or weeks if a company is motivated to do so, as can be seen by the rate of speed at which the company implemented multi-factor authentication after discovering the Breach.

40. Senator Wyden remarked that Defendant owe the American people an explanation regarding why they did not protect their systems with multi-factor authentication before the Breach and why their disaster and incident response planning so woefully inadequate such that they were unable to recover in a timely manner in that the company "flunked both" the need to protect data and the need to have important redundancies in place to recover and prevent harm to providers and patients.

10

41. Because the healthcare industry is one of the top targets of ransomware, as multiple Senators noted, Change Health and UnitedHealth Group should have known that it had a duty to implement reasonable cybersecurity protections, including the most basic best practices like multi-factor authentication.

42. As Senator Wyden remarked, the credit monitoring that Defendant are offering is "cold comfort" to the many millions of Americans who are still "in the dark" about how much of the sensitive information was stolen by cybercriminals.

43. Senator Wyden later noted that the attack could have been prevented by implementing "cybersecurity 101."

44. Indeed, Mr. Witty confirmed that the company had a policy requiring multi-factor authentication on all of its external facing systems and simply failed to ensure that its own internal policies were followed.

45. Senator Wyden further noted that small mental health providers, like Plaintiff, "have been left holding the bag" while being "unable to get straight answers" after what many consider the largest healthcare data breach "in American history."

46. Senator Crapo further noted: "For patients, the emotional and financial effects of leaked private information can have a devastating impact for years."

47. In his opening remarks, CEO Andrew Witty confirmed that the "the portal [the hackers] accessed was not protected by multi-factor authentication."

48. He then confirmed that the exfiltrated data contained the sensitive personally identifiable information and protected health information of a "substantial proportion of people in America."

11

49. Senator Wyden then asked, "How much longer will a provider who sent in a claim for services delivered in February have to wait in order to be paid?" Although Mr. Witty testified that he believed payments were essentially back to normal, providers across the across—including Plaintiff—still wait to be paid.

50. As Senator Warren later pointedly and correctly remarked, the Breach has put "hundreds of thousands" of medical providers "on the brink of collapse."

### *The Data Breach was Preventable*

51. As was made evident in the Congressional hearing, Change's cybersecurity practices and policies were inadequate and fell short of the industry-standard measures that should have been implemented long before the Data Breach occurred. This is especially true given that the healthcare industry is frequently one of the most targeted sectors for cyberattacks. Attacks using stolen credentials have increased precipitously over the last several years.

52. Healthcare providers and their affiliates like Change are prime targets because of the information they collect and store, including financial information of patients, login credentials, insurance information, medical records and diagnoses, and personal information of employees and patients—all extremely valuable on underground markets.

53. This was known and obvious to Change as it observed frequent public announcements of data breaches affecting healthcare providers and knew that information of the type it collected, maintained, and stored is highly coveted and a frequent target of hackers.

54. Given that the PHI it collected made it an obvious target for cybercriminals and because of the prevalence of dual extortion events in which data is exfiltrated and ransomware is deployed, Defendant Change should have known that it systems were at risk of being taken offline such that it should have been prepared with tested, reasonable, and industry standard incident response, business continuity, and disaster recovery plans.

12

55. According to the Federal Bureau of Investigation (FBI), phishing schemes designed to induce individuals to reveal personal information, such as network passwords, were the most common type of cybercrime in 2020, with such incidents nearly doubling in frequency between 2019 and 2020.[18] According to Verizon's 2021 Data Breach Investigations Report, 43% of breaches stemmed from phishing and/or pretexting schemes.[19]

56. The risk is so prevalent for healthcare providers that on October 28, 2020, the FBI and two federal agencies issued a "Joint Cybersecurity Advisory" warning that they have "credible information of an increased and imminent cybercrime threat to U.S. hospitals and healthcare providers."[20] The Cybersecurity and Infrastructure Security Agency (CISA), the Department of Health and Human Services (HHS), and the FBI issued the advisory to warn healthcare providers to take "timely and reasonable precautions to protect their networks from these threats."[21]

57. One of the most common and expected technical security barriers used to protect consumer data is multi-factor authentication. This technical safeguard is ubiquitous and is industry standard for even small organizations. Change failed to implement multi-factor authentication to protect its systems and the PII it collected, resulting in this Data Breach.

---

[18] *2020 Internet Crime Report*, FBI INTERNET CRIME COMPLAINT CENTER (last visited June. 13, 2024), https://www.ic3.gov/Media/PDF/AnnualReport/2020_IC3Report.pdf ).

[19] *2021 DBIR Master's Guide*, VERIZON (last visited Mar. 1, 2024), https://www.verizon.com/business/resources/reports/dbir/2021/masters-guide/ (subscription required).

[20] CISA, FBI & Dep't Health & Human Servs., *Joint Cybersecurity Advisory: Ransomware Activity Targeting the Healthcare and Public Health Sector* (October 29, 2020), https://us-cert.cisa.gov/sites/default/files/publications/AA20-302A_Ransomware%20_Activity_Targeting_the_Healthcare_and_Public_Health_Sector.pdf .

[21] *Id.*

58.     In addition to user training to spot phishing attacks (and tests to ensure users learn from their training), multi-factor authentication is among the most widely adopted cybersecurity controls and is undoubtedly expected in the healthcare industry.

59.     CISA guidance encourages organizations to prevent unauthorized access by:

- Conducting regular vulnerability scanning to identify and address vulnerabilities, particularly on internet-facing devices;

- Regularly patching and updating software to latest available versions, prioritizing timely patching of internet-facing servers and software processing internet data;

- Ensuring devices are properly configured and that security features are enabled;

- Employing best practices for use of Remote Desktop Protocol (RDP) as threat actors often gain initial access to a network through exposed and poorly secured remote services; and

- Disabling operating system network file sharing protocol known as Server Message Block (SMB) which is used by threat actors to travel through a network to spread malware or access sensitive data.[22]

60.     The CISA guidance further recommends use of a centrally managed antivirus software utilizing automatic updates that will protect all devices connected to a network (as opposed to requiring separate software on each individual device), as well as implementing a real-time intrusion detection system that will detect potentially malicious network activity that occurs

---

[22] Multi-State Information Sharing & Analysis Center, Ransomware Guide 4, CISA.GOV (Sept. 2020), https://www.cisa.gov/sites/default/files/publications/CISA_MS-ISAC_Ransomware%20Guide_S508C_.pdf.

14

prior to ransomware deployment.[23] Likewise, the principle of least privilege (POLP) to all systems should be applied to all systems so that users only have the access they need to perform their jobs.[24]

61.     Despite holding the PHI of millions of patients, Change failed to adhere to these basic industry standards. Indeed, had Change implemented common-sense security measures like multi-factor authentication, the hackers would never have accessed millions of patient files and the breach would have been prevented or would have been significantly smaller in scope. Change also lacked the necessary safeguards to detect and prevent phishing attacks and failed to implement adequate monitoring or control systems to detect the unauthorized infiltration after it occurred.

62.     Change, like any entity in the healthcare industry its size storing valuable data, should have had robust protections in place to detect and terminate a successful intrusion long before access and exfiltration could expand to millions of patient files. Change's below-industry-standard procedures and policies are inexcusable given its knowledge that it was a prime target for cyberattacks.

### The Aftermath of the Data Breach

63.     Because of the Data Breach, Change disconnected certain systems including its Change Platform used by healthcare providers nationwide in connection with payment and treatment. Change did this without an adequate substitute. This decision decimated healthcare practices like Plaintiff nationwide.

64.     Because Change disconnected the Change Platform, many healthcare providers lost their primary (and in some cases their *only*) source of processing payments for their services through patients' healthcare plans and thus did not receive payment or received only a fraction of

---

[23] *Id.* at 5.
[24] *Id.* at 6.

what they were owed. Healthcare providers are absorbing these upfront costs, which risks their ability to continue operating their businesses.

65. A dwindling account balance coupled with outstanding reimbursement has put many healthcare providers in a precarious position, including Plaintiff. For instance, Arlington Urgent Care, a chain of five urgent care centers around Columbus, Ohio, has about $650,000 in unpaid insurance reimbursements. The owners have taken lines of credit from banks and used their personal saving to stay in business.[25] Other healthcare providers are racking up duplicated payment software charges. Florida Cancer Specialists and Research Institute in Gainesville switched to two other healthcare software platforms because "it spends $300 million a month on chemotherapy and other drugs for patients whose treatments cannot be delayed."[26] And some healthcare providers are cutting resources for patients to persevere through this. A Philadelphia-based primary care practice with 20 clinicians has mailed off "hundreds and hundreds" of pages Medicare claims and is contemplating cutting expenses by "reducing the supply of vaccines the clinic has on hand."[27]

66. Because of the Data Breach, many healthcare providers, like Plaintiff, did not receive Change's services that they paid for, and without these services, these providers and practices struggled to care for patients and lost significant amounts of money. As such, Plaintiff did not receive the benefit of its bargain with Change because it paid for the value of services it did not receive.

67. Moreover, revenue cycle management organizations, like Plaintiff, lost a significant portion of their revenue. Because the Data Breach disrupted electronic claim

---

[25] Reed Abelson & Julie Creswell, *Cyberattack Paralyzes the Largest U.S. Healthcare Payment System*, NYTIMES (Mar. 7, 2024), https://www.nytimes.com/2024/03/05/health/cyberattack-healthcare-cash.html.
[26] *Id.*
[27] *Id.*

16

submissions and clearinghouse functions, these organizations could not submit claims for their provider clients.

68.     As such, revenue cycle management organizations could not bill for their own services tied their clients' claims. Moreover, these organizations lost provider clients whose departures stemmed from the disruptions and perceived instability resulting from the Data Breach.

### Plaintiff Red House Medical Billing MI LLC Has Suffered Significant Losses

69.     Specifically, Plaintiff, as an RCM company, operates to process medical billing payments of its provider clients' claims through Change's platforms.

70.     The Change Healthcare Data Breach significantly disrupted Plaintiff's billing operations and reimbursement processes. As a result, Plaintiff experienced reduced invoicing activity and cash flow interruption because it was unable to process claims for providers due to the platform interoperability.

71.     Because Plaintiff's profits are primarily derived from its ability to file insurance claims on behalf of its provider clients, the inability to process such claims in a timely manner devastated Plaintiff's business.

72.     Plaintiff experienced a measurable reduction in revenue during the affected period.

73.     Additionally, because of the sharp reduction in incoming revenue, Plaintiff obtained an interest-bearing loan to maintain business continuity.

74.     Plaintiff has also spent hundreds of hours attempting to file and refile claims on behalf of its provider clients and attempting to be paid for the work had already performed.

75.     The time Plaintiff has had to spend responding to the Breach has included time spent understanding the Data Breach and how Plaintiff's clients patients have been affected, contacting individuals and entities to seek assistance, problem solved unpaid charges, sitting on

17

hold for excessive periods likely due to call volumes, discussing claims with Defendant's representative's, and meeting with banks to discuss the financial issues caused by the Data Breach.

76. Plaintiff has furthermore spent considerable time and effort examining and re-examining claims to determine which ones went through successfully and which ones did not.

77. Plaintiff has also incurred substantial increases in personnel costs due to manual claim research, resubmissions, and client communications.

78. Moreover, Plaintiff has suffered significant additional harm in the form of lost business opportunities because of the amount of time Plaintiff has had to spend responding to the Data Breach and the perceived reliability of Plaintiff's business model. Plaintiff has spent hundreds of hours on the phone attempting to be paid for clients' claims.

79. Even further, along with missed opportunities for new clients, several of Plaintiff's current clients went out of business following the disruption, permanently eliminating associated revenue streams.

80. The combined effects of lost invoicing, financing costs, increased payroll expenses, and client attrition materially damaged Plaintiff's business

81. Due to the substantial reduction in billable activity and cash flow, Plaintiff estimates total direct damages of approximately $600,000, including approximately $200,000 just from lost invoicing opportunities.

82. Plaintiff also suffered additional incidental and consequential harm associated with the interruption of its billing operations and reduced client activity during and after the outage period.

83. The financial impact of the Data Breach materially impaired Plaintiff's business operations.

18

84. Because of the data breach, Plaintiff faces the serious risk to its current and future success.

### *Change Failed to Comply with Federal Law and Regulatory Guidance*

85. Change is covered by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") (see 45 C.F.R. § 160.102) and as such is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

86. These rules establish national standards for the protection of patient information, including PHI, defined as "individually identifiable health information" which either "identifies the individual" or where there is a "reasonable basis to believe the information can be used to identify the individual," that is held or transmitted by a healthcare provider. 45 C.F.R. § 160.103.

87. HIPAA limits the permissible uses of "protected health information" and prohibits unauthorized disclosures of "protected health information."[28]

88. HIPAA requires that Change implement appropriate safeguards for this information.[29]

89. HIPAA requires that Change provide notice of a breach of unsecured protected health information, which includes protected health information that is not rendered unusable, unreadable, or indecipherable to unauthorized persons—i.e. non-encrypted data.[30]

---

[28] 45 C.F.R. § 164.502.
[29] 45 C.F.R. § 164.530(c)(1).
[30] 45 C.F.R. § 164.404; 45 C.F.R. § 164.402.

90.     Despite these requirements, Change failed to comply with its duties under HIPAA and its own privacy policies. Indeed, Change failed to:

a.  Maintain an adequate data security system to reduce the risk of data breaches and cyberattacks;

b.  Adequately protect the PHI of patients;

c.  Ensure the confidentiality and integrity of electronically protected health information created, received, maintained, or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

d.  Implement technical policies and procedures for electronic information systems that maintain electronically protected health information to allow access only to those persons or software programs that have been granted access rights, in violation of 45 C.F.R. § 164.312(a)(1);

e.  Implement adequate policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R. § 164.308(a)(1)(i);

f.  Implement adequate procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports, in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

g.  Protect against reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 C.F.R. § 164.306(a)(3);

h.  Maintain and test sufficient incident response, business continuity, and disaster recovery plans;

20

i. Ensure compliance with the electronically protected health information security standard rules by their workforces, in violation of 45 C.F.R. § 164.306(a)(4); and/or

j. Train all members of their workforces effectively on the policies and procedures with respect to protected health information as necessary and appropriate for the members of their workforces to carry out their functions and to maintain security of protected health information, in violation of 45 C.F.R. § 164.530(b).

91. Additionally, federal agencies have issued recommendations and guidelines to help minimize the risks of a data breach for businesses holding sensitive data. For example, the Federal Trade Commission ("FTC") has issued numerous guides for business highlighting the importance of reasonable data security practices, which should be factored into all business-related decision making.[31]

92. The FTC's publication *Protecting Personal Information: A Guide for Business* sets forth fundamental data security principles and practices for businesses to implement and follow as a means to protect sensitive data.[32] Among other things, the guidelines note that businesses should (a) protect the personal customer information that they collect and store; (b) properly dispose of personal information that is no longer needed; (c) encrypt information stored on their computer networks; (d) understand their network's vulnerabilities; and (e) implement policies to correct security problems. The FTC guidelines further recommend that businesses use an intrusion

---

[31] *Start with Security*, FTC (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

[32] *Protecting Personal Information* (October 2016), FTC, https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

21

detection system, monitor all incoming traffic for unusual activity, monitor for large amounts of data being transmitted from their system, and have a response plan ready in the event of a breach.[33]

93.     Additionally, the FTC recommends that companies limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security; monitor for suspicious activity on the network, and verify that third-party service providers have implemented reasonable security measures.[34] This is consistent with guidance provided by the FBI, HHS, and the principles set forth in the CISA 2020 guidance.

94.     The FTC has brought enforcement actions against businesses for failing to reasonably protect customer information, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.[35]

95.     Change was fully aware of its obligation to implement and use reasonable measures to protect the PHI of the patients but failed to comply with these basic recommendations and guidelines that would have prevented this breach from occurring. Change's failure to employ reasonable measures to protect against unauthorized access to patient information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

---

[33] *Id.*

[34] Start With Security, supra note 33.

[35] *Privacy and Security Enforcement* (last visited June 13, 2024), FTC, https://www.ftc.gov/news-events/media-resources/protecting-consumer-privacy/privacy-security-enforcement.

22

## CLAIMS FOR RELIEF

### COUNT I
### Negligence and Gross Negligence

96.     Plaintiff re-alleges and incorporates all preceding factual paragraphs as though fully set forth herein.

97.     Change collected, processed, stored, and transmitted protected health information and claims data in connection with its healthcare transaction processing systems. Because of the significant amount of PHI and PII maintained within its systems, Change knew it was a likely and foreseeable target for cybercriminals.

98.     Change operated critical healthcare transaction infrastructure upon which independent revenue cycle management companies, including Plaintiff, depended in order to submit claims, process reimbursements, and generate revenue for their provider clients and for themselves. Change knew that interruption of its systems would directly impair the business operations and revenue streams of downstream RCM companies such as Plaintiff.

99.     That is, because of its significant market share, and its role as a claim clearinghouse, Change knew that Plaintiff relied heavily on it to process such claims and knew that an interruption in that service would place Plaintiff's business operations in financial peril.

100.     Change owed Plaintiff a duty to exercise reasonable care in protecting its systems and the sensitive data entrusted to it from the foreseeable harms of a data breach, including foreseeable operational disruption to entities that relied on its transaction processing infrastructure.

101.     Change owed Plaintiff a duty to exercise reasonable care in protecting it from the foreseeable harms of a data breach. Change acknowledged this duty in its privacy policies, where it promised not to disclose PHI, including SSNs, without authorization and to abide by all federal laws and regulations.

23

102. Given the ubiquity and prevalence of ransomware attacks in the healthcare sector and the well-known dependence of billing companies and providers on centralized electronic claims infrastructure, Change knew that failure to implement reasonable security protocols—including multi-factor authentication and adequate incident response, business continuity, and disaster recovery planning—could result in catastrophic downstream harm.

103. Change owed Plaintiff a duty of care to provide adequate data security consistent with industry standards and regulatory requirements, and to maintain its systems in a manner reasonably calculated to ensure their security and availability.

104. Change's duty to use reasonable care in protecting PHI arose from common law principles, applicable federal law including HIPAA and related regulations, industry cybersecurity standards, and Change's own public representations regarding privacy, security, and system reliability.

105. The foreseeability of harm was obvious. Change knew it operated infrastructure that processed billions of healthcare transactions and that independent RCM companies such as Plaintiff relied upon uninterrupted connectivity to perform their services and generate revenue.

106. Change knew or should have known of the risks inherent in maintaining centralized healthcare transaction systems, its vulnerability to credential-based attacks, and the critical importance of maintaining adequate security safeguards and continuity measures.

107. Change breached its duty to Plaintiff in numerous ways, including by:

- Failing to exercise reasonable care and implement adequate security systems and protocols sufficient to protect sensitive healthcare transaction data and maintain system availability;

24

- Failing to implement and enforce multi-factor authentication on externally accessible systems;

- Failing to maintain sufficient business continuity, disaster recovery, and incident response plans;

- Failing to comply with industry-standard cybersecurity measures applicable to healthcare transaction infrastructure;

- Failing to comply with its own privacy policies and internal security requirements;

- Failing to adequately monitor and ensure the security of its network and systems.

108. Change's failure to implement basic and widely accepted cybersecurity safeguards despite known ransomware threats targeting healthcare infrastructure constitutes conscious disregard of an extreme and foreseeable risk and amounts to gross negligence.

109. Change would not have disconnected or rendered inoperable its transaction processing systems but for its wrongful and grossly negligent breach of its duties. It was foreseeable that a data breach resulting from inadequate safeguards would require Change to take systems offline, thereby disrupting downstream RCM operations.

110. Change's failure to take proper security measures created conditions conducive to a foreseeable criminal act, namely unauthorized access to and disruption of its systems. It was also foreseeable that the resulting system shutdown would disrupt independent revenue cycle management companies' ability to submit claims, process reimbursements, and fulfill obligations to their clients.

111. As a direct and proximate result of Change's negligence and gross negligence, Plaintiff has suffered damages including lost revenue tied to claims submission, lost invoicing opportunities, increased labor costs associated with manual workarounds and resubmissions, interest expenses on emergency financing, diversion of management resources, client attrition, and lost business opportunities.

## COUNT II
### Negligence Per Se

112. Plaintiff re-alleges and incorporates all preceding factual paragraphs as though fully set forth herein.

113. Change had a duty to implement and maintain reasonable data security practices pursuant to Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a), which prohibits unfair acts or practices in or affecting commerce, including the unfair practice of failing to use reasonable measures to protect sensitive and confidential information.

114. The FTC Act prohibits unfair practices in or affecting commerce, including the failure by businesses engaged in healthcare transaction processing to implement reasonable and appropriate data security safeguards.

115. Change collected, stored, transmitted, and maintained protected health information and claims data as part of its regular business operations in interstate commerce.

116. Change violated the FTC Act by failing to implement reasonable security safeguards and continuity planning sufficient to protect its systems and the data entrusted to it.

117. Change's violations of the FTC Act constitute negligence per se.

118. Plaintiff is within the persons the FTC Act was intended to protect, including businesses harmed by unfair practices affecting commerce.

26

119. The harm that occurred as a result of the Data Breach, including system disruption and economic injury to downstream businesses, is the type of harm the FTC Act was intended to guard against.

120. Change also had a duty to implement and maintain reasonable safeguards pursuant to the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and its implementing regulations.

121. HIPAA requires covered entities and business associates to implement appropriate administrative, technical, and physical safeguards to ensure the confidentiality, integrity, and availability of electronic protected health information.

122. Pursuant to HIPAA's implementing regulations, Change was required to conduct risk analysis, implement risk management procedures, establish access controls and authentication safeguards, implement security incident procedures, and maintain contingency and disaster recovery plans.

123. Change violated HIPAA by failing to implement reasonable and appropriate safeguards, including multi-factor authentication and adequate contingency planning.

124. Change's violations of HIPAA constitute negligence per se.

125. Plaintiff is within the persons HIPAA was intended to protect, including entities whose operations depend upon secure and reliable handling of protected health information.

126. The harm that occurred—including operational disruption and economic injury resulting from system unavailability—is the type of harm HIPAA was intended to prevent.

127. As a direct and proximate result of Change's negligence per se, Plaintiff suffered economic losses as described herein.

27

128. Plaintiff's injuries were the direct and proximate result of Change's statutory and regulatory violations.

**COUNT III**
**Unjust Enrichment**

129. Plaintiff re-alleges and incorporates all preceding factual paragraphs as though fully set forth herein.

130. Plaintiff has an interest, both equitable and legal, in the injuries that arose from Change's wrongful conduct.

131. Plaintiff conferred a benefit on Change in the form of monetary payments for access to and use of the Change Platform.

132. Change appreciated and had knowledge of the benefits conferred upon it by Plaintiff.

133. In exchange for receiving Plaintiff's payments, which provided Change commercial gain, Change was expected to provide uninterrupted access to and use of the Change Platform and to maintain reasonable safeguards to ensure its continued operation. However, following the Data Breach, Change disconnected the Change Platform and failed to provide the services for which Plaintiff paid.

134. Because of Change's conduct, Plaintiff suffered actual damages as described herein. Under principles of equity and good conscience, Change should be compelled to disgorge all unlawful or inequitable proceeds it received from Plaintiff for services it failed to provide.

**COUNT IV**
**Tortious Interference with Business Relationships and Business Expectancies**

135. Plaintiff re-alleges and incorporates all preceding factual paragraphs as though fully set forth herein.

28

136. At all relevant times, Plaintiff maintained valid and ongoing business relationships and service agreements with healthcare provider clients under which Plaintiff provided revenue cycle management and billing services.

137. Plaintiff also maintained valid business expectancies in the continuation of those client relationships and in the submission and collection of claims arising from services performed on behalf of those clients.

138. Change knew that independent RCM companies, including Plaintiff, relied upon its transaction processing systems to perform their contractual obligations and generate revenue.

139. Change engaged in improper conduct and employed improper means, including:

140. Failing to implement basic and industry-standard cybersecurity safeguards despite well-known ransomware threats;

141. Failing to implement multi-factor authentication;

142. Failing to maintain adequate incident response and continuity planning;

143. Violating statutory and regulatory duties;

144. Representing that it maintained reasonable and reliable security safeguards while failing to do so.

145. Change knew or should have known that failure to implement such safeguards would foreseeably disrupt the ability of RCM companies to perform their obligations to clients.

146. As the Restatement explains, as used throughout the Restatement of Torts, intent "has reference to the consequences of an act rather than the act itself." Restatement (Second) of Torts § 8A, cmt. A (1964). "Intent is not, however, limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from her act,

and still goes ahead, she is treated by the law as if she had in fact desired to produce the result." *Id.* cmt. B.

147. Indeed, given the foreseeability of the harms inherent in data breaches and the ubiquitous nature of data breaches, Defendants were substantially certain that its failure to implement reasonable cybersecurity standards would lead to an interference with Plaintiff and its clients relationship and expectations.

148. Acting with knowledge, Defendants had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiff.

149. Change's actions constitute improper means. Indeed, Change's failures to prevent the Data Breach were a direct result from knowing failure to follow established industry and statutory cybersecurity standards.

150. Indeed, one of the most common and expected technical security barriers used to protect consumer data is multi-factor authentication. This technical safeguard is ubiquitous and is industry standard for even small organizations. Change failed to implement multi-factor authentication to protect its systems and the PII it collected, resulting in this Data Breach.

151. Moreover, Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR.DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

152. As a direct result of Change's improper conduct, its system shutdown prevented Plaintiff from timely submitting claims and collecting reimbursement on behalf of its clients.

30

153. The disruption interfered with Plaintiff's contractual relationships and business expectancies with its clients, including by causing lost revenue, missed timely filing deadlines, client dissatisfaction, and client attrition.

154. Change's conduct was intentional in that it knowingly disregarded the substantial and foreseeable risk that failure to implement required safeguards would disrupt downstream businesses.

155. As a direct and proximate result of Change's tortious interference, Plaintiff suffered lost revenue, lost clients, increased operational costs, reputational harm, and other damages as described herein.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the following relief:

A. That the Court grant permanent injunctive relief to prohibit and prevent Change from continuing to engage in the unlawful acts, omissions, and practices described herein;

B. That the Court award Plaintiff compensatory, consequential, and general damages, including nominal damages as appropriate, for each count as allowed by law in an amount to be determined at trial;

C. That the Court award statutory damages, trebled, and/or punitive or exemplary damages, to the extent permitted by law;

D. That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Change as a result of their unlawful acts, omissions, and practices;

E. That Plaintiff be granted the declaratory and injunctive relief sought herein;

F. That the Court award to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses; and

31

G. That the Court award pre-and post-judgment interest at the maximum legal rate and all such other relief as it deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial in the instant action.

Dated: February 23, 2026

/s/ J. Gerard Stranch, IV
J. Gerard Stranch, IV (BPR #23045)
Grayson Wells (BPR #039658)
**STRANCH, JENNINGS & GARVEY, PLLC**
223 Rosa L. Parks Ave., Suite 200
Nashville, TN 37203
Tel: (615) 254-8801
gstranch@stranchlaw.com
gwells@stranchlaw.com

Tracy W. Houck (*Pro Hac Vice* forthcoming)
**LAW OFFICE OF TRACY HOUCK, LLC**
301 South Bonner Street
Ruston, LA 71270
Tel: (318) 255-4066
Fax: (318) 255-8520
thouck@suddenlinkmail.com

Landon N. Tooker (*Pro Hac Vice* forthcoming)
**TOOKE LAW, LLC**
218 Orchard Valley Circle
Ruston, LA 71270
Tel: (318) 955-9730
landon@tookelaw.com

*Counsel for Plaintiff*

**IN THE CIRCUIT COURT OF DAVIDSON COUNTY, TENNESSEE**
**AT NASHVILLE**

RED HOUSE MEDICAL BILLING MI LLC,

       Plaintiff,

v.                                                                                       Case No. 26C525

CHANGE HEALTHCARE INC.,

       Defendant.

## MOTION TO STAY DEADLINE TO FILE RESPONSIVE PLEADING AND FOR LIMITED JURISDICTIONAL DISCOVERY

Defendant Change Healthcare Inc., by and through undersigned counsel, respectfully moves this Court for an entry of an Order staying its deadline to file a responsive pleading for a limited period to permit Defendant to conduct jurisdictional discovery regarding Plaintiff Red House Medical Billing MI LLC's citizenship for the purpose of assessing whether removal to federal court is proper.  Granting the stay will not harm Plaintiff and will avoid the unnecessary burden on this Court of litigating an action that will eventually be removed if diversity exists.

WHEREFORE, for the reasons set forth in Defendant's supporting memorandum, Defendant requests that the Court stay Defendant's deadline to file a responsive pleading so that it may conduct limited jurisdictional discovery regarding Plaintiff's citizenship to determine if diversity jurisdiction exists.

Dated: March 27, 2026

Respectfully submitted,

*/s/ E. Todd Presnell*
E. Todd Presnell (BPR 017521)
Andrew W. Tao (BPR No. 41344)
**BRADLEY ARANT BOULT CUMMINGS LLP**
One 22 One
1221 Broadway, Suite 2400
Nashville, TN 37203
T. (615) 252-2355
F. (615) 252-6355
tpresnell@bradley.com
atao@bradley.com

*Counsel for Defendant Change Healthcare Inc.*

## NOTICE OF HEARING

**DEFENDANT HEREBY SETS THIS MOTION TO BE HEARD ON
MAY 15, 2026 AT 9:00 A.M.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing document, which was filed with the Court through the

electronic filing system, will be sent electronically to the following parties:

J. Gerard Stranch, IV
Grayson Wells (BPR #039658)
STRANCH, JENNINGS & GARVEY, PLLC
223 Rosa L. Parks Ave., Suite 200
Nashville, TN 37203
Tel: (615) 254-8801
gstranch@stranchlaw.com
gwells@stranchlaw.com

Tracy W. Houck
LAW OFFICE OF TRACY HOUCK, LLC
301 South Bonner Street
Ruston, LA 71270
Tel: (318) 255-4066
Fax: (318) 255-8520
thouck@suddenlinkmail.com

Landon N. Tooker
TOOKE LAW, LLC
218 Orchard Valley Circle
Ruston, LA 71270
Tel: (318) 955-9730
landon@tookelaw.com

Dated: March 27, 2026

/s/ E. Todd Presnell
E. Todd Presnell

-3-

**IN THE CIRCUIT COURT OF DAVIDSON COUNTY, TENNESSEE**
**AT NASHVILLE**

RED HOUSE MEDICAL BILLING MI LLC,

      Plaintiff,

v.                                                                    Case No. 26C525

CHANGE HEALTHCARE INC.,

      Defendant.

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO**
**STAY DEADLINE TO FILE RESPONSIVE PLEADING AND FOR**
**LIMITED JURISDICTIONAL DISCOVERY**

Defendant Change Healthcare Inc. hereby respectfully moves this Court for entry of an Order staying its deadline to file a responsive pleading for a limited period to permit Defendant to conduct jurisdictional discovery regarding Plaintiff Red House Medical Billing MI LLC's citizenship for the purpose of assessing whether removal to federal court is proper.

**INTRODUCTION**

Plaintiff initiated this action in this Court but failed to plead the citizenship of its LLC members. Plaintiff alleges it is a limited liability company organized under the laws of Michigan with its principal place of business in Michigan. However, a limited liability company is deemed to have the citizenship of each of its members for purposes of diversity jurisdiction. The Complaint did not plead that information, and the identities of an LLC's members generally are not publicly available. Defendant therefore requested that Plaintiff voluntarily provide the limited information needed to determine the citizenship of Plaintiff and its members. Defendant explained that if Plaintiff did not provide the information, Defendant would have to move this Court for limited discovery of the information, as well as a stay during that discovery. Plaintiff has not provided the citizenship information requested by Defendant.

Without Plaintiff's citizenship information, Defendant cannot determine whether complete diversity exists under 28 U.S.C. § 1332 and cannot determine whether removal to federal court is appropriate, despite having a right to remove if diversity exists.  Therefore, Defendant moves this Court for a temporary stay of its responsive pleading deadline to allow for limited, targeted discovery of the identity and citizenship of Plaintiff and its members.  During the stay, Defendant intends to serve only one interrogatory for solely this information.  Granting the stay will not harm Plaintiff and will avoid the unnecessary burden on this Court of litigating an action that will eventually be removed if diversity exists.

**BACKGROUND**

Plaintiff filed its Complaint on February 23, 2026, identifying itself as "a Michigan limited liability company with its principal place of business at 28345 Beck Road, Wixom, Michigan 48393."  Compl. ¶ 14.  The Complaint does not identify Plaintiff's members or their citizenship. Defendant is a corporation formed under the laws of Delaware, and its principal place of business is in Minnesota.  Based on Plaintiff's pleading that it is a Michigan entity with its principal place of business in Michigan, Defendant believes that Plaintiff and Defendant likely are diverse. But without the citizenship of Plaintiff's LLC members, Defendant lacks information sufficient to confirm diversity for the purpose of removal.

Defendant was served with the Summons and Complaint in the State Court Action on February 25, 2026.  Thus, Defendant's responsive pleading is due by March 27, 2026, thirty days after service.  *See* Tenn. R. Civ. P. 12.01.  Without discovery into Plaintiff's membership and citizenship, Defendant cannot at this time ascertain whether federal diversity jurisdiction exists or whether removal is appropriate.

Defendant conferred with Plaintiff regarding an exchange of citizenship information but

-2-

was unable to come to an agreement.  Given the impending deadlines, Defendant is filing this Motion to stay this matter until the completion of limited jurisdictional discovery to determine Plaintiff's citizenship.

## **ARGUMENT**

"[Q]uestions of stay or continuance are matters entrusted to the sound discretion of the trial judge."  *Sanjines v. Ortwein & Associates, P.C.*, 984 S.W.2d 907, 909 (Tenn. 1998).  Likewise, a decision to permit limited jurisdictional discovery is a discretionary matter for the trial court to determine.  *First Cmty. Bank, N.A. v. First Tenn. Bank, N.A.*, 489 S.W.3d 369, 402, 406 (Tenn. 2015); *Willeford v. Klepper*, 597 S.W3d 454, 470 (Tenn. 2020).  This is consistent with the well-established principle that "trial courts possess broad discretionary authority to control their dockets and the proceedings in their courts[.]"  *Barnett v. Tenn. Orthopaedic All.*, 391 S.W.3d 74, 79 (Tenn. Ct. App. Sept. 19, 2012).  A temporary stay is appropriate where it will promote efficiency and avoid unnecessary litigation.  *See Bell v. Todd*, 206 S.W.3d 86, 94 (Tenn. Ct. App. Sept. 14, 2005).

## I.      **Removal Based on Diversity Jurisdiction**

A federal district court has jurisdiction over a case based on diversity of citizenship when the parties are citizens of different states and the amount in controversy is more than $75,000.  28 U.S.C. § 1332(a)(1).   If diversity jurisdiction exists, a defendant may remove a case originally filed in state court to the federal district court whose district includes the location of the state court where the suit was filed.  28 U.S.C. § 1441(a).  "When diversity jurisdiction is invoked in a case in which a limited liability company is a party, the court needs to know the citizenship of each member of the company."  *US Framing Int'l LLC v. Cont'l Bldg. Co.*, 134 F.4th 423, 428 (6th Cir. 2025) (quoting *Delay v. Rosenthal Collins Grp., LLC*, 585 F.3d 1003, 1005 (6th Cir. 2009)).  Removal petitions are strictly construed, and all doubts are resolved against removal.  *Tayes v.*

*Boing US Holdco, Inc.*, No. 3:23-cv-00361, 2023 WL 6978521, at *2 (M.D. Tenn. Oct. 23, 2023).

Yet, citizenship may not be generally asserted based on "information or belief" and instead must be based on objective criteria. *Lindemann v. CEC Ent., Inc.*, No. 3:24-cv-00908, 2025 WL 284632, at *3–5 (M.D. Tenn. Jan. 23, 2025) (refusing to assert jurisdiction based on a negative jurisdictional statement i.e., the defendant is not a citizen of Maine). *See also Bishop v. Bennett Motor Express, LLC*, No. 3:24-cv-00669, 2024 WL 3488071, at *4 (M.D. Tenn. July 19, 2024) ("Thus, the removing defendants' assertion that Johnson resides in Florida, without more, is not necessarily sufficient to establish Johnson's citizenship, particularly in the face of the plaintiff's challenge based on the lack of proof as to his actual citizenship."); *Dan's Gourmet Spot, LLC v. Versa Mktg., Inc.*, No. 16-02487, 2017 WL 9807431, at *1 (M.D. Tenn. Oct. 19, 2017) ("Since the notice of removal and the third-party complaint do not identify the citizenship of each of Dan's and Valley's members, the Court cannot determine whether complete diversity of citizenship exists.").

Tennessee federal courts have admonished parties for removing without having sufficient evidence of diversity at the time of removal. *See, e.g., Avery Outdoors, LLC v. Peak Rock Cap., LLC*, No. 2:16-cv-02229-SHL-tmp, 2018 WL 11416674, at *1 (W.D. Tenn. May 14, 2018).  For example, the court in *Avery Outdoors* reprimanded the removing party for its decision to "remove first, and ask questions later," and ordered defendants to show cause as to why sanctions should not be imposed. *Id.* at *2.  The court then remanded the action when the jurisdictional statements in defendants' notice of removal were disputed by plaintiff and shown to be wrong. *Avery Outdoors, LLC v. Peak Rock Cap., LLC*, No. 2:16-cv-02229-SHL-tmp, 2018 WL 11416673, at *2–3 (W.D. Tenn. July 2, 2018).  The court went as far as informing the parties that it would entertain any request for expenses and attorneys' fees. *Id.* at *4.

-4-

In light of the foregoing, and based on the insufficient allegations in Plaintiff's Complaint, Defendant is unable to determine if complete diversity exists in this matter because it lacks information concerning Plaintiff's membership and citizenship.  Thus, the Court should exercise its discretion to order a brief stay to allow Defendant to determine whether this case properly belongs in federal court.  Absent such a stay, Defendant would be forced unnecessarily to file a responsive pleading or motion in this Court while Defendant utilizes compulsory process to discover Plaintiff's citizenship, which if diverse will lead to removal.

## II.       Limited Jurisdictional Discovery

Courts regularly permit limited jurisdictional discovery where facts necessary to determine jurisdiction are within the exclusive knowledge or control of the opposing party.  *See, e.g.*, *First Cmty. Bank*, 489 S.W.3d at 405–06.  For example, in the context of personal jurisdiction, Courts consider five factors when assessing whether to grant jurisdictional discovery:

> (1) whether the plaintiff has shown that there is a likelihood that discovery will yield facts that will influence the personal jurisdiction determination; (2) whether the plaintiff has laid out with particularity the evidence sought by discovery; (3) whether the evidence sought is the type which would normally be in the exclusive control of the defendant; (4) whether the case is particularly complex; and (5) whether the plaintiff's interest in discovery outweighs the policy concerns of subjecting a nonresident defendant to burdensome discovery at such an early stage and seeking to avoid allowing the plaintiff to conduct a "fishing expedition."

*Id.* at 406.

To the extent satisfying these factors is necessary here, all of them weigh in Defendant's favor.  *First*, discovery concerning Plaintiff's membership and citizenship will resolve the question of whether a federal court has subject-matter jurisdiction.  *Second*, Defendant has described with particularity the information it seeks: the identify Plaintiff's members and their citizenship information sufficient to determine diversity.  *Third*, the information sought is solely in possession of the Plaintiff.  *Fourth*, this is a complex case, which is reflected by the existence of a multidistrict

litigation in the District of Minnesota. *See In re: Change Healthcare, Inc. Customer Data Security Breach Litig.*, MDL No. 3108 (June 7, 2024).  *Fifth*, Defendant is not on a fishing expedition for a vast amount of burdensome information.  Defendant's requested discovery is a single interrogatory of basic information about Plaintiff—modest, targeted, and directly tied to a threshold jurisdictional issue.  Allowing such discovery promotes judicial economy by ensuring that the case proceeds in the proper forum at the outset, rather than risking later disruption through removal or remand proceedings.

## CONCLUSION

For the foregoing reasons, Defendant respectfully submits that the most efficient management of this matter is for the Court to stay its deadline to file a responsive pleading so that it may conduct limited jurisdictional discovery regarding Plaintiff's citizenship to determine if diversity jurisdiction exists.

Dated: March 27, 2026

Respectfully submitted,

*/s/ E. Todd Presnell*
E. Todd Presnell (BPR 017521)
Andrew W. Tao (BPR No. 41344)
**BRADLEY ARANT BOULT CUMMINGS LLP**
One 22 One
1221 Broadway, Suite 2400
Nashville, TN 37203
T. (615) 252-2355
F. (615) 252-6355
tpresnell@bradley.com
atao@bradley.com

*Counsel for Defendant Change Healthcare Inc.*

EFILED  03/27/26 04:01 PM  CASE NO. 26C525  Joseph P. Day, Clerk

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document, which was filed with the Court through the

electronic filing system, will be sent electronically to the following parties:

> J. Gerard Stranch, IV
> Grayson Wells (BPR #039658)
> STRANCH, JENNINGS & GARVEY, PLLC
> 223 Rosa L. Parks Ave., Suite 200
> Nashville, TN 37203
> Tel: (615) 254-8801
> gstranch@stranchlaw.com
> gwells@stranchlaw.com
>
> Tracy W. Houck
> LAW OFFICE OF TRACY HOUCK, LLC
> 301 South Bonner Street
> Ruston, LA 71270
> Tel: (318) 255-4066
> Fax: (318) 255-8520
> thouck@suddenlinkmail.com
>
> Landon N. Tooker
> TOOKE LAW, LLC
> 218 Orchard Valley Circle
> Ruston, LA 71270
> Tel: (318) 955-9730
> landon@tookelaw.com

Dated: March 27, 2026

*/s/ E. Todd Presnell*
E. Todd Presnell

-7-

**THE CIRCUIT COURT FOR DAVIDSON COUNTY, TENNESSEE
TWENTIETH JUDICIAL DISTRICT, AT NASHVILLE**

| | |
|---|---|
| RED HOUSE MEDICAL BILLING MI LLC, | Case No. 26C525 |
| Plaintiff, | Judge Lynne T. Ingram |
| v. | |
| CHANGE HEALTHCARE INC., | |
| Defendant. | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO STAY
DEADLINE TO FILE RESPONSIVE PLEADING AND FOR LIMITED
JURISDICTIONAL DISCOVERY**

Plaintiff Red House Medical Billing MI LLC ("Plaintiff") submits this response in opposition to Defendant's Motion to Stay Deadline to File Responsive Pleading and For Limited Jurisdictional Discovery (the "Motion"). Defendant asks the Court to stay the proceedings while it propounds irrelevant discovery with an eye towards the filing of an eventual, improper removal to the Middle District of Tennessee. But that removal is inappropriate because Defendant has admitted time and time again that it is a Tennessee citizen, so the Forum Defendant Rule applies, barring removal. 28 U.S.C. § 1441(b)(2). Indeed, Defendant's true motive is an attempt to delay the Action and force Plaintiff into a class action by removing this case to federal court and then transferring it to the class action MDL,[1] despite the fact that Plaintiffs have communicated their intention to opt out of said class action.

---

[1] *See In re Change Healthcare, Inc. Customer Data Sec. Breach Litig.*, No. 24-md-03108 (D. Minn. 2024) (hereinafter "MDL").

1

**INTRODUCTION**

Plaintiff filed its complaint and initiated this action on February 23, 2026, in this Court. Thereafter, the Davidson County Circuit Court issued summons and Plaintiff perfected service of process via certified U.S. Mail. Defendant's registered agent was ultimately served on February 25, 2026. Nothing prevented Defendant from serving relevant discovery at that point. Tenn. R. Civ. P. 26.04 ("Unless the court upon motion . . . orders otherwise, methods of discovery may be used in any sequence . . . ."). At the time of filing, Defendant represented itself to be headquartered at 424 Church Street, Suite 1400, Nashville, Tennessee 37219. However, Defendant now claims it is headquartered in Minnesota and is therefore not a citizen of Tennessee. Def.'s Mtn., at 2. This in spite of the fact that Defendant repeatedly represented itself to the Tennessee Secretary of State to be headquartered in Nashville, Tennessee, from its original registration on August 5, 2019 until its filing on March 30, 2026, more than a month after the complaint was filed.[2] Indeed, Defendant failed to update the Tennessee Secretary of State about this alleged change in headquarters, despite providing other updates regarding its registered agent and its officers on December 19, 2025. *Id.* Additionally, the UnitedHealthcare's CEO admitted in testimony before the U.S. Senate Finance Committee that Defendant is headquartered in Nashville, Tennessee.[3] Defendant represented itself to this very Court to be headquartered in Nashville, Tennessee on December 9, 2025.[4] Contrary to

---

[2] **Exhibit A**.

[3] Available to stream at *Hacking America's Health Care: Assessing the Change Healthcare Cyber Attack and What's Next*, 118th Cong. Hearings on S. Comm. on Finance (2024) (Full Committee Hearing), https://www.finance.senate.gov/hearings/hacking-americas-health-care-assessing-the-change-healthcare-cyber-attack-and-whats-next); *Hacking America's Health Care: Assessing the Change Healthcare Cyber Attack and What's Next*, 118th Cong. Hearings on S. Comm. on Finance (2024) (Testimony of Andrew Witty CEO of UnitedHealth Group) (https://www.finance.senate.gov/imo/media/doc/0501_witty_testimony.pdf).

[4] *E.g.*, *TAOS Comprehensive Health Corporation v. Change Healthcare, Inc.*, No. 25C2291 (Davidson County Circuit Court, Tenn.) (Complaint and Answer (¶ 20) attached as collective **Exhibit B**). Defendant also filed similar representations in *PruittHealth, Inc. v. Change*

2

Defendant's insistence, "Change Healthcare, Inc." still remains conspicuously absent from a business entity search on the Minnesota Secretary of State's website.

Defendant has now moved to amend its answer in *Taos* and in other cases, but that does not change the fact that Defendant admitted numerous times that it was a citizen of Tennessee and is only attempting to change that reality now so that it can remove this case to federal court and transfer it to the federal MDL just to force Plaintiff to wait until it can opt out of a future class before it can return right back here to continue litigation at the same stage.

Determination of Plaintiff's citizenship does not change the fact that the Forum Defendant Rule applies to Defendant. In other words, Defendant, a Tennessee citizen, seeks to stay this case to perform unnecessary discovery into Plaintiff's citizenship just so that it can improperly remove so that it can then force Plaintiff into a class it will eventually opt out of.

## ARGUMENT

Defendant seeks irrelevant jurisdictional discovery that prejudices Plaintiff, because the Forum Defendant Rule prevents any subsequent attempt at removal. Defendant improperly relies on a test focused on whether a plaintiff should be allowed to seek jurisdictional discovery to show personal jurisdictional.[5] The concerns around such a scenario vastly differ from the concerns the Defendant has raised here. *See, e.g.*, *May v. Wal-Mart Stores, Inc.*, 751 F. Supp. 2d 947, 951–52 (E.D. Ky. 2010) ([P]ersonal jurisdiction over an individual defendant is very different from subject matter jurisdiction . . . . Personal jurisdiction involves individuals due process rights, whereas

---

*Healthcare, Inc.*, Davidson County Circuit Court, No. 25C2291, (Davidson County Circuit Court, Tenn.); *Total Wound v. Change Healthcare, Inc.*, No. 25C155 (Davidson County Circuit Court, Tenn.); *Time for a Change, LLC v. Change Healthcare, Inc.*, No. 25C151 (Davidson County Circuit Court, Tenn.).

[5] *See First Cmty. Bank, N.A. v. First Tennessee Bank, N.A.*, 489 S.W.3d 369, 404-05 (Tenn. 2015), *cert. denied sub nom. Fitch Ratings, Inc. v. First Cmty. Bank, N.A.*, 136 S. Ct. 2511 (2016).

subject matter jurisdiction involves the court's power to hear the case in the first place."). Instead, the Court should be more concerned with only two items: (1) whether jurisdictional discovery would be irrelevant and/or futile; and (2) the prejudice caused by jurisdictional discovery. *See Laub v. U.S. Dept. of Interior*¸ 342 F.3d 1080, 1093 (9th Cir. 2003) ("[W]hen it is clear that further discovery would not demonstrate facts sufficient to constitute a basis for jurisdiction," discovery may be denied).

Here, allowing a stay and jurisdictional discovery for irrelevant facts is extremely prejudicial to Plaintiff and a waste of the Court's time and resources.

The discovery of Defendant seeks is inherently futile because of the Forum Defendant Rule makes any discovery into Plaintiff's citizenship irrelevant. Defendant seeks jurisdictional discovery in an attempt to "determine whether this case properly belongs in federal court." Def.'s Mtn. at 5. When an action is removed based on diversity of citizenship, the federal court must determine whether complete diversity exists at the time of removal. *Coyne v. Am. Tobacco. Co.*, 183 F.3d 488, 492 (6th Cir. 1999).[6] The federal diversity jurisdiction statute provides that "a corporation shall be deemed to be a citizen of any State by which it has been incorporated *and of the State where it has its principal place of business.*" 28 U.S.C. § 1332(c)(1) (emphasis added). When the only basis for federal jurisdiction is diversity of citizenship, removal is not permitted "if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought." 28 U.S.C. § 1441(b)(2).

---

[6] When jurisdiction upon removal is uncertain, federal district courts must strictly construe the removal statutes and resolve all doubts in favor of remand. *Brierly v. Alusuisse Flexible Packaging, Inc.*, 184 F.3d 527, 534 (6th Cir. 1999). The manufactured dispute concerning Defendant's citizenship will be construed in favor of Plaintiff, as the non-moving party, and against the finding of complete diversity. *See Shamrock Oil and Gas Corp.*, 313 U.S. 108–109 (1941).

4

Despite, Defendant's assertion that it is now headquartered in Minnesota, Defendant's own admissions and representations make clear that any amount of jurisdictional discovery will waste the Court's time and resources. Indeed, Defendant still has not filed papers with the Minnesota Secretary of State's website such that a business entity search could reveal its headquarters address, despite filing papers with the Tennessee Secretary of State maintaining Change Healthcare is an active entity. Instead, conducting business entity search on the Minnesota Secretary of State's website reveals several entities that appear affiliated with Change Healthcare, Inc. still list Nashville, Tennessee, as the location of their principal place of business and where their CEO resides.[7] Based on Defendant's own submissions to the Tennessee Secretary of State, to this Court, and to the U.S. Senate Finance Committee, Defendant's principal place of business is located at 424 Church Street, Suite 1400, Nashville, Tennessee 37219. As such, discovery into Plaintiff's citizenship is necessarily irrelevant. In the discovery context, relevance is synonymous with "germane" or "bearing on the subject matter." *West v. Schofield*, 460 S.W.3d 113, 125 (Tenn. 2015). Here, Plaintiff's citizenship has no bearing on this case, nor the federal court's jurisdiction over the matter, as the Forum Defendant rule necessarily precludes the federal court from having subject matter jurisdiction regardless of Plaintiff's citizenship. In other words, any jurisdictional discovery Defendant seeks is inherently futile, because of the Forum Defendant Rule makes such discovery into Plaintiff's citizenship irrelevant.

In reality, Defendant's Motion is a premature Motion to Compel. Essentially, Defendant attempts to prevent Plaintiff's objection to the irrelevant discovery before the discovery has even been served. Rule 26.04 specifically provides "methods of discovery may be used in any sequence." Defendant has had ample time to serve discovery requests upon Plaintiff, but by filing

---

[7] **Exhibit C**.

5

this Motion attempts to skip the procedures laid out in Rule 37.01. That is, Defendant has filed a motion to get this court to rule on the relevance of Plaintiff's citizenship prior to Plaintiff's opportunity to object to its irrelevance.

Moreover, alongside asking the Court to endorse its future irrelevant and futile discovery requests, Defendant also seeks a stay of the rest of this litigation while offering no basis for such a stay. Staying this litigation will significantly prejudice Plaintiff by delaying the case for months, potentially years. This unnecessarily halt to the Action in favor is particularly offensive and prejudicial in light of the fact that discovery here does not resolve the question of whether a federal court has subject-matter jurisdiction. Indeed, that question has already been resolved by the Forum Defendant Rule. Should Plaintiff's citizenship match Defendant's, Defendant cannot remove this case to federal court. Should Plaintiff's citizenship differ from Defendant, Defendant still cannot remove this case to federal court. The only difference between the scenarios is the subsequent futile and wasteful motion practice Defendant will undoubtedly put Plaintiff through, and that Defendant will likely attempt removal even knowing that it is improper.

Additionally, Defendant's Motion is an express attempt to remove this Action for the purposes of transferring the matter to the MDL and forcing Plaintiff to wait until after the class action is adjudicated before Plaintiff is allowed to pursue its claims. Further still, Defendant knows full well that if a class is certified in the MDL, Plaintiff will opt out of that class to pursue separate litigation. In other words, this is nothing more than another delay tactic designed to make Plaintiff wait for the slow-moving MDL to proceed to the stage where Plaintiff can opt out so that Plaintiff can finally restart this litigation right where it is now—potential years down the road.

6

## CONCLUSION

For the foregoing reasons, Defendant respectfully submits that the most efficient management of this matter is for the Court to deny summarily Defendant's Motion.

Dated: May 11, 2026

Respectfully Submitted,

/s/ J. Gerard Stranch, IV
J. Gerard Stranch, IV (TN BPR #23045)
Grayson Wells (TN BPR #039658)
**STRANCH, JENNINGS & GARVEY, PLLC**
The Freedom Center
223 Rosa. L. Parks Avenue, Suite 200
Nashville, TN 37203
Tel: (615) 254 8801
gstranch@stranchlaw.com
gwells@stranchlaw.com

Tracy W. Houck*
**LAW OFFICE OF TRACY HOUCK, LLC**
301 South Bonner Street
Ruston, LA 71270
Tel: (318) 255-4066
Fax: (318) 255-8520
thouck@suddenlinkmail.com

Landon N. Tooke*
**TOOKE LAW, LLC**
218 Orchard Valley Circle
Ruston, LA 71270
Tel: (318) 955-9730
landon@tookelaw.com

*Pro Hac Vice forthcoming

***Counsel for Plaintiff***

7

**CERTIFICATE OF SERVICE**

I hereby certify that on May 11, 2026, the foregoing was filed with the Clerk of Court using

the Court's electronic filing system, which will then serve notice on the following:

E. Todd Presnell (TN BPR 017521)
Kimberly M. Ingram-Hogan (TN BPR 35191)
**BRADLEY ARANT BOULT CUMMINGS, LLP**
One 22 One
1221 Broadway, Suite 2400
Nashville, TN 37203

Allison M. Ryan (TN BPR 028584)
Joseph J. Cavanaugh*
**HOGAN LOVELLS US LLP**
555 Thirteenth Street NW
Washington DC 20004

Michael Maddigan*
**HOGAN LOVELLS US LLP**
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067

* Admitted *Pro Hac Vice*

**Counsel for Defendant**

/s/ J. Gerard Stranch, IV
J. Gerard Stranch, IV (TN BPR # 23045)

8

# <u>EXHIBIT A</u>

EFILED 05/11/26 11:11 PM CASE NO. 26C525 Joseph P. Day, Clerk

# CHANGE HEALTHCARE INC.

Entity Type: Foreign For-profit Corporation

Formed in: DELAWARE

Term of Duration: Perpetual

Status: Active

Control Number: 001043757

Initial Filing Date: 8/5/2019 1:32:00 PM

Fiscal Ending Month: December

AR Due Date: 04/01/2027

| Registered Agent | Principal Office Address | Mailing Address |
|---|---|---|
| UNITED AGENT GROUP INC. | 1 OPTUM CIR | 1 OPTUM CIR |
| 5865 RIDGEWAY CENTER PKWY, STE 395 | EDEN PRAIRIE, MN 55344 | EDEN PRAIRIE, MN 55344 |
| MEMPHIS, TN 38120 | | |

| AR Standing: Good | RA Standing: Good | Other Standing: Good | Revenue Standing: Good |
|---|---|---|---|

## History (13)

| Type | Date | Tracking Number | Change History |
|---|---|---|---|
| 2025 Annual Report for CHANGE HEALTHCARE INC. | 3/30/2026 10:28:27 AM | B2026321071 | o Annual Report Due Date changed from: 4/1/2026 to: 4/1/2027<br>o Principal Address changed from: 424 CHURCH STREET STE 1400, NASHVILLE, TN, 37219 DAVIDSON USA to: 1 OPTUM CIR, EDEN PRAIRIE, MN, 55344, USA<br>o Business Mailing Address changed from: 424 CHURCH STREET STE 1400, NASHVILLE, TN, 37219, USA to: 1 OPTUM CIR, EDEN PRAIRI MN, 55344, USA<br>o Officers Changed |
| Amended Application for Certificate of Authority for CHANGE HEALTHCARE INC. | 12/19/2025 1:30:00 PM | B2025856764 | o Officers Changed |
| Joint Agent Change | 12/19/2025 1:23:00 PM | B2025856670 | o Registered Agent changed from: C T CORPORATION SYSTEM 300 MONTVUE RD KNOXVILLE, TN 37919-5546 to: UNITED AGENT GROUP INC. 5865 RIDGEWAY CENTER PKWY, STE 395 MEMPHIS 38120 |
| 2024 Annual Report for Change Healthcare Inc. | 1/30/2025 2:21:56 PM | B1675-7705 | o Principal Address 1 changed from: 424 CHURCH ST to: 424 CHURCH STREET<br>o Principal Postal Code changed from: 37219-2367 to: 37219 |

EFILED 05/11/2026 1:11 PM CASE NO. 26C5525 Joseph P. Day, Clerk

| | | | |
|---|---|---|---|
| Administrative Amendment for Change Healthcare Inc. | 10/31/2023 3:37:00 PM | B1344-4863 | o Fiscal Year Close Changed changed from: 3 to: 12<br>o Annual Report Due Date changed from: 07/01/2024 to: 04/01/2025 |
| 2023 Annual Report for Change Healthcare Inc. | 5/12/2023 3:34:33 PM | B1390-2978 | |
| 2022 Annual Report for Change Healthcare Inc. | 6/3/2022 9:01:26 AM | B1218-5096 | |
| 2021 Annual Report for Change Healthcare Inc. | 6/22/2021 10:59:05 AM | B1060-3973 | |
| Application for Amended Certificate of Authority for Change Healthcare Inc. | 4/1/2021 4:19:00 PM | B0996-9306 | o Principal Address 1 changed from: 3055 LEBANON PIKE to: 424 CHURCH ST<br>o Principal Address 2 changed from: STE 1000 to: STE 1400<br>o Principal Postal Code changed from: 37214-2239 to: 37219-2367<br>o Commenced Doing Business in TN Date changed from: No value to: 08/05/2019 |
| 2020 Annual Report for Change Healthcare Inc. | 7/14/2020 7:13:50 PM | B0890-7631 | |
| System Amendment for Change Healthcare Inc. | 7/2/2020 1:40:31 AM | | |
| Duplicate Name Consent for Change Healthcare Inc. | 3/16/2020 2:32:00 PM | B0824-8960 | o Entity Giving Consent Control # changed from: No value to: 001043757<br>o Entity Giving Consent Name changed from: No value to: Change Healthcare Inc.<br>o Consent Given to Control # changed from: No value to: 001086313<br>o Consent Given to Name changed from: No value to: Change Healthcare LLC<br>o Consent Method changed from: No value to: Both entities will share name and registered agent |
| Initial Filing for Change Healthcare Inc. | 8/5/2019 1:32:40 PM | B0741-6097 | o Record Status changed from: Pending Review to: Active |

EFILED  05/11/26 11:11 PM  CASE NO. 26C525 Joseph P. Day, Clerk

# Collective Exhibit B

EFILED 05/11/26 11:11 PM CASE NO. 26C525 Joseph P. Day, Clerk

**IN THE CIRCUIT COURT OF DAVIDSON COUNTY, TENNESSEE**
**TWENTIETH JUDICIAL DISTRICT**

TAOS COMPREHENSIVE HEALTH
CORPORATION

                               Plaintiff,

      v.

CHANGE HEALTHCARE, INC.,

                              Defendant.

**Case No.**

**JURY TRIAL DEMANDED**

**COMPLAINT**

Plaintiff, TAOS Comprehensive Health Corporation brings this complaint for damages against Defendant, Change Healthcare Inc. ("Change") and allege the following:

**INTRODUCTION**

1.      Plaintiff's business operations have been severely harmed by Defendant Change's negligence in securing and safeguarding their information systems from a foreseeable cyberattack which came to pass in February 2024, and by Defendant's conduct following the breach.

2.      Defendant Change manages healthcare technology pipelines, processing 15 billion transactions a year. It offers a range of services to the healthcare sector, including payment and billing, prescription processing and data analytics, connecting approximately 900,000 physicians, 118,000 dentists, 33,000 pharmacies, 5,500 hospitals, and 600 laboratories. Medical records of one in every three American patients passes through Change's digital systems. It processes $1.5 trillion in medical claims annually. The company reported $920 million in total revenue for the 2022 fiscal year.

3.      On February 12, 2024, cybercriminals took advantage of weaknesses in Change's cybersecurity processes to access its network.

1

4.      Defendant Change first reported the network outage on February 21, 2024, and later said the problem was a "cybersecurity issue" from an outside threat.

5.      It was only on February 29, 2024, after the Russian-speaking ransomware group AlphV, also known as Blackcat ("Blackcat"), in a since deleted message on the dark web claimed responsibility for the attack, that Change confirmed that its systems had been penetrated by the group.

6.      Blackcat, a well-known cybergroup, breaches healthcare institutions by exploiting network vulnerabilities, using ransomware to attack valuable targets. They then demand payment for decryption keys, but even when paid, they may still leak data onto the Dark Web. Blackcat ranks as one of the top ransomware service providers globally.

7.      The attack resulted in severe network interruptions and the seizure of 6 terabytes of crucial, confidential information, affecting millions of patients and physicians. Blackcat claimed that it exfiltrated data that "relates to all Change Health clients that have sensitive data being processed by the company."[1]

8.      According to publicly reported information, the Data Breach involved a ransomware attack, wherein the cybercriminals accessed Change Healthcare's systems and encrypted Change's data to hold it hostage in seeking a ransom payment. It was reported that Change paid Blackcat a ransom of 350 bitcoins, or approximately $22 million.

---

[1]*See Change Healthcare cyberattack fallout continues*, TECHTARGET, (May 2, 2024) https://healthitsecurity.com/news/change-healthcare-disconnects-system-amid-cyberattack#:~:text=2%2F29%2F2024%20%2D%20Change,latest%20notice%20to%20custome rs%20stated (last accessed on August 8, 2025).

9.     Change handles and stores sensitive patient data that range from phone numbers, addresses, Social Security numbers to medical, dental, and insurance records for millions of individuals. Blackcat accessed and copied vast amounts of this data.

10.    Furthermore, being a subsidiary of a major healthcare insurer, UnitedHealth Group ("UHG"), Change processes a massive number of transactions annually, affecting a significant portion of U.S. patient records. The data breach has severely impacted the healthcare sector and will continue to do so.

11.    In response to the attack, Change disconnected its affected systems, hamstringing providers and disrupting key operations such as pharmacy orders, as providers have not been able to communicate pharmacy prescriptions and pharmacies have been unable to verify patient eligibility and coverage. As a result, patients with life threatening diseases have been facing difficulty accessing essential medications.

12.    However, the repercussions of the data breach extend beyond patients to healthcare providers like the plaintiff, whose operations rely on Change's services for claims processing.

13.    Healthcare providers, such as the Plaintiff, are still grappling with the aftermath of the data breach, facing financial strain and potential closure. They have been unable to file claims and receive normal cash flow to support operations.  As a result, they have been forced to incur additional expenses by transitioning to alternative claim processing platforms. Small and mid-sized practices are harmed the most, as they have continued to treat patients, adjust to a new system, and pay for another service, all while they have been weeks to months behind on receiving payment. These less resourced provider services cannot tolerate a months-long disruption of their cash reserves, and such disruption causes an existential threat to these providers.

3

14. While healthcare providers have been dealing with severe revenue interruption as a result of Change's negligence, Change has continued to charge subscribers, adding insult to injury for healthcare providers already struggling with the fallout of the breach.

15. Change neglected to implement adequate security measures. The system weakness exploited by Blackcat hackers was easily identifiable and curable. Change's failure to take the required steps to prevent the attack resulted in significant financial losses and operational disruptions for healthcare providers.

16. The consequences of Change's actions have been dire for many healthcare providers, with some facing the possibility of insolvency and others having to resort to extreme measures to maintain operations.

17. As a direct and proximate result of Change's failures, Plaintiff has suffered serious injury.

18. Accordingly, Plaintiff seeks to hold Defendant responsible for harms caused by their negligence.

## **PARTIES**

19. Plaintiff TAOS Comprehensive Health Corporation is a New Mexico corporation, with its principal place of business in Santa Fe, New Mexico.

20. Defendant Change Healthcare Inc. is a domestic limited liability corporation with its principal place of business in Nashville, Tennessee.

## **JURISDICTION AND VENUE**

21. This Court has jurisdiction over this action pursuant to Tenn. Code Ann. §§ 16-10-101. Further, the conduct giving rise to this action occurred in this County, including Defendant

Change's decisions not to implement the reasonable, industry standard cybersecurity safeguards that it was legally obligated to implement and maintain.

22.     Moreover, this Court has personal jurisdiction over Defendant Change pursuant to Tenn. Code Ann. § 20-2-222 because Defendant is domiciled in, organized under the law of, and maintains a principal place of business in Tennessee.

23.     Venue is proper in this Court pursuant to Tenn. Code Ann. § 20-4-104 as the County where Defendant maintains its principal place of business.

## FACTUAL ALLEGATIONS

24.     Defendant Change is a healthcare service and support company that provides revenue and payment cycle management to healthcare providers. It connects payers, providers, and patients within the US healthcare system. Change is the predominant source of more than 100 critical functions that keep the US healthcare system operating. Among these functions, Change manages the clinical criteria used to authorize a substantial portion of patient care and coverage, processes billions of claims, supports clinical information exchange, and processes drug prescriptions. The company promotes itself as offering "data and analytics, plus patient engagement and collaboration tools" to help "providers, payers, third-party administrators, and pharmacies". Change Healthcare is a major player in processing prescription medications in the United States and manages billing for pharmacies nationwide, handling "15 billion healthcare transactions each year."[2]

---

[2] Ron Wyden, *Wyden Hearing Statement on Change Healthcare Cyberattack and UnitedHealth Group's Response* (May 1, 2024),
.https://www.finance.senate.gov/imo/media/doc/0501_wyden_statement.pdf.gov/imo/media/doc/0501_wyden_statement.pdf (last visited August 12, 2025)

EFILED  05/11/26 11:11 PM  CASE NO. 26C525  Joseph P. Day, Clerk

25.     Defendant Change specializes in "moving patient data from doctor's office, or to and from your insurance company." This includes Social Security numbers, medical records, insurance information, and more.[3]

26.     Healthcare providers, who have paid for Change's services to submit insurance claims. Change then forwards these claims to health insurance companies for evaluation and processing. Subsequently, providers receive reimbursement payments from the insurance companies.

27.     Given the volume and sensitive nature of the data it stores, Defendant Change has a privacy policy that outlines how confidential and personal information is used and disclosed. The policy states: "We implement and maintain organizational, technical, and administrative security measures designed to safeguard the data we process against unauthorized access, destruction, loss, alteration, or misuse. These measures are aimed at providing ongoing integrity and confidentiality of data, including your personal information."

28.     Defendant Change's prior statements about data security demonstrate that it was fully aware of its responsibility to protect patients' Personal Health Information (PHI) and Personal Identifiable Information (PII).

### The Data Breach

29.     On February 21, 2024, UHG reported in its required 8-K SEC filing that "a suspected nation-state associated cybersecurity threat actor had gained access to some of the Change Healthcare information technology systems."[4] After detecting the breach, UHG claimed

---

[3] *Id*.
[4] UnitedHealth Group Incorporation Form 8-K, SEC (Feb. 21, 2024), https://www.sec.gov/Archives/edgar/data/731766/000073176624000045/unh-20240221.htm

to have "proactively isolated the impacted systems from other connecting systems."[5] UHG also stated it was "working with law enforcement" and had "notified customers, clients, and certain government agencies" about the breach.[6] UHG clarified that the "network interruption [was] specific to Change Healthcare."[7]

30.     According to Blackcat, the stolen data included millions of records, such as active US military/navy personnel PII, medical records, payment information, claims information, patients' PII including phone numbers, addresses, Social Security number, email addresses, insurance records, among others.

31.     Following the Data Breach, Defendant Change disconnected its Platform. The Change Platform was inoperable from the time of the breach and was expected to remain down until at least mid-March. On March 18, 2024, Change informed customers that they could expect to be reconnected by the week of March 25, 2024.

32.     Since the Change Platform handles 15 billion healthcare transactions annually, affecting about one in three U.S. patient records, its outage disrupted a vast number of healthcare providers' claims. For many providers who rely solely on Change for claim processing, their payments were entirely halted during the outage.

33.     The potential impact of the Data Breach is staggering while its effects are still being felt by healthcare providers and payers nationwide.

---

[5] *Id.*
[6] *Id.*
[7] *Id.*

### The Data Breach and Resulting Shutdown Were Foreseeable Risks of Which Defendants Were on Notice and Could Have Prevented.

34.     Cybercriminals target the healthcare industry the most due to the treasure trove of confidential health and personal information maintained and stored by healthcare organizations.

35.     Cyberattacks have doubled from 2016 to 2021 and have resulted in the exposure of personal health information for approximately 42 million patients.[8]

36.     The most prevalent and successful method of illicitly accessing a company's internal networks has historically been through the use of stolen credentials. It's imperative for companies to implement proactive measures to prevent such attacks.

37.     As early as 2014, the FBI warned healthcare stakeholders that they are the target of hackers, stating "[t]he FBI has observed malicious actors targeting healthcare related systems perhaps for the purpose of obtaining Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII)."[9]

38.     On October 28, 2020, the FBI and two federal agencies released a "Joint Cybersecurity Advisory" alerting to "credible information of an increased and imminent cybercrime threat to U.S. hospitals and healthcare providers."[10] The advisory, issued by the Cybersecurity and Infrastructure Security Agency (CISA), the Department of Health and Human

---

[8] *See* Darious Tahir et al., *Health industry struggles to recover from cyberattack on a unit of UnitedHealth*, NPR (Mar. 9, 2024, 7:00 AM) https://www.npr.org/sections/health-shots/2024/03/09/1237038928/health-industry-ransomware-cyberattack-change-healthcare-optum-uhc-united (last accessed on August 12, 2025).

[9] *See FBI Cyber Bulletin: Malicious Actors Targeting Protected Health Information*, PUBLIC INTELLIGENCE (Sept. 2, 2014) https://publicintelligence.net/fbi-targeting-healthcare/ (last accessed on June 24, 2025)

[10] *Ransomware Activity Targeting the Healthcare and Public Health Sector*, Cybersecurity & Infrastructure SEC. Agency (Nov. 2, 2020), https://www.cisa.gov/news-events/cybersecurity-advisories/aa20-302a (last accessed June 24, 2025).

Services ("HHS"), and the FBI, urged healthcare providers to promptly implement "timely and reasonable precautions" to safeguard their networks against these threats.[11]

39.     In 2023, the FBI reported 249 ransomware attacks in the healthcare industry.

40.     According to the HHS, Office for Civil Rights, the health care sector has been experiencing a 278% increase in large breaches involving ransomware which has led to "extended care disruptions, patient diversions to other facilities, and delayed medical procedures, all putting patient safety at risk."[12]

41.     Approximately 80% of ransomware is delivered through email phishing attacks.[13] Other means to deliver ransomware is through brute force attacks on open remote desktop protocol ports.

42.     The primary methods for reducing the risk of stolen credentials are through user education and the implementation of technical security measures.

43.     To prevent ransomware attacks, organizations must provide training to its employees for the handling of suspicious emails. They can also disable macros, avoid storing passwords in plain text, and perform hunts and search for suspicious behavior in their networks, among other things.

44.     This is not the first time that the UHG family has dealt with a data breach. In May 2023, United HealthCare, a UHG subsidiary, had to notify members that protective health

---

[11] *Id.*

[12] HHS Press Office, *HHS Announces Next Steps in Ongoing Work to Enhance Cybersecurity for Health Care and Public Health Sectors,* U.S. DEP'T OF HEALTH AND HUM. SERV. (Dec. 6, 2023), https://www.hhs.gov/about/news/2023/12/06/hhs-announces-next-steps-ongoing-work-enhance-cybersecurity-health-care-public-health-sectors.html (last accessed August 12, 2024)

[13] Paul Gillan, *The history of phishing,* VERIZON BUSINESS, https://www.verizon.com/business/resources/articles/s/the-history-of-phishing/#:~:text=In%202020%2C%20phishing%20was%20responsible,99%20contains%20a%20phishing%20attack (last accessed August 12, 2025).

information may have been compromised due to a credential stuffing attack that occurred on the United Healthcare mobile app in February 2023.

45.     Accordingly, Defendant Change knew that given the vast amount of PHI and PII that healthcare providers such as the Plaintiff acquire and transmit to Defendant Change directly or through vendors, and that in turn, Defendant Change stores and maintains, they were a target for cybercriminals and should have taken all reasonable measures to avoid cyberattacks.

46.     Defendant Change also understood the risks posed by their insecure data security practices and computer networks. Defendant Change's failure to heed warnings and failure to adequately maintain their computer networks secure resulted in the shutdown and harm to the Plaintiff.

47.     Despite their crucial position in the healthcare sector, Defendant Change neglected to adhere to the recommended best practices outlined by CISA. Had Defendant Change implemented basic security measures, the hackers would have been unable to access millions of patient files, potentially preventing the breach entirely or significantly limiting its scope. Additionally, Change lacked essential safeguards to prevent and detect phishing attacks and failed to establish sufficient monitoring or control systems to identify unauthorized infiltration post-breach.

48.     Defendant Change's failure to adhere to industry standards is unjustifiable, particularly considering their awareness of being a prime target for cyberattacks.

49.     Defendant Change knew that a breach of their computer system, and exposure of the information stored therein, would very likely necessitate taking their systems offline to address the resulting issues, thereby depriving healthcare providers of critical services. Accordingly,

Defendant Change had a duty to implement a backup system that would fulfill the basic functions for the Plaintiff in the event of a cybersecurity incident, such as the February 2024 data breach.

### The Aftermath of the Data Breach

50.     Following the Data Breach, Defendant Change shut down a significant portion of its network, including its Change Platform, which is utilized by healthcare providers across the country for payment and treatment purposes. However, Change made this decision without offering a sufficient alternative, leading to widespread devastation among healthcare practices nationwide.

51.     With the disconnection of the Change Platform, numerous healthcare providers lost their primary, and in some instances, sole means of processing payments for their services through patients' healthcare plans, resulting in a lack of payment. Consequently, healthcare providers have been bearing the brunt of these upfront costs.

52.     With dwindling account balances and outstanding reimbursements, many healthcare providers have found themselves in precarious financial situations. Many providers have had to grapple with hundreds of thousands to millions of dollars in unpaid insurance reimbursements. To cover essential expenses like employee payroll and rent, many of the practice owners have had to resort to securing lines of credit from banks and dipping into their personal savings.[14] Meanwhile, other healthcare providers have been facing challenges such as duplicated payment software charges. Many other healthcare providers had to switch to other healthcare software platforms, as they spend substantial amounts on critical medications such as

---

[14] Reed Abelson & Julie Creswell, *Cyberattack Paralyzes the Largest U.S. Healthcare Payment System*, NYTIMES (July 30, 2024), https://www.nytimes.com/2024/03/05/health/cyberattack-healthcare-cash.html (last accessed August 12, 2025).

chemotherapy for cancer patients that could not be delayed. [15] Additionally, some healthcare providers have been forced to make difficult decisions, such as reducing resources for patients, to navigate through these challenging times.

53.     Plaintiff has paid for Change's services that they have not received. Without access to these services, Plaintiff has been facing difficulties in delivering patient care and experiencing financial losses.

**Defendants Failed to Comply with Federal Law and Regulatory Guidance.**

54.     By obtaining, collecting, using, and deriving a benefit from PHI and PII, Defendant Change assumed the duty of protecting such information from unauthorized disclosure.

55.     In addition to their common law duties, Defendant Change's duty to use reasonable security measures arose, in part, under Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), as outlined in 45 C.F.R. § 160.102. On its website, Defendant Change states that it "functions as a HIPAA business associate for its HIPAA covered entity payer and provider customers as its primary business function," so Change is admittedly subject to HIPAA regulations.

56.     As a business covered under HIPAA, Defendant Change is required to comply with HIPAA rules, including the Privacy Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E (which establish standards for the privacy of individually identifiable health information), and the Security Rule (which specify security standards for the protection of electronic protected health information), 45 C.F.R. Part 160 and Part 164, Subparts A and C.  HIPAA requires, *inter alia*, that Defendant Change reasonably protect PHI from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1).

---

[15] *Id.*

57.    HIPAA restricts the permissible uses of "protected health information" and prohibits unauthorized disclosures of "protected health information." 45 C.F.R. § 164.502.

58.    HIPAA mandates that Defendant Change implement suitable safeguards for this information. 45 C.F.R. § 164.530(c)(1).

59.    HIPAA mandates that Defendant Change notifies individuals in the event of a breach of unsecured protected health information. This includes protected health information that has not been rendered unusable, unreadable, or indecipherable to unauthorized individuals, such as non-encrypted data. 45 C.F.R. § 164.404; 45 C.F.R. § 164.402.

60.    Despite these obligations, Defendant Change failed to fulfill its duties under HIPAA. Specifically, *inter alia*, Change failed to: (1) Ensure the maintenance of a sufficient data security system to mitigate the risk of data breaches and cyberattacks; (2) Enact technical policies and procedures for electronic information systems that handle electronically protected health information; (3) Implement adequate policies and procedures to prevent, detect, contain, and correct security violations; (4) Implement adequate policies and procedures to prevent, detect, contain, and correct security violations;  (5) Adequately protect the confidentiality and integrity of electronically stored or transmitted PHI.

61.    Moreover, businesses entrusted with sensitive data have been furnished with authoritative and readily accessible resources aimed at mitigating the risks of cyberattacks. For instance, the Federal Trade Commission ("FTC") has released several guides for businesses underscoring the significance of employing reasonable data security practices, which should inform all decision-making processes related to business operations.[16]

---

[16] *Start with Security*, FTC, https://www.ftc.gov/system/files/documents/plainlanguage/pdf0205-startwithsecurity.pdf  (last visited August 12, 2025).

13

62.     Among other recommendations, the guidelines advise that businesses should safeguard the personal customer information they collect and store, properly dispose of personal information that is no longer needed, encrypt information stored on their computer networks, understand vulnerabilities within their network, and implement policies to address security issues. Additionally, the FTC guidelines suggest that businesses utilize an intrusion detection system, monitor incoming traffic for any unusual activity, watch for large volumes of data being transmitted from their system, and have a response plan prepared in the event of a breach.[17]

63.     Further, the FTC recommends that companies restrict access to sensitive data, mandate the use of complex passwords for network access, employ industry-tested security methods, monitor networks for any suspicious activity, and ensure that third-party service providers have implemented reasonable security measures.[18] This is consistent with guidance provided by the FBI, HHS, and the principles set forth in the CISA 2020 guidance.

64.     Businesses that neglect to adequately protect customer information have faced FTC enforcement actions. The FTC regards the failure to implement reasonable and appropriate measures to safeguard against unauthorized access to confidential consumer data as an unfair act or practice, which is prohibited by Section 5 of the Federal Trade Commission Act. 15 U.S.C. § 45. Orders resulting from these actions provide additional clarity on the steps businesses must take to fulfill their data security obligations.[19]

65.     Despite being fully cognizant of its obligation to protect patients' PHI, Defendant Change neglected to adhere to fundamental recommendations and guidelines that could have

---

[17] *Id.*

[18] *Start With Security*, *supra* note 16.

[19] *Privacy and Security Enforcement*, FTC, https://www.ftc.gov/newsevents/media-resources/protecting-consumer-privacy/privacy-security-enforcement (last visited August 12, 2025).

averted this breach. Moreover, despite awareness of prior cyberattacks, Change failed to take adequate measures. Change's failure to implement reasonable cybersecurity measures to prevent unauthorized access to patient information constitutes an unfair act or practice, which is proscribed by the FTC Act. 15 U.S.C. § 45.

**Allegations Relating to Plaintiff**

66.     Plaintiff is a New Mexico based healthcare provider.

67.     Plaintiff contracted with Advanced MD, a service that used the Change Platform to submit bills/reimbursement forms on behalf of their clients like Plaintiff.

68.     About mid-to-late February 2024, Plaintiff became aware that their reimbursement claims were not being processed, and they were not receiving payments for the services they provided.

69.     Upon information and belief, Defendant Change disconnected its systems.

70.     Once the Data Breach occurred and Defendant Change disabled its Platform, Plaintiff was unable to submit reimbursement requests/bills for their patients.

71.     Upon information and belief, the disruption of processing and payment of Plaintiff's bills have been the result of Defendant Change's decision to disconnect the network after the Data Breach. This disconnection was reasonably foreseeable to Change due to the failure to protect its network from cyberattacks.

72.     Plaintiff continued to treat patients during the Change Platform outage, without any certainty about when payment would be received.

73.     Further still, Plaintiff, through its employees, has spent hundreds of hours attempting to file and refile claims to be paid for services already rendered, amounting to thousands of dollars paid for additional labor, as a result of the data breach.

15

EFILED 05/11/26 11:11 PM  CASE NO. 26C525  Joseph P. Day, Clerk

74.     As a result of Defendant's misconduct in permitting the breach to occur, and in disconnecting its Platform following the breach, Plaintiff has suffered multiple forms of damages in the form of:

    a.    Damages due to medical bills payable to Plaintiff, which was unable to be processed due to the inoperability of the Change Platform;

    b.    Damages due to increased labor costs for Plaintiff to resubmit claims;

    c.    out-of-pocket expenses associated with transitioning to a new electronic medical records ("EMR") provider and implementing a new billing system necessitated by the breach;

    d.    Diminished financial performance, including lost revenue, reduced profits, and a significant decrease in cash flow due to the breach;

    e.    Substantial reduction in the overall value and reputation of their business and brand as a result of the breach;

    f.    Loss of projected future revenue and profit, which were undermined by the long-term effects of the breach;

    g.    Non-economic damages, including emotional distress, anxiety, and mental suffering caused by the fallout from the breach and its impact on their livelihood;

    h.    Debts and unpaid amounts owed to vendors;

    i.    Reduction in earnings and the diminished earning potential of business owners and shareholders due to the long-term repercussions of the breach; and,

    j.    Other monetary damages as discovery will reveal.

75.     Currently, Plaintiff estimates monetary losses in excess of $300,000 based on outstanding medical bills that were not processed due to the Change Platform outage.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE

76.     Plaintiff repeats and realleges every allegation set forth in the preceding paragraphs.

77.     Defendant Change required patients' PHI as a prerequisite of receiving healthcare services and to perform their functions in connection with patients receiving medical treatment.

16

Change stored the data for the purposes of providing health insurance services and for commercial gain.

78.     Moreover, because of its significant market share, and its role as a claim clearinghouse, Change knew that Plaintiff relied heavily on it to process such claims and knew that an interruption in that service would place Plaintiff's business operations in financial peril.

79.     Defendant Change owed Plaintiff a duty to exercise reasonable care in protecting the information submitted to it from unauthorized disclosure or access. Change acknowledged this duty in its privacy policies, where it promised to abide by all federal laws and regulations with regard to the information submitted to it.

80.     Defendant Change owed a duty of care to Plaintiff to provide adequate data security, consistent with industry standards, to ensure that Change's systems and networks adequately protected the PHI.

81.     Defendant Change's duty to use reasonable care in protecting PHI arises from common law and federal law, including the HIPAA regulations described above and Change's own policies and promises regarding privacy and data security.

82.     Defendant Change knew, or should have known, of the risks inherent in collecting and storing PHI in a centralized location, Change's vulnerability to network attacks, and the importance of adequate security.

83.     It was foreseeable that in the event of a data breach and interruption in the Change's operation, Plaintiff would experience interruption of their operation and would suffer economic injuries.

84.     Defendant Change breached its duty to Plaintiff in numerous ways, as described herein, including by:

- Failing to exercise reasonable care and implement adequate security systems, protocols, and practices;
- Failing to comply with industry standard data security measures for the healthcare industry leading up to the Data Breach;
- Failing to comply with its own privacy policies; and
- Failing to adequately monitor, evaluate, and ensure the security of Change's network and systems.

85. Patients' PHI would not have been compromised but for Defendant Change's wrongful and negligent breach of its duties.

86. Defendant Change would not have disconnected the Change Platform but for its wrongful and negligent breach of its duties.

87. Defendant Change's failure to take proper security measures to protect patients' PHI, as described herein, created conditions conducive to a foreseeable, intentional criminal act, namely the unauthorized access and copying of PHI by unauthorized third parties. It was also foreseeable that as a result of a data breach, Change would have to disconnect systems that could disrupt healthcare practices.

88. As a direct and proximate result of Defendant Change's conduct, Plaintiff suffered damages, including missed payments and out-of-pocket expenses associated with (i) transitioning to a new electronic medical records ("EMR") provider and implementing a new billing system necessitated by the breach; (ii) disruptions to daily operations caused by the breach; and (iii) debts and unpaid amounts owed to vendors, exacerbated by the financial strain resulting from the breach.

**COUNT II**
**THIRD-PARTY BENEFICIARY BREACH OF CONTRACT**

89. Plaintiff restates and re-alleges every allegation of the preceding paragraphs of this Complaint.

90. Acting in the ordinary course of business, Change contracts with healthcare providers, like Plaintiff, either directly or through third parties to offer its Platform. This platform

EFILED  05/11/26 11:11 PM  CASE NO. 26C525  Joseph P. Day, Clerk

acts as an intermediary, allowing providers to submit insurance claims to insurance companies for evaluation and payment.

91.     Plaintiff paid for the usage of Change's Platform through an intermediary, Advanced MD, which maintained a service contract with Change Healthcare.

92.     Because Change knew that Advanced MD was not the entity ultimately benefitting from the use of its platform, it understood that providers like Plaintiff were the ultimate beneficiaries of that contract.

93.     In February 2024, following the Data Breach, Change disconnected the Change Platform thereby severing Plaintiff's access and use of the Change Platform and breaching its contractual obligations.

94.     As a direct and proximate result of Change's breach of its contractual obligations with Advanced MD, Plaintiff sustained actual losses and damages, as described above.

## COUNT III
## UNJURST ENRICHMENT

95.     Plaintiff restates and re-alleges every allegation of the preceding paragraphs of this Complaint.

96.     Plaintiff conferred benefits on Defendant Change in the form of payment for claims management and processing, insurance verification, authorization and medical necessity reviews, and disbursement of payments, among other things, both directly and indirectly. Defendant Change had knowledge of the benefits conferred by Plaintiff and appreciated such benefits. Defendant Change should have used, in part, the monies Plaintiff paid to it, directly and indirectly, to pay the costs of reasonable data privacy and security procedures.

19

EFILED 05/11/26 11:11 PM  CASE NO. 26C525  Joseph P. Day, Clerk

97. Defendant Change states that it devotes "significant resources" to protect PHI, a portion of which is derived from the benefit conferred by the contractual payments made by Plaintiff to Defendant Change.

98. Plaintiff has suffered actual damages and harm as a result of Defendant Change's conduct, inactions, and omissions.

99. It is unjust for Defendant Change to retain the benefits of its conduct that resulted in substantial damages to Plaintiff.

100. Defendant Change should not be allowed to retain the economic benefit derived from their improper conduct. should be required to disgorge all unlawful or inequitable proceeds received from the Plaintiff.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the following relief:

a. That the Court award Plaintiff compensatory, consequential, incidental, and general damages, including nominal damages as appropriate, for each count as allowed by law in an amount to be determined at trial;

b. That the Court award statutory damages, trebled, and/or punitive or exemplary damages, to the extent permitted by law;

c. That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendant Change as a result of their unlawful acts, omissions, and practices;

d. That the Court award to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses; and

EFILED  05/11/26 11:11 PM  CASE NO. 26C525  Joseph P. Day, Clerk

e.     That the Court award pre-and post-judgment interest at the maximum legal rate and

all such other relief as it deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial in the instant action.

Dated: August 18, 2025                          Respectfully submitted,

                                                _/s/ J. Gerard Stranch, IV_
                                                J. Gerard Stranch, IV (BPR #23045)
                                                Grayson Wells (BPR #039658)
                                                Miles M. Schiller (BPR # 041531)
                                                STRANCH, JENNINGS & GARVEY, PLLC
                                                223 Rosa L. Parks Avenue, Suite 200
                                                Nashville, Tennessee 37203
                                                Tel : (615) 254-8801
                                                gstranch@stranchlaw.com
                                                gwells@stranchlaw.com
                                                mschiller@stranchlaw.com

                                                Matthew Sill (*Pro hac vice* forthcoming)
                                                Tara Tabatabaie (*Pro hac vice* forthcoming)
                                                Dimitri Flowers (*Pro hac vice* forthcoming)
                                                SILL LAW GROUP, PLLC
                                                1101 N. Broadway Ave., Suite 102
                                                Oklahoma City, Oklahoma 73103
                                                Tel: (405) 509-6300
                                                Fax: (800) 978-1345

                                                Jacob Diesselhorst (*Pro hac vice* forthcoming)
                                                Andy Campbell (*Pro hac vice* forthcoming)
                                                MAPLES NIX & DIESSELHORST
                                                15401 N. May Avenue
                                                Edmond, Oklahoma 73013
                                                Tel: (405) 478-3737
                                                Fax: (405) 513-5005
                                                jacob@mndlawfirm.com
                                                andy@mndlawfirm.com

                                                *Attorneys for the Plaintiff*

21

EFILED 12/09/25 04:14 PM CASE NO. 25C2291 Joseph P. Day, Clerk

**IN THE CIRCUIT COURT FOR DAVIDSON COUNTY, TENNESSEE**
**TWENTIETH JUDICIAL DISTRICT AT NASHVILLE**

| | |
|---|---|
| TAOS COMPREHENSIVE HEALTH CORPORATION, | Case No.: 25C2291 |
| Plaintiff, | Related Actions: 25C149; 25C151; 25C155; 25C1826; 25C2264 |
| v. | |
| CHANGE HEALTHCARE INC., | Judge Lynne T. Ingram |
| Defendant. | |

EFILED 05/11/26 11:11 PM CASE NO. 26C525 Joseph P. Day, Clerk

**DEFENDANT'S ANSWER TO COMPLAINT**

Subject to its affirmative defenses set forth below, and without waiver of any rights, privileges, or defenses, Defendant Change Healthcare Inc. ("Change Healthcare" or "Defendant"), through counsel, hereby submits its Answer to the Complaint filed August 18, 2025 ("Complaint") filed by Plaintiff Taos Comprehensive Health Corporation ("Taos" or "Plaintiff") in the above-captioned matter.

***Defendant's Preliminary Statement***

Each numbered response in this Answer is made subject to the following limitations as if fully set forth therein.

*First*, this Answer, including the Affirmative Defenses asserted herein, shall not be construed as a waiver of Defendant's right to pursue counterclaims. Any construction to the contrary would violate Defendant's due process rights.

*Second*, where Defendant states that it lacks knowledge or information sufficient to admit or deny a certain allegation, Defendant reserves the right to argue that the allegation is true or false based on the evidence and any facts learned during discovery.

1

COPY

*Third*, to the extent the Complaint attempts to characterize certain alleged facts (*e.g.*, by describing conduct as "misconduct"), Defendant responds generally that such allegations constitute mere pejoratives or conclusions of law and do not constitute allegations of fact requiring a response; but to the extent such allegations may be construed as allegations of fact or otherwise require a response, Defendant objects to and denies them.

*Fourth*, to the extent the Complaint attempts to characterize the content of documents, or purports to quote documents, Defendant responds generally that such documents speak for themselves and do not require a response; but to the extent allegations regarding documents require a response, Defendant denies them.

*Fifth*, to the extent that the allegations in the Complaint include undefined terms subject to multiple potential meanings and interpretations, Defendant denies each and every such allegation.

*Sixth*, except as may be expressly and specifically admitted herein, Defendant denies each and every allegation alleged in the Complaint, further denies that Plaintiff has suffered any damages by reason of any act, omission, or conduct on the part of Defendant, and further denies that Plaintiff is entitled to the relief sought in the Complaint, or to any relief at all, from Defendant.

In response to the numbered paragraphs of the Complaint, Defendant further responds as follows:

### INTRODUCTION

1.　　Defendant states that Paragraph 1 purports to state a legal conclusion as to which no response is required. To the extent the allegations in Paragraph 1 require a response, Defendant lacks knowledge or information sufficient to admit or deny the allegations and, on that basis, denies them.

EFILED  05/11/26 11:11 PM  CASE NO. 26C525  Joseph P. Day, Clerk

COPY

2. Defendant admits that for the fiscal year 2022, the company reported approximately $920 million in total revenue. With respect to the other allegations contained in Paragraph 2, Defendant admits this information at or about the time of the Cyberattack

3. Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 3 and, on that basis, denies them.

4. Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 4 and, on that basis, denies them.

5. Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 5 and, on that basis, denies them.

6. Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 6 and, on that basis, denies them.

7. The document cited in Paragraph 7 speaks for itself and no response is required. As to the other allegations, Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 7 and, on that basis, denies them.

8. Defendant admits that as part of the cyberattack, a threat actor deployed ransomware that encrypted numerous systems across the Change environment. Defendant admits that it paid a ransom of $22 million in Bitcoin.

9. Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 9 and, on that basis, denies them.

10. Defendant admits that it is a subsidiary of UnitedHealth Group. Defendant lacks knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 10 and, on that basis, denies them.

3

COPY

11.	Defendant admits that it disconnected certain systems after the cyberattack. Defendant lacks knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 11 and, on that basis, denies them.

12.	Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 12 and, on that basis, denies them.

13.	Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 13 and, on that basis, denies them.

14.	Defendant states that Paragraph 14 purports to state a series of legal conclusions as to which no response is required. To the extent the allegations in Paragraph 14 require a response, Defendant denies them. Defendant also lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 14 and, on that basis, denies them.

15.	Defendant denies the allegations in Paragraph 15.

16.	Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 16 and, on that basis, denies them.

17.	Defendant states that the allegations in Paragraph 17 purport to state a legal conclusion as to which no response is required. To the extent the allegations in Paragraph 17 require a response, Defendant denies them.

18.	Defendant states that Paragraph 18 purports to state a legal conclusion as to which no response is required. To the extent the allegations in Paragraph 18 require a response, Defendant denies them. Defendant also lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 18 and, on that basis, denies them.

COPY

**PARTIES**

19.     Defendant admits that Plaintiff is a New Mexico corporation, with its principal place of business in Santa Fe, New Mexico.

20.     Defendant admits Paragraph 20.

**JURISDICTION AND VENUE**

21.     Defendant states that Paragraph 21 purports to state a series of legal conclusions as to which no response is required. To the extent the allegations in the first sentence of Paragraph 21 require a response, Defendant does not contest subject matter jurisdiction at this time. To the extent the allegations in the second sentence of Paragraph 21 require a response, Defendant denies them.

22.     Defendant states that Paragraph 22 purports to state a legal conclusion as to which no response is required. To the extent the allegations in Paragraph 22 require a response, Defendant admits that Change is domiciled in, organized under the law of, and maintains its principal place of business in Tennessee.

23.     Defendant states that Paragraph 23 purports to state a legal conclusion as to which no response is required. To the extent the allegations in Paragraph 23 require a response, Defendant admits that Change maintains its principal place of business in this county.

**FACTUAL ALLEGATIONS**

24.     The documents cited and quoted in Paragraph 24 speak for themselves and no response is required.  As to the other allegations contained in Paragraph 24, Defendant admits that, among other things, it provides services for healthcare providers to submit claims to insurance companies.

5

COPY

25. The document cited in Paragraph 25 speaks for itself and no response is required. To the extent the allegations in Paragraph 25 require a response, Defendant denies them.

26. Defendant denies the allegations in Paragraph 26.

27. The document cited in Paragraph 27 speaks for itself and no response is required. To the extent the allegations regarding this document require a response, Defendant denies them.

28. Defendant states that Paragraph 28 purports to state legal conclusions as to which no response is required.

### The Data Breach

29. Defendant states that the document cited in Paragraph 29 speaks for itself, and no response is required. To the extent the allegations regarding this document require a response, Defendant denies them.

30. Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 30 and, on that basis, denies them.

31. Defendant admits it disconnected certain services after the cyberattack. Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 31 and, on that basis, denies them.

32. Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 32 and, on that basis, denies them.

33. Defendant lacks knowledge or information to admit or deny the allegations in Paragraph 33 and, on that basis, denies them.

### The Data Breach and Resulting Shutdown Were Foreseeable Risks of Which Defendant Were on Notice and Could Have Prevented.

34. Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 34 and, on that basis, denies them.

6

COPY

35. The document cited in Paragraph 35 speaks for itself and no response is required. To the extent the allegations regarding this document require a response, Defendant denies them.

36. Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 36 and, on that basis, denies them.

37. The document cited in Paragraph 37 speaks for itself and no response is required. To the extent the allegations regarding this document require a response, Defendant denies them.

38. The document cited in Paragraph 38 speaks for itself and no response is required. To the extent the allegations regarding this document require a response, Defendant denies them.

39. Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 39 and, on that basis, denies them.

40. The document cited in Paragraph 40 speaks for itself and no response is required. To the extent the allegations regarding this document require a response, Defendant denies them.

41. The document cited in Paragraph 41 speaks for itself and no response is required. To the extent the allegations regarding this document require a response, Defendant denies them.

42. Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 42 and, on that basis, denies them.

43. Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 43 and, on that basis, denies them.

44. Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 44 and, on that basis, denies them.

45. Defendant states that Paragraph 45 purports to state a legal conclusion as to which no response is required.

7

COPY

46.     Defendant states that Paragraph 46 purports to state a series of legal conclusions as to which no response is required.

47.     Defendant denies the allegations in Paragraph 47.

48.     Defendant denies the allegations in Paragraph 48.

49.     Defendant states that Paragraph 49 purports to state a series of legal conclusions as to which no response is required.

### The Aftermath of the Data Breach

50.     Defendant admits it disconnected certain systems after the cyberattack. Defendant lacks knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 50 and, on that basis, denies them. Defendant denies the allegations contained in the second sentence of Paragraph 50.

51.     Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 51 and, on that basis, denies them.

52.     The documents cited in Paragraph 52 speak for themselves and no response is required. To the extent the allegations regarding these documents require a response, Defendant denies them.  As to the remaining allegations, Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 52 and, on that basis, denies them.

53.     Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 53 and, on that basis, denies them.

### Defendant Failed to Comply with Federal Law and Regulatory Guidance.

54.     Defendant states that Paragraph 54 purports to state a legal conclusion as to which no response is required. To the extent the allegations in Paragraph 54 require a response, Defendant denies them.

8

COPY

55.     Defendant states that Paragraph 55 purports to state a legal conclusion as to which no response is required. To the extent the allegations in Paragraph 55 require a response, Defendant denies them.

56.     Defendant states that Paragraph 56 purports to state a series of legal conclusions as to which no response is required. To the extent the allegations in Paragraph 56 require a response, Defendant denies them.

57.     The statute cited in Paragraph 57 speaks for itself and no response is required. To the extent the allegation regarding this statute requires a response, Defendant denies them.

58.     Defendant states that Paragraph 58 purports to state a legal conclusion as to which no response is required. To the extent the allegations in Paragraph 58 require a response, Defendant denies them.

59.     Defendant states that Paragraph 59 purports to state a series of legal conclusions as to which no response is required. To the extent the allegations in Paragraph 59 require a response, Defendant denies them.

60.     Defendant states that Paragraph 60 purports to state a series of legal conclusions as to which no response is required. To the extent the allegations in Paragraph 60 require a response, Defendant denies them.

61.     The document cited in Paragraph 61 speaks for itself, and no response is required. To the extent the allegations regarding this document require a response, Defendant denies them.

62.     The document cited in Paragraph 62 speaks for itself, and no response is required. To the extent the allegations regarding this document require a response, Defendant denies them.

63.     The document cited in Paragraph 63 speaks for itself, and no response is required. To the extent the allegations regarding this document require a response, Defendant denies them.

9

COPY

64. The webpage cited in the third sentence of Paragraph 64 speaks for itself, and no response is required. To the extent the allegations regarding this webpage require a response, Defendant denies them. Defendant lacks knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 64 and, on that basis, denies them.

65. Defendant states that Paragraph 65 purports to state a series of legal conclusions as to which no response is required. To the extent the allegations in Paragraph 65 require a response, Defendant denies them.

**Allegations Relating to Plaintiff**

66. Defendant admits that Plaintiff is a New Mexico based healthcare provider.

67. Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 67 and, on that basis, denies them.

68. Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 68 and, on that basis, denies them.

69. Defendant admits it disconnected certain systems after the cyberattack.

70. Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 70 and, on that basis, denies them.

71. Defendant states that Paragraph 71 purports to state a series of legal conclusions as to which no response is required. To the extent the allegations in Paragraph 71 require a response, Defendant denies them.

72. Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 72 and, on that basis, denies them.

73. Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 73 and, on that basis, denies them.

EFILED 05/11/26 11:11 PM CASE NO. 26C525 Joseph P. Day, Clerk

COPY

74. Defendant states that Paragraph 74 purports to state a series of legal conclusions as to which no response is required. To the extent the allegations in Paragraph 74 require a response, Defendant denies them. Defendant also lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 74 and, on that basis, denies them.

75. Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 75 and, on that basis, denies them.

**CAUSES OF ACTION**

**<u>COUNT 1</u>**
**Negligence**

76. Defendant hereby incorporates as if fully set forth herein their answers and defenses to Paragraphs 1-75.

77. Defendant denies the allegations in Paragraph 77.

78. Defendant states that Paragraph 78 purports to state a series of legal conclusions as to which no response is required. To the extent the allegations in Paragraph 78 require a response, Defendant denies them.

79. Defendant states that Paragraph 79 purports to state a series of legal conclusions as to which no response is required. To the extent the allegations in Paragraph 79 require a response, Defendant denies them.

80. Defendant states that Paragraph 80 purports to state a series of legal conclusions as to which no response is required. To the extent the allegations in Paragraph 80 require a response, Defendant denies them.

81. Defendant states that Paragraph 81 purports to state a series of legal conclusions as to which no response is required. To the extent the allegations in Paragraph 81 require a response, Defendant denies them.

EFILED 05/11/26 11:11 PM CASE NO. 26C525 Joseph P. Day, Clerk

COPY

82.     Defendant states that Paragraph 82 purports to state a series of legal conclusions as to which no response is required. To the extent the allegations in Paragraph 82 require a response, Defendant denies them.

83.     Defendant states that Paragraph 83 purports to state a series of legal conclusions as to which no response is required. To the extent the allegations in Paragraph 83 require a response, Defendant denies them.

84.     Defendant states that Paragraph 84 purports to state a series of legal conclusions as to which no response is required. To the extent the allegations in Paragraph 84 require a response, Defendant denies them.

85.     Defendant states that Paragraph 85 purports to state a legal conclusion as to which no response is required. To the extent the allegations in Paragraph 85 require a response, Defendant denies them.

86.     Defendant states that Paragraph 86 purports to state a legal conclusion as to which no response is required. To the extent the allegations in Paragraph 86 require a response, Defendant denies them.

87.     Defendant states that Paragraph 87 purports to state a series of legal conclusions as to which no response is required. To the extent the allegations in Paragraph 87 require a response, Defendant denies them.

88.     Defendant states that Paragraph 88 purports to state a series of legal conclusions as to which no response is required. To the extent the allegations in Paragraph 88 require a response, Defendant denies them.  Defendant also lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 88 and, on that basis, denies them.

12

COPY

## COUNT II
### Third-Party Beneficiary Breach of Contract

89.     Defendant hereby incorporates as if fully set forth herein their answers and defenses to Paragraphs 1-88.

90.     Defendant admits that it contracts with certain healthcare providers to offer its services, but otherwise denies the allegations in the first sentence of Paragraph 90. Defendant admits that its systems allow providers to submit insurance claims.

91.     Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 91 and, on that basis, denies them.

92.     Defendant states that the allegations in Paragraph 92 purport to state a series of legal conclusions as to which no response is required. To the extent the allegations in Paragraph 92 require a response, Defendant denies them.

93.     Defendant admits it disconnected certain services after the cyberattack. Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 93 and, on that basis, denies them. Furthermore, Defendant states that the remaining allegations in Paragraph 93 purport to state a series of legal conclusions as to which no response is required.

94.     Defendant states that the allegations in Paragraph 94 purport to state a legal conclusion as to which no response is required.

## COUNT III
### Unjust Enrichment

95.     Defendant hereby incorporates as if fully set forth herein their answers and defenses to Paragraphs 1-94.

96.     Defendant states that the allegations in Paragraph 96 purport to state a legal conclusion as to which no response is required. To the extent the allegations in Paragraph 96 require a response, Defendant denies them. Defendant also lacks knowledge or information

13

COPY

sufficient to admit or deny certain allegations in the first sentence of Paragraph 96 and, on that basis, denies them.

97.    Defendant lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 97 and, on that basis, denies them.

98.    Defendant states that the allegation in Paragraph 98 purports to state a legal conclusion as to which no response is required. To the extent the allegation in Paragraph 98 requires a response, Defendant denies them.

99.    Defendant states that the allegation in Paragraph 99 purports to state a legal conclusion as to which no response is required. To the extent the allegation in Paragraph 99 requires a response, Defendant denies them.

100.    Defendant states that the allegations in Paragraph 100 purport to state a legal conclusion as to which no response is required. To the extent the allegations in Paragraph 100 require a response, Defendant denies them.

## OTHER ALLEGATIONS

Sentences and clauses under the heading "REQUEST FOR RELIEF" and "DEMAND FOR JURY TRIAL" set forth legal conclusions and Plaintiff's characterization of the relief sought in this action, as to which no response is required. To the extent a response is required, Defendant denies all allegations and any liability to Plaintiff, in any form or amount. Defendant incorporates and reasserts their responses to each of the preceding numbered paragraphs as if fully set forth herein. All allegations of the Complaint not expressly admitted in this Answer are denied.

COPY

## AFFIRMATIVE DEFENSES

Defendant, based on the facts and information known to date and subject to amendment following further investigation of the facts and proceedings in this action, and without waiver of any rights, privileges, or defenses, states the affirmative defenses as follows:

### FIRST AFFIRMATIVE DEFENSE

The Complaint, and every claim alleged therein, is barred and/or estopped, in whole or in part, by the absence of any material misrepresentation, misleading disclosures, and/or omissions made by Defendant to Plaintiff upon which Plaintiff could have reasonably or justifiably relied.

### SECOND AFFIRMATIVE DEFENSE

The Complaint, and every claim alleged therein, is barred and/or estopped, in whole or in part, to the extent the Plaintiff has not suffered any actual injury or damage, in part but not limited to Plaintiff's enlistment of another, new vendor to process payments, and despite receiving payments based on bills submitted by Defendant and the new vendor.

### THIRD AFFIRMATIVE DEFENSE

The Complaint, and every claim alleged therein, is barred and/or estopped, in whole or in part, because Plaintiff has failed to establish personal jurisdiction over one or more Defendant, including by failing to establish sufficient minimal contacts with the forum state.

### FOURTH AFFIRMATIVE DEFENSE

The Complaint, and every claim alleged therein, is barred and/or estopped, in whole or in part, because Plaintiff did not rely on any alleged misrepresentations or omissions by Defendant, or alternatively, such reliance was not reasonable or justifiable.

15

COPY

**FIFTH AFFIRMATIVE DEFENSE**

The Complaint, and every claim premised on fraudulent or unfair conduct alleged therein, is barred and/or estopped, in whole or in part, for failure to plead fraud with sufficient particularity under the Tennessee Rules of Civil Procedure, including Rule 9.02.

**SIXTH AFFIRMATIVE DEFENSE**

The Complaint, and every claim alleged therein, is barred and/or estopped, in whole or in part, for failure by Plaintiff to mitigate damages, including by engaging in bad faith, misrepresentations, or omissions in conduct or communications with Defendant.

**SEVENTH AFFIRMATIVE DEFENSE**

The Complaint, and every claim alleged therein, is barred and/or estopped, in whole or in part, by a contract, or contracts, including but not limited to, third-party beneficiary exclusionary provisions, contractual limitations period, venue or forum selection provisions, and contractual liability limitations.

**EIGHTH AFFIRMATIVE DEFENSE**

The Complaint, and every claim alleged therein, is barred and/or estopped, in whole or in part, because Defendant performed the services in a reasonable manner consistent with applicable industry standards.

**NINTH AFFIRMATIVE DEFENSE**

The Complaint, and every claim alleged therein, is barred and/or estopped, in whole or in part, by the doctrine of unclean hands, including because Plaintiff contributed to any alleged injury.

**TENTH AFFIRMATIVE DEFENSE**

The Complaint, and every claim alleged therein, is barred and/or estopped, in whole or in part, to the extent that Plaintiff breached any contract(s) with Defendant.

EFILED 05/11/26 11:11 PM CASE NO. 26C525 Joseph P. Day, Clerk

COPY

## ELEVENTH AFFIRMATIVE DEFENSE

The Complaint, and every claim alleged therein, is barred and/or estopped, in whole or in part, to the extent Plaintiff lacks standing to assert the claims and/or lacks capacity to sue.

## TWELFTH AFFIRMATIVE DEFENSE

The Complaint, and every claim alleged therein, is barred and/or estopped, in whole or in part, because Defendant, at all times acted in good faith and in compliance with applicable state and federal laws and regulations.

## THIRTEENTH AFFIRMATIVE DEFENSE

The Complaint, and every claim alleged therein, is barred and/or estopped, in whole or in part, because Plaintiff lacks privity with Defendant as it has not entered into a contractual agreement with Plaintiff.

## FOURTEENTH AFFIRMATIVE DEFENSE

The Complaint, and every claim alleged therein, is barred and/or estopped, in whole or in part, to the extent that ALPHV, BlackCat, or any other named or unnamed, known or unknown ransomware group or cyberactor, not Defendant, caused and/or is liable for Plaintiff's alleged harms.

## FIFTEENTH AFFIRMATIVE DEFENSE

The Complaint, and every claim alleged therein, is barred and/or estopped, in whole or in part, to the extent that other intervening events outside of the control of Defendant, and disrupted the flow of necessary information required to provide certain services to Plaintiff.

## SIXTEENTH AFFIRMATIVE DEFENSE

The Complaint, and every claim alleged therein, is barred and/or estopped, in whole or in part, by the doctrines of waiver, estoppel, settlement, payment, release, and/or offset.

17

EFILED  05/11/26 11:11 PM  CASE NO. 26C525  Joseph P. Day, Clerk

COPY

## SEVENTEENTH AFFIRMATIVE DEFENSE

Defendant is entitled to all available protections under applicable law, including but not limited to, the apportionment of fault against parties and non-parties.

## RESERVATION OF RIGHTS & DEFENSES

Defendant currently does not have knowledge or information sufficient to form a belief as to any other potential defenses that may be available to them. Defendant expressly and specifically reserves the right to amend this Answer, including to add, delete, and/or modify defenses based upon legal theories, facts, and circumstances that may be or will be divulged through further legal analysis of Plaintiff's position in this litigation. Defendant further expressly and specifically reserves the right to assert any and all additional or alternative defenses under any applicable states or federal law or regulations. Defendant also expressly and specifically reserves the right to assert any additional or alternative cross-claims, counterclaims, and third-party claims, including but not limited to claims for failure to pay. Defendant also expressly and specifically reserves the right to assert that this action should be coordinated with the ongoing federal, multi-district litigation in the District of Minnesota, titled *In re: Change Healthcare, Inc. Customer Data Security Breach Litigation*, Case No. 24-md-3108.

COPY

Dated: December 9, 2025

Respectfully submitted,

/s/ *Kimberly Ingram-Hogan*
E. Todd Presnell (BPR 017521)
Kimberly M. Ingram-Hogan (BPR 35191)
BRADLEY ARANT BOULT CUMMINGS LLP
One 22 One
1221 Broadway, Suite 2400
Nashville, TN 37203
T. (615) 252-2355
F. (615) 252-6355
tpresnell@bradley.com
kingram@bradley.com

Allison M. Ryan (BPR 028584)
Joseph J. Cavanaugh*
HOGAN LOVELLS US LLP
555 13th Street NW, Columbia Square
Washington, D.C. 20004
T. (202) 637-5600
F. (202) 637-5910
allison.holt-ryan@hoganlovells.com
joe.cavanaugh@hoganlovells.com

Michael Maddigan*
HOGAN LOVELLS US LLP
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
T. (310) 785-4600
F. (310) 785-4601
michael.maddigan@hoganlovells.com

* Pro Hac Vice Forthcoming

*Counsel for Defendant Change Healthcare Inc.*

19

COPY

## CERTIFICATE OF SERVICE

I hereby certify that on this the 9th day of December 2025, the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon counsel of record:

J. Gerard Stranch, IV
Grayson Wells
Miles M. Schiller
STRANCH, JENNINGS & GARVEY, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Tel: (615) 254-8801
gstranch@stranchlaw.com
gwells@stranchlaw.com
mschiller@stranchlaw.com

Matthew J. Sill
Tara Tabatabaie
Dimitri Flowers
SILL LAW GROUP, PLLC
1101 N. Broadway Ave., Suite 102
Oklahoma City, OK 73103
Tel: (405) 509-6300
Fax: (800) 978-1345

Jacob Diesselhorst
Andy Campbell
MAPLES NIX & DIESSELHORST
15401 N. May Avenue
Edmond, Oklahoma 73013
Tel: (405) 478-3737
Fax: (405) 513-5005
jacob@mndlawfirm.com
andy@mndlawfirm.com

*/s/ Kimberly Ingram-Hogan*_____
Kimberly Ingram-Hogan

20

# EXHIBIT C

EFILED 05/11/26 11:11 PM CASE NO. 26C525 Joseph P. Day, Clerk

## Business Record Details »

Minnesota Business Name
## Change Healthcare Pharmacy Solutions, Inc.

**Business Type**
Business Corporation (Foreign)

**MN Statute**
303

**File Number**
1164625400022

**Home Jurisdiction**
Maine

**Filing Date**
6/23/2020

**Status**
Active / In Good Standing

**Renewal Due Date**
12/31/2026

**Registered Office Address**
5200 WILLSON RD
STE 150
EDINA, MN 55424–1300
USA

**Registered Agent(s)**
United Agent Group Inc.

**Chief Executive Officer**
Roger Gerard Connor
424 Church Street, Suite 1400
Nashville, TN 37219
United States

**Home Business Name**
Change Healthcare Pharmacy Solutions, Inc.

---

**Filing History**

# Filing History

**Select the item(s) you would like to order:** | Order Selected Copies |

EFILED  05/11/26 11:11 PM  CASE NO. 26C525  Joseph P. Day, Clerk

| | Filing Date | Filing | Effective Date |
|---|---|---|---|
| ☐ | 6/23/2020 | Original Filing - Business Corporation (Foreign) (Business Name: Change Healthcare Pharmacy Solutions, Inc.) | |
| ☐ | 11/17/2025 | Registered Office and/or Agent - Business Corporation (Foreign) | |

© 2026 Office of the Minnesota Secretary of State - **Terms & Conditions**

The Office of the Secretary of State is an equal opportunity employer

⊠ **Subscribe for email updates!**
**Vulnerability Disclosure**

EFILED 05/11/26 11:11 PM CASE NO. 26C525 Joseph P. Day, Clerk

## Business Record Details »

Minnesota Business Name
# Change Healthcare Payer Payment Integrity, LLC

**Business Type**
Limited Liability Company (Foreign)

**MN Statute**
322C

**File Number**
959072500025

**Home Jurisdiction**
Delaware

**Filing Date**
7/27/2017

**Status**
Active / In Good Standing

**Renewal Due Date**
12/31/2026

**Registered Office Address**
5200 WILLSON RD
STE 150
EDINA, MN 55424–1300
USA

**Registered Agent(s)**
United Agent Group Inc.

**Manager**
Change Healthcare Solutions LLC
424 CHURCH ST
STE 1400
NASHVILLE, TN 37219–2367
United States

**Principal Executive Office Address**
424 CHURCH ST
STE 1400
NASHVILLE, TN 37219–2367
United States

**Home Business Name**
Change Healthcare Payer Payment Integrity, LLC

**Principal Place of Business Address**
3055 Lebanon Pike, Suite 1000
Nashville, TN 37214
USA

**Filing History**

EFILED 05/11/26 11:11 PM CASE NO. 26C525 Joseph P. Day, Clerk

# Filing History

**Select the item(s) you would like to order:**  Order Selected Copies

| | Filing Date | Filing | Effective Date |
|---|---|---|---|
| ☐ | 7/27/2017 | Original Filing - Limited Liability Company (Foreign) (Business Name: Change Healthcare Payer Payment Integrity, LLC) | |
| ☐ | 11/17/2025 | Registered Office and/or Agent - Limited Liability Company (Foreign) | |

© 2026 Office of the Minnesota Secretary of State - **Terms & Conditions**

The Office of the Secretary of State is an equal opportunity employer

✉ **Subscribe for email updates!**
**Vulnerability Disclosure**

EFILED  05/11/26 11:11 PM  CASE NO. 26C525  Joseph P. Day, Clerk

## Business Record Details »

Minnesota Business Name
### Change Healthcare Resources LLC

**Business Type**
Limited Liability Company (Foreign)

**MN Statute**
322C

**File Number**
1098891500026

**Home Jurisdiction**
Delaware

**Filing Date**
8/30/2019

**Status**
Active / In Good Standing

**Renewal Due Date**
12/31/2026

**Registered Office Address**
5200 WILLSON RD
STE 150
EDINA, MN 55424–1300
USA

**Registered Agent(s)**
United Agent Group Inc.

**Principal Place of Business Address**
424 Church Street, Suite 1400
Nashville, TN 37219
USA

**Manager**
Change Healthcare Resources Holdings Inc.
424 Church Street, Suite 1400
Nashville, TN 37219
United States

**Principal Executive Office Address**
424 Church Street, Suite 1400
Nashville, TN 37219
United States

**Home Business Name**
Change Healthcare Resources LLC

**Filing History**

# Filing History

EFILED 05/11/26 11:11 PM CASE NO. 26C525 Joseph P. Day, Clerk

**Select the item(s) you would like to order:** Order Selected Copies

| | Filing Date | Filing | Effective Date |
|---|---|---|---|
| ☐ | 8/30/2019 | Original Filing - Limited Liability Company (Foreign) (Business Name: Change Healthcare Resources LLC) | |
| ☐ | 3/3/2021 | Amendment - Limited Liability Company (Foreign) | |
| ☐ | 11/13/2025 | Registered Office and/or Agent - Limited Liability Company (Foreign) | |

© 2026 Office of the Minnesota Secretary of State - **Terms & Conditions**

The Office of the Secretary of State is an equal opportunity employer

☒ **Subscribe for email updates!**
**Vulnerability Disclosure**

EFILED 05/11/26 11:11 PM CASE NO. 26C525 Joseph P. Day, Clerk

## Business Record Details »

Minnesota Business Name
# Change Healthcare Solutions, LLC

**Business Type**
Limited Liability Company (Foreign)

**MN Statute**
322C

**File Number**
2085409-2

**Home Jurisdiction**
Delaware

**Filing Date**
11/06/2006

**Status**
Active / In Good Standing

**Renewal Due Date**
12/31/2026

**Registered Office Address**
5200 WILLSON RD
STE 150
EDINA, MN 55424–1300
USA

**Registered Agent(s)**
United Agent Group Inc.

**Home Business Name**
Change Healthcare Solutions, LLC

**Principal Place of Business Address**
424 Church Street, Suite 1400
Nashville, TN 37219
USA

**Manager**
Change Healthcare Operations, LLC
424 CHURCH ST
STE 1400
NASHVILLE, TN 37219–2367
United States

**Principal Executive Office Address**
424 CHURCH ST
STE 1400
NASHVILLE, TN 37219–2367
United States

**Home Office Address**
1209 Orange Str %Corporation Trust Co
Wilmington, DE 19801
USA

**Filing History**

EFILED 05/11/26 11:11 PM CASE NO. 26C525 Joseph P. Day, Clerk

# Filing History

Select the item(s) you would like to order: [ Order Selected Copies ]

| | Filing Date | Filing | Effective Date |
|---|---|---|---|
| ☐ | 11/06/2006 | Original Filing - Limited Liability Company (Foreign) | |
| | 11/06/2006 | Limited Liability Company (Foreign) Business Name (Business Name: Envoy LLC) | |
| ☐ | 04/10/2007 | Global Registered Office and/or Agent - Limited Liability Company (Foreign) | |
| ☐ | 01/07/2008 | Revocation - Limited Liability Company (Foreign) | |
| ☐ | 06/12/2009 | Annual Reinstatement - Limited Liability Company (Foreign) | |
| ☐ | 8/7/2012 | Revocation - Limited Liability Company (Foreign) | |
| ☐ | 1/30/2013 | Annual Reinstatement - Limited Liability Company (Foreign) | |
| ☐ | 6/12/2015 | Revocation - Limited Liability Company (Foreign) | |
| ☐ | 8/20/2015 | Annual Reinstatement - Limited Liability Company (Foreign) | |
| ☐ | 2/12/2016 | Amendment - Limited Liability Company (Foreign) (Business Name: Change Healthcare Solutions, LLC) | |
| ☐ | 9/16/2016 | Registered Office and/or Agent - Limited Liability Company (Foreign) | |
| | 1/1/2018 | Conversion to 322C Due to Statute Mandate – Limited Liability Company (Foreign) | |
| ☐ | 3/9/2018 | Revocation - Limited Liability Company (Foreign) | |
| ☐ | 5/2/2018 | Annual Reinstatement - Limited Liability Company (Foreign) | |
| ☐ | 3/3/2021 | Amendment - Limited Liability Company (Foreign) | |

EFILED 05/11/26 11:11 PM CASE NO. 26C525 Joseph P. Day, Clerk

| Filing Date | Filing | Effective Date |
|---|---|---|
| ☐ 11/13/2025 | Registered Office and/or Agent - Limited Liability Company (Foreign) | |

© 2026 Office of the Minnesota Secretary of State - **Terms & Conditions**

The Office of the Secretary of State is an equal opportunity employer

✉ **Subscribe for email updates!**
**Vulnerability Disclosure**

EFILED 05/11/26 11:11 PM CASE NO. 26C525 Joseph P. Day, Clerk

EFILED  05/13/26 04:18 PM  CASE NO. 26C525  Joseph P. Day, Clerk

**IN THE CIRCUIT COURT OF DAVIDSON COUNTY, TENNESSEE
AT NASHVILLE**

RED HOUSE MEDICAL BILLING MI LLC,

      Plaintiff,

v.

CHANGE HEALTHCARE INC.,

      Defendant.

Case No. 26C525

**REPLY IN SUPPORT OF MOTION TO STAY DEADLINE TO FILE RESPONSIVE
PLEADING AND FOR LIMITED JURISDICTIONAL DISCOVERY**

Defendant Change Healthcare Inc. ("Defendant"), by and through counsel, respectfully

submits the following Reply to Plaintiff Red House Medical Billing MI LLC's ("Plaintiff")

Response in Opposition to Defendant's Motion to Stay Deadline to File Responsive Pleading and

For Limited Jurisdictional Discovery (the "Response" or "Opp.").

**INTRODUCTION**

Defendant is seeking a brief stay of its responsive-pleading deadline while it takes limited

jurisdictional discovery to ascertain the identity and citizenship of Plaintiff's LLC member(s).

This information is needed to determine whether complete diversity exists and removal is

available.  Plaintiff does not dispute that: (a) its members' identities and citizenship are relevant

to the existence of federal subject-matter jurisdiction, (b) the complaint failed to plead this

information, or (c) the information will, at some point, be revealed during ordinary discovery.

Rather, Plaintiff's essential argument is that, in its view, Plaintiff inevitably will win if there is a

future dispute over jurisdiction.  As explained below, that is wrong.

The cornerstone of Plaintiff's Response is the contention that discovery would be "futile"

because "the question of whether a federal court has subject-matter jurisdiction . . . *has already*

*been resolved* by the Forum Defendant Rule." (Response at 6.)  Not so.  Defendant's principal place of business shifted to Minnesota before this suit was filed, so it is no longer a Tennessee citizen for diversity purposes.  Plaintiff's counsel raised the exact same forum defendant rule arguments in several related cases (the "Federal Cases") that were removed to the United States District Court for the Middle District of Tennessee (the "Federal Court"), which Plaintiffs sought to remand back to state court. The Federal Court denied each motion to remand and stayed all five cases pending a decision by the federal Judicial Panel on Multidistrict Litigation ("JPML") on whether to transfer the Federal Cases to the Multidistrict Litigation currently pending in the District of Minnesota ("the MDL"). In its ruling denying the motions to remand, the Federal Court held that the disputed citizenship question should be decided by "one entity—the JPML" to ensure consistent rulings across the related cases.  So too here.

This Court need not resolve whether federal jurisdiction would be proper in this action. Discovery will reveal the identity and citizenship of Plaintiff's LLC member(s), and then Defendant will determine whether to take the procedural step of removing the action to federal court.  The only question on this Motion (for a temporary stay) is whether, in the meantime, this Court should be forced to unnecessarily expend resources by presiding over an action—and eight others—that may ultimately be removed from its docket.  It should not.  The Court should grant the Motion and implement a temporary stay to facilitate the efficient, targeted discovery of Plaintiff's identity and citizenship.

## BACKGROUND

In February 2024, Defendant was the victim of a cyberattack ("the Cyberattack").  Despite efforts to restore its systems and support individuals, customers, and providers, Defendant and related entities have been sued in over 200 federal and state court cases regarding the Cyberattack.

Accordingly, on June 7, 2024, the JPML granted a Motion to Transfer that created the Change MDL.  Transfer Order, *In re: Change Healthcare, Inc. Customer Data Security Breach Litig.*, MDL No. 3108 (June 7, 2024), ECF No. 158.

This action is one of fourteen (14) separate actions concerning the Cyberattack that Plaintiff's counsel filed against Defendant from February 22, 2026 to March 6, 2026.  Five of those actions (the Federal Cases) were filed by corporations, which allowed Defendant to ascertain the plaintiffs' citizenship and remove to the Federal Court based on diversity jurisdiction.[1]  The remaining nine actions, including this one, were filed on behalf of unincorporated entities whose members' citizenships were not pled and could not be ascertained from publicly available information.  Thus, Defendant filed identical Motions to Stay Deadline to File Responsive Pleading and For Limited Jurisdictional Discovery (the "Motion").  That is the Motion at issue here.

In each of the Federal Cases, Plaintiff's counsel moved to remand based on the same arguments presented here, including the forum defendant rule, and Defendant filed motions to stay to allow the JPML to decide whether to transfer each action to the MDL.  On April 28 and 29, 2026, the Federal Court denied every motion to remand without prejudice and granted Defendant's motions to stay pending the JPML's transfer decision and ultimate ruling on the forum defendant rule argument.  *See, e.g., Dexios Corp. v. Change Healthcare Inc.*, No. 3:26-cv-00340 (M.D. Tenn. Apr. 29, 2026) (Dkt. 17) (the "*Dexios* Order"), attached hereto as **Exhibit 1**.[2]  Applying the three-

---

[1] *Alamance Eye Center, P.A. v. Change Healthcare Inc.*, No. 3:26-cv-00344; *Advanced Billing Consultants, Inc. v. Change Healthcare Inc.*, No. 3:26-cv-00338; *DentFirst P.C. v. Change Healthcare Inc.*, No. 3:26-cv-00339; *Dexios Corp. v. Change Healthcare Inc.*, No. 3:26-cv-00340; *Reus Services Valued Professionals, Inc. v. Change Healthcare Inc.*, No. 3:26-cv-00337.

[2] The remaining Orders are *Advanced Billing Consultants, Inc. v. Change Healthcare Inc.*, No. 3:26-cv-00338 (M.D. Tenn. Apr. 29, 2026) (Dkt. 19); *Alamance Eye Center, P.A. v. Change Healthcare Inc.*, No. 3:26-cv-00344 (M.D. Tenn. Apr. 29, 2026) (Dkt. 17); *DentFirst P.C. v.*

factor stay analysis from *Dunaway v. Purdue Pharma L.P.*, 391 F. Supp. 3d 802, 807 (M.D. Tenn. 2019), the Federal Court held that the disputed question of Defendant's citizenship should be resolved by "one entity—the JPML" to "promote judicial uniformity and avoid the risk of … issuing conflicting rulings as to the citizenship of Defendant."  *See e.g., Dexios* Order at 13. Plaintiff's counsel filed a parallel motion to vacate the JPML's conditional transfer order, arguing the same forum defendant rule prohibition, which remains pending.  MDL No. 3108, Dkt. No. 622-1 at 9.

Plaintiff filed this action on February 22, 2026, pleading that it is a Michigan LLC with its principal place of business in Michigan but disclosing no information regarding its members' citizenship.  Compl. ¶ 14.  Following the Federal Court's order staying the Federal Cases, Defendant's counsel emailed Plaintiff's counsel on May 6, 2026, citing "Judge Richardson's recent rulings" and asking whether Plaintiff's counsel would voluntarily disclose the LLC-member citizenship for the nine remaining state court actions to avoid further motion practice.  In response, Plaintiff's counsel refused, in a single sentence: "we can't agree to discovery that we see as irrelevant given the forum defendant rule."  *See* Email Exchange attached hereto as **Exhibit 2**.

## ARGUMENT

### I.     Plaintiff's Citizenship Is Relevant, and Plaintiff Does Not Show Otherwise.

Plaintiff's entire Response turns on a single incorrect premise: that the limited discovery Defendant seeks would be "futile" and would yield only "irrelevant" information.  (Opp. at 4–6.) That premise fails at the threshold.  The identity of Plaintiff's members and their citizenship is unquestionably relevant to whether the Federal Court has concurrent jurisdiction over this matter.

---

*Change Healthcare Inc.*, No. 3:26-cv-00339 (M.D. Tenn. Apr. 29, 2026) (Dkt. 18); and *Reus Services Valued Professionals, Inc. v. Change Healthcare Inc.*, No. 3:26-cv-00337 (M.D. Tenn. Apr. 28, 2026) (Dkt. 17).

An LLC is deemed to have the citizenship of each of its members for purposes of diversity jurisdiction.  *US Framing Int'l LLC v. Cont'l Bldg. Co.*, 134 F.4th 423, 428 (6th Cir. 2025). Plaintiff did not plead its members' citizenship, and Defendant has a right to learn that information through discovery.

Indeed, Plaintiff does not dispute that, in the ordinary course, citizenship information will be exchanged in discovery.  Defendant simply seeks to obtain that limited information *before* the Court and the parties expend resources on substantively litigating this matter.  In other words, Defendant seeks an efficient, targeted exchange that allows the parties to assess subject-matter jurisdiction at the outset.  Doing so will avoid the Court and the parties expending unnecessary time and resources in the wrong forum.

## II.  Plaintiff's Sole Basis for Opposition, the Forum Defendant Rule, Does Not Apply.

Plaintiff provides only one reason the Court should deny this short, practical stay: its belief that Defendant's discovery would be "futile" because, in Plaintiff's view, the forum defendant rule indisputably bars removal regardless of Plaintiff's citizenship.  (Opp. at 4–6.)  However, the applicability of the forum defendant rule is not settled.  Defendant's position is that the rule does not apply here because Defendant's principal place of business has shifted to Minnesota and it is no longer a Tennessee citizen for diversity purposes. *See Hertz Corp. v. Friend*, 559 U.S. 77, 92–93 (2010) (citizenship determined by current "nerve center").  Plaintiff disputes this.  That genuine dispute is exactly the kind of jurisdictional question that needs to be decided in the proper forum and consistently across the dozens of related cyberattack cases, as the Federal Court held.  That would, of course, be done through briefing on a motion to remand after removal – not by a premature assertion of the ultimate conclusion.

To be clear, this question has not "already been resolved," as Plaintiff contends (Opp. at

6).  Plaintiff's counsel raised the same forum defendant rule argument in the five removed federal cases.  The Federal Court did *not* adopt Plaintiff's argument.  To the contrary, it denied Plaintiff's counsel's motions to remand without prejudice and stayed all five cases pending the JPML's transfer decision, holding that the disputed citizenship question should be resolved by "one entity—the JPML" to "promote judicial uniformity and avoid the risk of … issuing conflicting rulings as to the citizenship of Defendant."  *Dexios* Order at 13.

At the heart of the Federal Court's ruling is a recognition that a single court should decide the forum defendant rule question, once, on a single record, and consistently across all of the related cases.  *See* 28 U.S.C. § 1407(a).  If Plaintiff's citizenship is diverse from Defendant's citizenship of Delaware and Minnesota, this case should likewise be included in that citizenship determination to maintain consistency.  Plaintiff's "futility" argument is, in substance, an invitation for this Court to reach the very question on which the Federal Court deferred.

Plaintiff's own authority confirms that a stay is appropriate.  Plaintiff cites *Laub v. U.S. Dep't of Interior*, 342 F.3d 1080 (9th Cir. 2003), for the proposition that "discovery may be denied" here.  (Opp. at 4.)  But the *Laub* court in fact granted discovery, and ruled that "*discovery should be granted* when, as here, the *jurisdictional facts are contested or more facts are needed*.  Id. (quoting *Wells Fargo & Co. v. Wells Fargo Express Co.,* 556 F.2d 406, 430 n. 24 (9th Cir. 1977) (emphasis added)).  Here, the jurisdictional facts are contested and more facts are needed, namely the citizenship of Plaintiff's LLC members.  The discovery Defendant seeks "should be granted," not denied.

## III.    A Brief Stay Is Consistent with Tennessee Law and Will Not Prejudice Plaintiff.

Plaintiff does not address the controlling Tennessee standard for a stay.  Tennessee courts have "broad discretionary authority to control their dockets and the proceedings in their courts."

*Barnett v. Tenn. Orthopaedic All.*, 391 S.W.3d 74, 79 (Tenn. Ct. App. 2012).  And a temporary stay is appropriate where it will promote efficiency and avoid unnecessary litigation.  *Bell v. Todd*, 206 S.W.3d 86, 94 (Tenn. Ct. App. 2005); *see also Sanjines v. Ortwein & Assocs., P.C.*, 984 S.W.2d 907, 909 (Tenn. 1998).  That standard is easily met here.

A brief stay would promote efficiency.  As explained above, information about Plaintiff, its members, and their citizenship will be subject to and revealed during the ordinary course of discovery in this action.  The only question is whether that occurs now, in a targeted exchange to efficiently resolve a threshold jurisdictional issue, or later, after the case has continued to be litigated in this Court.  Producing the information now allows the parties and the Court to assess subject-matter jurisdiction before any further resources are spent litigating a matter in the wrong forum.  The brief stay that Defendant proposes is the most efficient course.

Likewise, a brief stay will not prejudice Plaintiff.  This case is in its infancy: no scheduling order has been issued, no discovery has been exchanged, and the pleadings are not closed.  The discovery Defendant seeks to facilitate efficiently through this Motion is narrow and limited to a single topic.  Despite Plaintiff's contentions, the procedural path contemplated by the Motion is normal and does not in any way prejudice Plaintiff.  If discovery shows that complete diversity exists, Defendant will exercise its statutory right of removal.  *See* 28 U.S.C. §§ 1441, 1446(b)(3).  If Plaintiff disputes removal, it can move to remand and argue that the forum defendant rule applies—just as Plaintiff's counsel has already done in the five Federal Cases.  That is ordinary process and ordinary procedure.  Though it may not be Plaintiff's preference, Plaintiff will not be deprived of any right or prejudiced in any way.

In the end, a brief stay serves the Court's interest in avoiding inefficient and unnecessary litigation.  Defendant currently faces over 200 cyberattack cases nationwide, including fourteen

actions filed by Plaintiff's counsel recently.  Nine of those fourteen, including this one, have the same Motion for Limited Jurisdictional Discovery pending, which is now before the Court. Resolving the threshold citizenship question now, in a brief and targeted manner, conserves the resources of the Court and the parties, and allows the JPML and the MDL transferee court to address jurisdictional issues in a consistent, coordinated fashion.  Forcing Defendant to file a responsive pleading, as well as engage in significant discovery, motion practice, and other proceedings before this Court, only to have the action potentially removed from the Court on the basis of facts that could be disclosed now, serves no one's interest.

## **CONCLUSION**

Accordingly, Defendant requests that the Court stay Defendant's deadline to file a responsive pleading so that it may conduct limited jurisdictional discovery regarding Plaintiff's citizenship to determine if diversity jurisdiction exists.

Dated: May 13, 2026

Respectfully submitted,

*/s/ E. Todd Presnell*
E. Todd Presnell (BPR 017521)
Andrew W. Tao (BPR No. 41344)
**BRADLEY ARANT BOULT CUMMINGS LLP**
One 22 One
1221 Broadway, Suite 2400
Nashville, TN 37203
T. (615) 252-2355
F. (615) 252-6355
tpresnell@bradley.com
atao@bradley.com

*Counsel for Defendant Change Healthcare Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document, which was filed with the Court through the

electronic filing system, will be sent electronically to the following parties:

J. Gerard Stranch, IV
Grayson Wells (BPR #039658)
STRANCH, JENNINGS & GARVEY, PLLC
223 Rosa L. Parks Ave., Suite 200
Nashville, TN 37203
Tel: (615) 254-8801
gstranch@stranchlaw.com
gwells@stranchlaw.com

Tracy W. Houck
LAW OFFICE OF TRACY HOUCK, LLC
301 South Bonner Street
Ruston, LA 71270
Tel: (318) 255-4066
Fax: (318) 255-8520
thouck@suddenlinkmail.com

Landon N. Tooke
TOOKE LAW, LLC
218 Orchard Valley Circle
Ruston, LA 71270
Tel: (318) 955-9730
landon@tookelaw.com


Dated: May 13, 2026

/s/ E. Todd Presnell
E. Todd Presnell

# EXHIBIT 1

EFILED 05/13/26 04:18 PM CASE NO. 26C525 Joseph P. Day, Clerk

| | | |
|---|---|---|
| DEXIOS CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | NO. 3:26-cv-00340 |
| v. | ) | |
| | ) | JUDGE RICHARDSON |
| CHANGE HEALTHCARE INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court in this action are two motions. The first is a motion to remand (Doc. No. 7, "Motion to Remand"), filed by Plaintiff, Dexios Corporation. Via the Motion to Remand, Plaintiff seeks an order "remanding this case to Davidson County Circuit Court for lack of complete diversity and improper removal by Defendant." (Doc. No. 7 at 1). Plaintiff has filed a brief (Doc. No. 8) in support of the Motion to Remand. Defendant, Change Healthcare Inc., has filed a response (Doc. No. 13, "Remand-Motion Response") in opposition to the Motion to Remand. Plaintiff has filed a reply (Doc. No. 15) in further support of the Motion to Remand.

The second Motion is a motion to stay (Doc. No. 11, "Motion to Stay") filed by Defendant. Via the Motion to Stay, Defendant seeks:

> an order staying all proceedings in the above-captioned matter pending a decision by the United States Judicial Panel on Multidistrict Litigation ("JPML") on Defendant's notice identifying this action as a potential tag-along action in the related multidistrict litigation captioned *In re: Change Healthcare Inc., Customer Data Security Breach Litig.*, MDL No. 3108. ECF No. 588 (J.P.M.L. March 25, 2026).

EFILED 05/13/26 04:18 PM CASE NO. 26C525 Joseph P. Day, Clerk

(Doc. No. 11 at 1). Defendant has filed a brief (Doc. No. 12) in support of the Motion to Stay. Plaintiff has filed a response (Doc. No. 14) in opposition to the Motion to Stay. Defendant has filed a reply (Doc. No. 16) in further support of the Motion to Stay.

For the reasons described below, the Motion to Remand (Doc. No. 7) is **DENIED** and the Motion to Stay (Doc. No. 11) is **GRANTED**.

BACKGROUND

On March 20, 2026, Defendant removed this action from the Davidson County Circuit Court. (Doc. No. 1). On March 25, 2026, Plaintiff filed its Motion to Remand, contending that Defendant's removal of this action is an "improper attempt to force this state court case into the federal Multidistrict Litigation against Defendant that is pending in the United States District Court for the District of Minnesota[: *In re: Change Healthcare Inc., Customer Data Security Breach Litig.*, Case No. 0:24-md-03108-DWF-DJF. (D. Minn.)]." (Doc. No. 8 at 1-2). Plaintiff argues that removal to federal court is improper because (according to Plaintiff) Defendant is a citizen of Tennessee by virtue of Defendant's principal place of business being located (according to Plaintiff) in Tennessee, and so removal is prohibited based on the so-called "Forum Defendant Rule."[1] (Doc. No. 8 at 3-5). Defendant, of course, disagrees that remand is warranted, contending in the Remand-Motion Response that Defendant is a citizen of Delaware (given that Delaware is the state of Defendant's incorporation—something that Plaintiff does not dispute) and a citizen of Minnesota (on account of Defendant's principal place of business being located (according to Defendant) in Minnesota (rather than Tennessee)). (Doc. No. 13 at 4-8).

---

[1] 28 U.S.C. § 1441(b)(2) provides that cases in which federal jurisdiction is based solely on complete diversity of citizenship "may not be removed if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought." This provision is known colloquially as the Forum Defendant Rule. *See e.g., Madden v. Berea Healthcare, LLC*, No. CV 5:23-223-DCR, 2023 WL 8654369, at *6 (E.D. Ky. Dec. 14, 2023).

EFILED 05/13/26 04:18 PM CASE NO. 26C525 Joseph P. Day, Clerk

Meanwhile, on March 25, 2026, Defendant filed a "Notice of Potential Tag-Along Actions" (JPML Change MDL Doc. No. 588, "Tag-Along Notice") in the multidistrict litigation ("MDL") ongoing before the Judicial Panel on Multidistrict Litigation ("JPML") captioned *In re: Change Healthcare Inc., Customer Data Security Breach Litig.*, MDL No. 3108. (J.P.M.L) ("JPML Change MDL").[2] On March 30, 2026, the Acting Clerk of the JPML entered a conditional transfer order (JPML Change MDL Doc. No. 591, "Conditional Transfer Order") therein conditionally transferring this action to the multidistrict litigation ongoing in the United States District Court for the District of Minnesota captioned *In re: Change Healthcare Inc., Customer Data Security Breach Litig.*, Case No. 0:24-md-03108-DWF-DJF. (D. Minn.) ("Minn. Change MDL").[3] Plaintiff filed an objection (JPML Change MDL Doc. No. 599, "Objection") to the Conditional Transfer Order in the JPML Change MDL on April 6, 2026, and filed a motion to vacate (JPML Change MDL Doc. No. 622, "Motion to Vacate") the Conditional Transfer Order in the JPML Change MDL on April 21, 2026, asserting in its memorandum in support of the Motion to Vacate, in part, that transfer of this action to the Minn. Change MDL is improper because "the Forum Defendant Rule applies, eliminating the ability for the federal courts to exercise subject matter jurisdiction solely on diversity of citizenship." (JPML Change MDL Doc. No. 622-1 at 9).[4] Briefing on the

---

[2] When referring to filings in the JPML Change MDL, the Court will use the following format (for textual references and for citations, respectively): "JPML Change MDL Docket No. ___" or "(JPML Change MDL Doc. No. ___)"

[3] When referring to filings in the Minn. Change MDL, the Court will use the following format (for textual references and for citations, respectively): "Minn. Change MDL Docket No. ___" or "(Minn. Change MDL Doc. No. ___)"

[4] Plaintiff filed a corrected version of the Motion to Vacate and memorandum at JPML Change MDL Docket Nos. 635 and 635-1, respectively. Herein, the Court will refer to and cite the originally filed Motion to Vacate and memorandum filed at JPML Change MDL Docket Nos. 622 and 622-1, respectively.

EFILED 05/13/26 04:18 PM CASE NO. 26C525 Joseph P. Day, Clerk

Motion to Vacate is ongoing. The Motion to Vacate remains pending for decision by the JPML, as does the decision of whether to conclusively transfer this action to the Minn. Change MDL.

Subsequent to the filing of the Tag-Along Notice, on March 27, 2026, Defendant filed the Motion to Stay, contending that this action, including any decision on the Motion to Remand, should be stayed pending the JPML's decision on the Tag-Along Notice—i.e., stayed pending the JPML's decision on whether to transfer this action unconditionally to the Minn. Change MDL. (Doc. No. 12 at 1, 3-7). Plaintiff contends in opposition:

> The Court should deny Defendant's request for a stay, which is nothing more than a ploy to use an improper removal to force state court litigants into a federal multidistrict class action pending in Minnesota—a class action Defendant knows Plaintiff will opt out of. Indeed, though a stay is extremely prejudicial to Plaintiff, denying the stay offers no prejudice to Defendant because being required to defend a case is not prejudicial.

(Doc. No. 14 at 3).

Below, the Court will consider the Motion to Stay and the Motion to Remand. For the reasons stated below, the Court concludes that the Motion to Stay will be granted, that a substantive decision on the merits of the Motion to Remand will be deferred, and that the Motion to Remand will be denied without prejudice.

<u>LEGAL STANDARD</u>

A district court has wide discretion when considering whether to stay a matter. *See Clinton v. Jones*, 520 U.S. 681, 706 (1997) ("The District Court has broad discretion to stay proceedings as an incident to its power to control its own docket."). Indeed, the power to stay proceedings is "incidental to the power inherent in every court to control the disposition of the causes in its docket with economy of time and effort for itself, for counsel and for litigants," and "the entry of [] an order [implementing a stay] ordinarily rests with the sound discretion of the District Court." *F.T.C. v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 626–27 (6th Cir. 2014) (quoting *Ohio Envtl. Council v.*

EFILED 05/13/26 04:18 PM CASE NO. 26C525 Joseph P. Day, Clerk

*U.S. Dist. Court, S. Dist. of Ohio, E. Div.*, 565 F.2d 393, 396 (6th Cir.1977)). This discretion extends to a district court considering whether to "grant a stay of proceedings pending a final ruling of the [JPML] on the transfer of a case [to the MDL]." *Fox v. Depuy Orthopaedics, Inc.*, 3:11–cv–387–CRS, 2011 WL 6057509, at *1 (W.D. Ky. Dec. 6, 2011).

When considering whether to grant a stay pending the resolution of the transfer of a case into a MDL, courts generally consider three factors: "(1) potential prejudice to the non-moving party; (2) hardship and inequity to the moving party if the action is not stayed; and (3) the judicial resources that would be saved by avoiding duplicative litigation if the case[] [is in fact transferred to the MDL]." *Dunaway v. Purdue Pharma L.P.*, 391 F. Supp. 802, 807 (M.D. Tenn. 2019) (quoting *Glazer v. Whirlpool Corp.*, No. 1:08-CV-1624, 2008 WL 4534133, at *2 (N.D. Ohio Oct. 6, 2008)).

Notably, the Rules of Procedure of the JPML provide that "pendency of a [] conditional transfer order [] before the Panel pursuant to 28 U.S.C. § 1407 does not affect or suspend orders and pretrial proceedings in any pending federal district court action and does not limit the pretrial jurisdiction of that court." JPML Rule 2.1(d). However—and as relevant for the instant action wherein the Court is faced with a pending motion to remand and a pending motion to stay—the "general rule is for federal courts to defer ruling on pending motions to remand in MDL litigation until after the [JPML] has [determined whether to] transfer[] the case." *Beshear v. Volkswagen Grp. of America, Inc.*, No. 16-CV-27-GFVT, 2016 WL 3040492, at *8 (E.D. Ky. May 25, 2016) (quoting *Kelly v. Aultman Physician Center*, 2013 WL 2358583, *2 (N.D. Ohio May 29, 2013)). This general rule is especially applicable in instances where "jurisdiction issues 'are complex and their resolution is uncertain' and where such issues 'are common to other cases pending before the

EFILED  05/13/26 04:18 PM  CASE NO. 26C525  Joseph P. Day, Clerk

MDL court.'" *Beshear*, 2016 WL 3040492, at *8 (quoting *Curtis v. BP Am., Inc.*, 808 F. Supp. 2d 976, 981 (S.D. Tex. 2011)).

DISCUSSION

Turning to the Motions, the Court finds that granting the Motion to Stay, deferring a substantive decision on the merits of the Motion to Remand, and denying the Motion to Remand without prejudice are warranted.[5]

An analysis of the aforementioned three applicable factors reveals that a stay is warranted in this action.

Turning to the first factor—the potential prejudice to the nonmovant—Defendant argues that Plaintiff (the nonmovant with respect to the Motion to Stay) will not be prejudiced by a stay because "[i]n the event that the JPML declines to consolidate the pending case[] [into the Minn. Change MDL], this case will have been delayed for only a short time, and even then, the delay will have occurred in the earliest stages of litigation." (Doc. No. 12 at 4).

Plaintiff argues, by contrast:

Plaintiff would be severely prejudiced. Defendant is asking the Court to forego its obligation to determine its own jurisdiction long enough to allow the JPML to transfer this case to the District of Minnesota where it will be joined with the pending class action MDL where the MDL court's appointed class counsel would take over. It is an attempt to strip Plaintiff of its chosen forum and its chosen counsel until Plaintiff can opt out. Further still, Defendant knows full well that if a class is certified in the MDL, Plaintiff will opt out of that class to pursue separate litigation. In other words, this is nothing more than another delay tactic designed to make Plaintiff wait for the slow-moving MDL to proceed to the stage where Plaintiff can opt out so that Plaintiff can finally restart this litigation right where it is now— potentially years down the road.

Moreover, that delay would only exist after the JPML ruled on the attempted transfer, which itself could take months. . . . There is no indication as to the timeline

---

[5] Naturally, and as shown by the analysis below, the decision on whether to grant the Motion to Stay and the decision on whether to defer a decision on the merits of the Motion to Remand are intertwined insofar as the granting of the Motion to Stay would naturally result in a deferral of a decision on the merits of the Motion to Remand.

EFILED 05/13/26 04:18 PM CASE NO. 26C525 Joseph P. Day, Clerk

for which the JPML will issue a decision as to the [Conditional Transfer Order], but such decisions have thus far taken anywhere from four months to as long as eight months from the filing of a plaintiff's notice of opposition to conditional transfer order for the JPML to resolve.

(Doc. No. 14 at 6-7).[6] At base, Plaintiff's argument boils down to a contention that Plaintiff will be prejudiced by the delay that it will suffer as a result of the Court staying this action (thereby deferring a substantive ruling on the Motion to Remand) pending the decision of the JPML on whether to transfer this action conclusively to the Minn. Change MDL. Although the Court understands that Plaintiff might be frustrated by a stay of this action resulting from the granting of the Motion to Stay, mere delay is not sufficient to prevent such a stay. *See Watson v. Progressive Direct Ins. Co.*, No. CV 5:22-203-DCR, 2024 WL 3092373, at *3 (E.D. Ky. June 21, 2024) (noting in considering a stay (in a non-MDL context) that although plaintiff contends that "she will . . . be prejudiced by a delay" as a result of a stay, "'delay alone is generally not sufficient to prevent a stay, as it is inherent in any stay.'" (quoting *Sec'y of U.S. Dep't of Lab. v. Kavalec*, No. 1:19-CV-00968, 2019 WL 5684462, at *3 (N.D. Ohio Nov. 1, 2019))); *Semiconductor Energy Lab'y Co. v. Chimei Innolux Corp.*, No. SACV 12-21-JST JPRX, 2012 WL 7170593, at *3 (C.D. Cal. Dec. 19, 2012) ("the mere fact and length of any delay . . . does not demonstrate prejudice sufficient to deny [a] request for a stay."). *Cf. Allied Erecting & Dismantling Co., Inc. v. Genesis Equipment & Mfg.,*

---

[6] Moreover, the Court notes that although Plaintiff's argument refers to the Court's obligation to determine its own jurisdiction over this action, the Court notes that such obligation does not require the Court to determine its jurisdiction prior to the decision of the JPML on whether to conclusively transfer this action to the Minn. Change MDL. It is without question that the Court would certainly have an obligation to determine its subject-matter jurisdiction over this action if this action did in fact remain before this Court (rather than being transferred to the Minn. Change MDL). *See Strategic Assets, Inc. v. Fed. Express Corp.*, 190 F. Supp. 2d 1065, 1067 (M.D. Tenn. 2001) ("a district court's first obligation is to determine whether the court has subject matter jurisdiction"). However, this obligation does not require the Court to determine its jurisdiction *prior* to the decision of the JPML as to whether to conclusively transfer this action to the Minn. Change MDL. If this obligation did in fact require a court to determine its jurisdiction *prior* to the decision of the JPML on whether to conclusively transfer an action to an MDL, it would be impossible for district courts to adhere to the general rule of "defer[ring] ruling on pending motions to remand in MDL litigation until after the [JPML] has [determined whether to] transfer[] the case." *Beshear*, 2016 WL 3040492, at *8.

EFILED 05/13/26 04:18 PM CASE NO. 26C525 Joseph P. Day, Clerk

*Inc.*, No. 4:08CV589, 2010 WL 3239001, at *2 (N.D. Ohio Aug. 16, 2010) (noting in the context of a requested stay to permit reexamination of patents that "[w]hile some prejudice to Plaintiffs is inherent in any delay, this alone is not sufficient to prevent a stay."). Put another way, the Court finds that the delay that Plaintiff purportedly will suffer as a result of the Motion to Stay does not weigh against granting the Motion to Stay. Given that the Court can discern little other harm that Plaintiff would suffer if the Motion to Stay were granted, the Court finds that this factor weighs in favor of the Court granting the Motion to Stay (and therefore deferring a substantive decision on the merits of the Motion to Remand).

Turning to the second factor—the hardship and inequity to the moving party if the action is not stayed—the Court does not agree with Plaintiff's contention that Defendant has not shown hardship or inequity that would result were a stay not granted. Defendant contends that absent a stay, it will be harmed by being forced "'to engage in parallel proceedings in numerous courts [(e.g., before this Court and the JPML Change MDL)] while being temporarily denied the [potential] full benefit of the highly organized process of the MDL proceedings'" (Doc. No. 12 at 5 (quoting *Abshire v. Davol, Inc.*, No. 2:18-cv-268, 2018 WL 2538746, at *2 (S.D. Ohio June 4, 2018))), and that "[l]itigating the individual cases across different fora will cost Defendant 'an excessive amount of time, money and energy' that might otherwise be avoided." (Doc. No. 12 at 5 (quoting *U.S. Bank, Nat'l Assoc. v. Royal Indem. Co.*, 2002 WL 31114069, at *2 (N.D. Tex. Sept. 23, 2002))). Defendant's argument here is well-taken, and indeed district courts frequently find that a movant—in the context of a motion to stay—faces hardship or inequity if forced to litigate an action while awaiting a decision from the JPML on whether to transfer an action to a multidistrict case. *See e.g., Ates v. Delta Air Lines, Inc.*, No. CIV.A. 15-3228, 2015 WL 5774979, at *3 (E.D. La. Sept. 30, 2015) ("The Court is convinced by Defendants' argument that continuing

EFILED 05/13/26 04:18 PM CASE NO. 26C525 Joseph P. Day, Clerk

to litigate this case while waiting for a decision from the JPML that is likely to come in the near future would prove a substantial hardship and inequity to Defendants."). *But see Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1112 (9th Cir. 2005) (noting that "being required to defend a suit, without more, does not constitute a 'clear case of hardship or inequity'" for a stay to issue). Indeed, as Defendant argues, its burden is not merely one of having to litigate this case, but also to litigate:

> over 190 federal and state court cases arising from the same cyberattack, all at varying stages of litigation, across the country. Without a stay, Defendant must simultaneously navigate different discovery schedules, motions practice, and pretrial orders here while the same issues are being coordinated in the Change MDL. The JPML created the MDL specifically to avoid this kind of fragmented, duplicative, and costly parallel litigation. A stay pending the JPML's transfer decision is precisely the tool Congress and the JPML envisioned for this situation.

(Doc. No. 16 at 4). Thus, the Court discerns that Defendant would face substantial hardship were it required to litigate an action in this Court pending the JPML's transfer decision, and so this factor weighs in favor of granting the Motion to Stay (and therefore deferring, for the time being, a substantive decision on the merits of the Motion to Remand). *Cf. Pace v. Merck & Co.*, No. CIV 04-1356MCA/ACT, 2005 WL 6125457, at *2 (D.N.M. Jan. 10, 2005) (noting, when granting a motion to stay, the risk that a defendant-movant faced of "duplicative motion practice and redundant discovery proceedings absent a stay").[7]

The third stay factor—the judicial resources that would be saved by avoiding duplicative litigation if the case ultimately is transferred to the MDL—weighs strongly in favor of granting

---

[7] The Court does feel compelled to note that, naturally, Plaintiff might contend that Defendant would not face a burden of litigating (at least in this Court) if the Motion to Remand were to be considered and granted. Still this (hypothetical argument) is at this point unconvincing. The Court is not convinced that the Motion to Remand would in fact be granted so as to prevent Defendant from facing the burden of litigating in this Court (and preclude the transfer of this action to the Minn. Change MDL). Moreover, as will be discussed below—the Court discerns that at this juncture it would be misguided and premature to consider the Motion to Remand as a threshold matter.

EFILED 05/13/26 04:18 PM CASE NO. 26C525 Joseph P. Day, Clerk

the Motion to Stay (and thus avoiding, at this juncture, a ruling on the merits of the Motion to Remand).

As an initial matter, the Court notes that in the briefing on the Motion to Remand (which the Court would naturally consider on the merits if the Motion to Stay was to be denied), Plaintiff and Defendant have presented the Court with various exhibits comprised of competing evidence as to the location of Defendant's citizenship. For example, Defendant has filed a copy of a "Rule 7.1(b)(2) Supplemental Corporate Disclosure Statement" (Doc. No. 13-2), which Defendant originally filed in the Minn. Change MDL (Minn. Change MDL Doc. No. 493), wherein Defendant asserts that its "principal place of business is now Minnesota[, and] [a]s a result, [Defendant] is now a citizen of Minnesota and Delaware." (Doc. No. 13-2 at 2).

This indicates that if the Court were to decline to grant the Motion to Stay (and thus in turn consider the Motion to Remand), the Court would be required to make a substantive determination as to the citizenship of Defendant, a determination that promises to be a complex one given the breadth of the briefing filed in connection with the Motion to Remand. This determination would involve not just weighing the various competing arguments and evidence that the parties have submitted in connection with the Motion to Remand, but also the weight to be afforded to the filings that Defendant has made in the Minn. Change MDL (namely the "Rule 7.1(b)(2) Supplemental Corporate Disclosure Statement"). The Court is convinced that embarking on this course of action would not only be a poor use of judicial resources but would also pose a substantial risk of inconsistent judicial orders, as will be explained in more depth below. *See Spaeth v. TJM Medical, Inc.*, No. 1:21-CV-02160-PAB, 2021 WL 5936462, at *3 (N.D. Ohio Dec. 16, 2021) (weighing—in the context of the third stay factor—the interests of judicial economy and

EFILED 05/13/26 04:18 PM CASE NO. 26C525 Joseph P. Day, Clerk

efficiency, as well as the possibility of inconsistent rulings in considering whether a stay is warranted).[8]

With respect to preserving judicial resources, the Court notes that ruling on the Motion to Remand now risks wasting judicial resources. Consider, for example, a situation in which (1) the Court ultimately denies the Motion to Stay, promptly considers the Motion to Remand, and ultimately denies the Motion to Remand on the merits by finding that Defendant is a citizen of Minnesota rather than Tennessee (which at present certainly remains a potential outcome), and (2) this case is ultimately transferred to the Minn. Change MDL—via the JPML denying the Motion to Vacate and perhaps ruling conclusively that Defendant is a citizen of Minnesota rather than Tennessee. In that scenario, two judicial bodies—this Court and the JPML— would have expended judicial resources in considering the same issue: Defendant's citizenship. The Court discerns that such a duplicative expenditure of judicial resources would be inefficient and antithetical to the preservation of scarce judicial resources.

Furthermore, even if this action is *not* in fact transferred conclusively to the Minn. Change MDL (i.e., if the JPML ultimately grants the Motion to Vacate and remands the case back to this Court), judicial resources would be best served by deferring a decision on the Motion to Remand and granting the Motion to Stay. The Court observes that in Plaintiff's memorandum in support of the Motion to Vacate filed in the JPML Change MDL, Plaintiff has raised many of the same arguments that it has raised in the Motion to Remand, namely that the federal courts lack jurisdiction over this action because "the Forum Defendant Rule applies, eliminating the ability

---

[8] Put another way, although aware that the Rules of Procedure of the JPML provide that "pendency of a [ ] conditional transfer order [] before the Panel pursuant to 28 U.S.C. § 1407 does not affect or suspend orders and pretrial proceedings in any pending federal district court action and does not limit the pretrial jurisdiction of that court," JPML Rule 2.1(d), the Court (for the reasons stated above and below) does not believe it would be a wise use of its jurisdiction to consider the merits of the Motion to Remand at this juncture.

EFILED 05/13/26 04:18 PM CASE NO. 26C525 Joseph P. Day, Clerk

for the federal courts to exercise subject matter jurisdiction solely on diversity of citizenship." (JPML Change MDL Doc. No. 622-1 at 9). Put another way, Plaintiff is now (understandably) contending before two judicial bodies—this Court and the JPML—that the exercise of jurisdiction over this action is improper based on the Forum Defendant Rule. With this in mind, the Court finds that it would be a much better use of judicial resources to defer a decision on the status of Defendant's citizenship to the JPML because the JPML is likely to already have a familiarity with the issues and evidence relevant to a determination of Defendant's citizenship. For the same reason, even if the JPML ultimately grants Plaintiff's Motion to Vacate (JPML Change MDL Doc. No. 622), and permits this action to remain in this Court, the Court finds it plausible that the JPML's analysis in its ruling on the Motion to Vacate would likely be informative of this Court's ruling on any motion to remand.

Thus, the Court discerns that it would be a more efficient use of judicial resources to grant the Motion to Stay (and thus defer a decision on the merits of the Motion to Remand) pending the decision of the JPML on whether to transfer this action to the Minn. Change MDL (via a decision on the Motion to Vacate). *See Chaney v. JUUL Labs, Inc.*, No. 2:19-CV-4145, 2019 WL 13196794, at *2 (S.D. Ohio Oct. 31, 2019) (deferring consideration of a plaintiff's motion to remand, stating that because the plaintiff raised the same jurisdictional arguments in both the motion to remand and the motion to vacate a conditional transfer order, "the Court finds that the interests of judicial consistency, economy, and uniformity are best served by deferring ruling on Plaintiff's Motion to Remand pending the MDL's decision on transfer."); *Beal v. Merck & Co.*, No. 05-1344-T/AN, 2005 WL 3279285, at *2 (W.D. Tenn. Dec. 1, 2005) ("The Court finds that having the jurisdictional issues decided in one proceeding will promote judicial economy and conserve judicial resources.").

EFILED 05/13/26 04:18 PM CASE NO. 26C525 Joseph P. Day, Clerk

As suggested above, in considering the third stay factor, the Court considers a risk of inconsistent judicial orders. This risk weighs in favor of the Court granting the Motion to Stay, for many of the same reasons that concerns over judicial resources weigh in favor of the Court granting the Motion to Stay (and thus declining to consider the merits of the Motion to Remand). Indeed, the Court discerns that having one entity—the JPML—consider jurisdictional issues, like those raised in the Motion to Remand and Motion to Vacate, will promote judicial uniformity and avoid the risk of this Court and the JPML issuing conflicting rulings as to the citizenship of Defendant. *See Chaney*, 2019 WL 13196794, at *2 (finding that deferring jurisdictional arguments to the JPML when raised in both a motion to remand and motion to vacate conditional transfer order is in "the interests of judicial [] uniformity").

All told, the third factor weighs strongly in favor of the Court granting the Motion to Stay (and accordingly deferring a ruling on the Motion to Remand). This means that all three of the factors the Court has considered herein weigh in favor of the Court granting the Motion to Stay. So, the Court will grant the Motion to Stay.

Given that the Court is granting the Motion to Stay and thus deferring a decision on the merits of the Motion to Remand, the Court will deny the Motion to Remand without prejudice to Plaintiff refiling a motion to remand in the event that the JPML does not ultimately transfer this action to the Minn. Change MDL.

CONCLUSION

For the reasons stated herein, the Motion to Remand (Doc. No. 7) is **DENIED** without prejudice to Plaintiff refiling the Motion to Remand if this action is ultimately not transferred to the Minn. Change MDL. Moreover, the Motion to Stay (Doc. No. 11) is **GRANTED**. All deadlines and proceedings in this matter are **STAYED** pending a decision by the JPML on whether to

EFILED 05/13/26 04:18 PM CASE NO. 26C525 Joseph P. Day, Clerk

transfer this action to the Minn. Change MDL. Within seven (7) days of the JPML determining whether to transfer this action to the Minn. Change MDL, the parties shall file a status update with the Court detailing the decision of the JPML, therein indicating the reasons, if any, that the stay should be lifted. Alternatively, at any point prior to any transfer of this case, any party may move to lift the stay in this case for good cause.[9]

      IT IS SO ORDERED.

                                      *Eli Richardson*
                                    ELI RICHARDSON
                                    UNITED STATES DISTRICT JUDGE

---

[9] In an order (Doc. No. 10), the Court indicated that it would "rule promptly on the Motion to Remand once briefing on the Motion to Remand is concluded." (Doc. No. 10 at 1). Plaintiff may take umbrage with the Court's decision herein given that the Court has not ruled on the merits of the Motion to Remand and instead denied the Motion to Remand without prejudice. Nevertheless, the Court stresses that it has expedited its decision on both the Motion to Remand (insofar as it has determined that it is inadvisable to reach the merits of the Motion to Remand and denied the Motion to Remand without prejudice within two weeks of briefing on the Motion to Remand concluding) and the Motion to Stay—putting numerous older pending motions on the metaphorical backburner to do so.

EFILED  05/13/26 04:18 PM  CASE NO. 26C525  Joseph P. Day, Clerk

# EXHIBIT 2

EFILED 05/13/26 04:18 PM CASE NO. 26C525 Joseph P. Day, Clerk

| From: | Grayson Wells |
|---|---|
| To: | Presnell, Todd; Gerard Stranch |
| Cc: | Mueller, Joe; Tao, Andy |
| Subject: | RE: Change Healthcare--Pending State Court Actions |
| Date: | Monday, May 11, 2026 3:12:07 PM |

Hi Todd,

Thanks for the email, but we can't agree to discovery that we see as irrelevant given the forum defendant rule.

Thanks,



**Grayson Wells**
**Member**

The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Office:  615.254.8801
Mobile: 615.209.1975

gwells@stranchlaw.com

---

**From:** Presnell, Todd <tpresnell@bradley.com>
**Sent:** Monday, May 11, 2026 9:46 AM
**To:** Grayson Wells <gwells@stranchlaw.com>; Gerard Stranch <gstranch@stranchlaw.com>
**Cc:** Mueller, Joe <jmueller@bradley.com>; Tao, Andy <atao@bradley.com>
**Subject:** RE: Change Healthcare--Pending State Court Actions

Grayson,

Hope you had a nice weekend.

In response to your inquiry below, under 28 U.S.C. § 1446(b)(3), removal is proper within 30 days after receipt of any paper from which it may first be ascertained that the case is one that is or has become removable. The operative complaints did not plead information sufficient to ascertain the citizenship of the plaintiff entities.  For this reason, we seek discovery to determine whether diversity exists to support removal.  If discovery reveals that diversity exists to support removing, then that discovery would trigger any deadline to remove.  The reason for my email request, therefore, is to simply ask for the information now without having to finish briefing and arguing the request for discovery.  If the entities' members do not support diversity and removal, then we will

EFILED  05/13/26 04:18 PM  CASE NO. 26C525  Joseph P. Day, Clerk

not need to go through this process.

Hope this makes sense.  We are happy to discuss our request further if it would be helpful.  In short, our intent is to obtain the citizenship information efficiently and to avoid unnecessary burden on the court.


Thanks,
Todd



Bradley
**Todd Presnell**
Partner
e: tpresnell@bradley.com w: bradley.com
d: 615.252.2355
Bradley Arant Boult Cummings LLP
ONE 22 ONE, 1221 Broadway, Suite 2400
Nashville, TN 37203

---

**From:** Grayson Wells <gwells@stranchlaw.com>
**Sent:** Wednesday, May 6, 2026 5:23 PM
**To:** Presnell, Todd <tpresnell@bradley.com>; Gerard Stranch <gstranch@stranchlaw.com>
**Cc:** Mueller, Joe <jmueller@bradley.com>; Tao, Andy <atao@bradley.com>
**Subject:** RE: Change Healthcare--Pending State Court Actions

Hi Todd,

These complaints were filed and served back in February, so the 30-day removal timer has long since expired. Please let me know if you have any authority for the proposition that removal is still on the table.

Thanks,


**Grayson Wells**
**Member**

The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Office:  615.254.8801
Mobile: 615.209.1975

gwells@stranchlaw.com

EFILED  05/13/26 04:18 PM  CASE NO. 26C525  Joseph P. Day, Clerk

**From:** Presnell, Todd <tpresnell@bradley.com>
**Sent:** Wednesday, May 6, 2026 12:07 PM
**To:** Gerard Stranch <gstranch@stranchlaw.com>; Grayson Wells <gwells@stranchlaw.com>
**Cc:** Mueller, Joe <jmueller@bradley.com>; Tao, Andy <atao@bradley.com>
**Subject:** Change Healthcare--Pending State Court Actions

Gerard and Grayson,

Hope you are doing well.

In light of Judge Richardson's recent rulings and the upcoming hearings in the state-court cases listed below, I write to ask whether you are willing to provide the Plaintiff entities' citizenship to avoid additional motion practice and hearing attendance. This would consist of providing the members of each Plaintiff entity and their state of citizenship. To the extent any member is also an LLC or other unincorporated entity, we would also need that LLC/entity's membership and citizenship, and so forth, until all members are individuals or corporations. In short, we just want to know whether complete diversity exists so that we can determine whether there is—or is not—a threshold basis for removal.

We are available to confer if you have any questions about our request or if it would be helpful to discuss further.

| | |
|---|---|
| Family Care Medical Center, P.A. | 26C520 |
| Healthcare Administrative, LLC | 26C517 |
| Intelibill Professional Services, LLC | 26C516 |
| Red House Medical Billing MI LLC | 26C525 |
| Surgical Recovery Solutions, LLC | 26C521 |
| The Auctus Group LLC | 26C540 |
| Lutze Consulting, LLC | 26C536 |
| | |

EFILED 05/13/26 04:18 PM CASE NO. 26C525 Joseph P. Day, Clerk

| | |
|---|---|
| Mind Over Matters, PLLC | 26C542 |
| Medical Management & Mentoring LLC | 26C689 |

Thank you,
Todd



Bradley

**Todd Presnell**
Partner
e: tpresnell@bradley.com w: bradley.com
d: 615.252.2355
Bradley Arant Boult Cummings LLP
ONE 22 ONE, 1221 Broadway, Suite 2400
Nashville, TN 37203

Confidentiality Notice: This e-mail is from a law firm and may be protected by the attorney-client or work product privileges. If you have received this message in error, please notify the sender by replying to this e-mail and then delete it from your computer.

EFILED 05/13/26 04:18 PM CASE NO. 26C525 Joseph P. Day, Clerk

**THE CIRCUIT COURT FOR DAVIDSON COUNTY, TENNESSEE**
**TWENTIETH JUDICIAL DISTRICT, AT NASHVILLE**

| | |
|---|---|
| RED HOUSE MEDICAL BILLING MI LLC, <br><br> Plaintiff, <br><br> v. <br><br> CHANGE HEALTHCARE INC., <br><br> Defendant. | Case No. 26C525 <br><br> JURY TRIAL DEMANDED <br><br> Judge Lynne T. Ingram |

**PLAINTIFF'S MOTION FOR LEAVE TO CONDUCT LIMITED EXPEDITED**
**DISCOVERY REGARDING DEFENDANT'S CORPORATE CITIZENSHIP**

Plaintiff Red House Medical Billing MI LLC, ("Plaintiff") respectfully moves this Court for entry of an order permitting Plaintiff to conduct limited jurisdictional discovery regarding Defendant Change Healthcare's citizenship for the purpose of assessing whether the Forum Defendant Rule is applicable and thus any potential removal to federal court is improper. At bottom, this limited discovery is relevant for the same reason the Court allowed Defendant to conduct limited jurisdictional discovery—to determine whether a good faith basis to remove this action to federal court exists. To facilitate this discovery, Plaintiff also request that the Parties' responsive deadlines to discovery be coordinated such that the Parties can determine whether the Forum Defendant applies prior to Defendant's attempted removal.

## INTRODUCTION

Plaintiff initiated this action in this Court on February 23, 2026. Thereafter, the Davidson County Circuit Court issued summons and plaintiff perfected service of process via certified U.S. Mail. Defendant's registered agent was ultimately served on February 25, 2026. Defendant then filed its Motion to Stay Deadline to File Responsive Pleading and for Limited Jurisdictional Discovery ("Def.'s Mtn. to Stay"). The Court granted Defendant's Motion and allowed Defendant

1

to seek limited discovery seeking to determine Plaintiff's citizenship—a fact that Defendant believes will permit removal to the Middle District of Tennessee under 28 U.S.C. § 1332.

At the time of filing, however, Defendant represented its headquarters to be located at 424 Church Street, Suite 1400, Nashville, Tennessee. Indeed, Defendant represented to the Tennessee Secretary of State to be headquartered in Nashville, Tennessee—asserting its principal place of business was in Nashville on its original registration on August 5, 2019, all the way until its latest annual filing on March 30, 2026, more than a month after the complaint was filed.[1] In fact, Defendant represented itself to this very Court to be headquartered in Nashville, Tennessee on December 9, 2025.[2] Moreover, "Change Healthcare, Inc." still remains conspicuously absent from a business entity search on the Minnesota Secretary of State's website.[3]

Therefore, Plaintiff believes any attempted removal would be improper under the Forum Defendant Rule. 28 U.S.C. § 1441(b)(2). But Defendant now claims it is headquartered in Minnesota and therefore not a citizen of Tennessee and is thus propounding discovery to Plaintiff as to Plaintiff's citizenship for the purpose of removing this Action to the Middle District of Tennessee—a removal that is only proper if Defendant's principle place of business is indeed in Minnesota pursuant to the nerve center test.

---

[1] *See* Exhibit A, Pl.'s Resp. Opp'n Def.'s Mtn. to Stay Deadline to File Resp. Pleading & for Limited Jurisdictional Disc. (May 11, 2026).

[2] *See, e.g.*, Exhibit B., Resp. Opp'n Def.'s Mtn. to Stay Deadline to File Resp. Pleading & for Limited Jurisdictional Disc. (May 11, 2026). Defendant also filed similar representations in *PruittHealth, Inc. v. Change Healthcare, Inc.*, Davidson County Circuit Court, No. 25C2291, (Davidson County Circuit Court, Tenn.); *Total Wound v. Change Healthcare, Inc.*, No. 25C155 (Davidson County Circuit Court, Tenn.); *Time for a Change, LLC v. Change Healthcare, Inc.*, No. 25C151 (Davidson County Circuit Court, Tenn.). Although, the Court has since permitted Defendant to file an Amended Answer so that Defendant may assert its principal place of business moved, Defendant has done little in the way of proving its "nerve center" ever left Nashville, or if it did, when.

[3] *See* Exhibit C, Resp. Opp'n Def.'s Mtn. to Stay Deadline to File Resp. Pleading & for Limited Jurisdictional Disc. (May 11, 2026).

2

Given that Defendant's issuance of discovery to Plaintiff regarding its citizenship places Defendant's citizenship at issue, Plaintiff requested discovery from the Defendant regarding their citizenship. But Defendant denied Plaintiff's request stating that Defendant's citizenship was "irrelevant." Therefore, Plaintiff moves this Court to conduct limited jurisdictional discovery regarding Defendant Change Healthcare's citizenship. To prevent unnecessary inefficiencies, delay, and burden upon the Plaintiff and the Courts, Plaintiff intends to serve the attached limited discovery to determine the "nerve center" of Change Healthcare, Inc. and whether the Forum Defendant Rule is applicable.

## ARGUMENT

A decision to permit limited jurisdictional discovery is a discretionary matter for the trial court to determine. *First Cmty. Bank, N.A. v. First Tenn. Bank, N.A.*, 489 S.W.3d 369, 402, 406 (Tenn. 2015); *Willeford v. Klepper*, 597 S.W3d 454, 470 (Tenn. 2020). Defendant previously argued for the Court to adopt five factors when assessing whether to grant jurisdictional discovery:

> (1) whether the plaintiff has shown that there is a likelihood that discovery will yield facts that will influence the personal jurisdiction determination; (2) whether the plaintiff has laid out with particularity the evidence sought by discovery; (3) whether the evidence sought is the type which would normally be in the exclusive control of the defendant; (4) whether the case is particularly complex; and (5) whether the plaintiff's interest in discovery outweighs the policy concerns of subjecting a nonresident defendant to burdensome discovery at such an early stage and seeking to avoid allowing the plaintiff to conduct a "fishing expedition."

Def.'s Mem. in Supp. of Def.'s Mtn. to Stay Deadline to File Responsive Pleading and for Limited Jurisdictional Disc. ("Def.'s Mtn. to Stay"), at 5 (citing *First Cmty. Bank, N.A. v. First Tenn. Bank, N.A.*, 489 S.W.3d 369, 405–06 (Tenn. 2015)). Plaintiff on the other hand, advocated "the Court should be more concerned with only two items: (1) whether jurisdictional discovery would be relevant and fruitful; and (2) the prejudice caused by jurisdictional discovery." Pl. Resp. in Opp'n to Def.'s Mtn to Stay, at 4 (citing *Laub v. U.S. Dept. of Interior¸* 342 F.3d 1080, 1093 (9th Cir.

3

2003) ("Although a refusal to grant discovery to establish jurisdiction is not an abuse of discretion when it is clear that further discovery would not demonstrate facts sufficient to constitute a basis for jurisdiction, discovery should be granted when, as here, the jurisdictional facts are contested or more facts are needed.") (internal citations omitted)). Regardless of the test applied here, all factors weigh in favor of granting leave for jurisdictional discovery.

## I.    Discovery as to Defendant's Purported Move to Minnesota is Relevant

Under Tennessee Rule of Civil Procedure 26.02 "[p]arties may obtain discovery regarding any matter, not privilege, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party[.]" "The phrase relevant to the subject matter involved in the pending action is synonymous with germane or bearing on the subject matter." *West v. Schofield*, 460 S.W.3d 113, 125 (Tenn. 2015) (quoting *Vythoulkas v. Vanderbilt Univ. Hosp.,* 693 S.W.2d 350, 359 (Tenn. Ct. App. 1985) (superseded on other grounds). That is, the information sought by plaintiff through discovery must have some logical connection to proving his case and/or obtaining his prayed-for relief. *Id.*

Defendant's citizenship is relevant. A federal district court has jurisdiction over a case based on diversity of citizenship when the parties are citizens of different states and the amount in controversy is more than $75,000. 28 U.S.C. § 1332(a)(1). If diversity jurisdiction exists, a defendant may remove a case originally filed in state court to the federal district court whose district includes the location of the state court where the suit was filed. 28 U.S.C. § 1441(a). Citizenship is determined at the time of filing, *Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 67, 570–71 (2004), and for corporations, the federal diversity jurisdiction statute provides that "a corporation shall be deemed to be a citizen of any State by which it has been incorporated

4

*and of the State where it has its principal place of business.*" 28 U.S.C. § 1332(c)(1) (emphasis added). But if Defendant is a citizen of the forum state, whether by incorporating there or because it's "nerve center" is there, then the Forum Defendant Rule bars removal. 28 U.S.C. § 1441(b)(2).

Here, Defendant argued to this Court that it needed jurisdictional discovery before removing. But Plaintiff contends that the Forum Defendant Rule precludes the federal court from having subject matter jurisdiction because Defendant is a citizen of Tennessee, thus making any removal improper. Though the question of federal jurisdiction does not go to a claim presented, Defendant opened the door to jurisdictional discovery being relevant by expressly and successfully asking for it in this Court. If jurisdictional discovery is relevant for Defendant, it must be relevant for Plaintiff. That is especially so given that the only way Defendant's requested discovery could possibly be relevant is if the Forum Defendant Rule did not apply—the rule Plaintiff now seeks discovery on.

Although this Court will not and need not decide the merits of federal diversity and subject matter jurisdiction, Defendant's citizenship has become highly relevant to the pursuit of Plaintiff's claims in a timely, efficient manner.

## II. Limited Discovery Regarding Defendant's Citizenship Will Not Prejudice Defendant

Several of the factors Defendant cited in its Motion to Stay Deadline and to File Responsive Pleading and For Limited Jurisdictional Discovery are focused on the prejudiced caused by jurisdictional discovery. *See First Cmty. Bank*, 489 S.W.3d at 405–06. That is, jurisdictional discovery should (1) be likely to yield facts that influence the determination of jurisdiction; (2) be sufficiently tailored and narrow; (3) be evidence normally the exclusive control of the defendant; and (4) not be unduly burdensome on defendant. Here, Plaintiff's proposed written discovery will not prejudice Defendant.

5

First, Plaintiff's proposed propounded discovery is highly likely to yield facts that influence jurisdiction. Here, Plaintiff simply seeks to find the "nerve center" of Defendant such that its principal place of business can be determined, as Defendant has provided no facts other than basic legal conclusions to support its assertion. Typically, a corporation's "nerve center" is its main headquarters, "provided that the headquarters is the actual center of direction, control, and coordination." *Hertz Corp. v. Friend*, 559 U.S. 77, 92–93 (2010). But, "[i]f the record reveals attempts at [jurisdictional] manipulation—for example, that the alleged 'nerve center' is nothing more than a mail drop box, a bare office with computer, or the location of annual executive retreat—the courts should instead take as the 'nerve center' as the place of actual direction, control, and coordination, in the absence of such manipulation." *Id.* at 97. Additionally, a "domicile once acquired is presumed to continue until it is shown to have been changed." *Mitchell v. United States*, 88 U.S. 350, 353 (1874). Because Defendant admits at one point in time to have been a Tennessee citizen, *see* Def.'s Reply in Supp. of Def.'s Mtn. to Stay, at 1, Defendant's citizenship can only have changed by relocating its "nerve center" to establish its principal place of business in another state. Here, Plaintiff's propounded discovery will yield facts that reveal whether Defendant relocated its nerve center by moving the place of actual direction, control, and coordination of Defendant at the time of filing. *See* Exhibit A (Proposed Interrogatories). Moreover, Plaintiff's propounded discovery is sufficiently tailored and narrow, and as such will not unduly burden Defendant. Plaintiff's proposed written discovery does not require Defendant to conduct any e-discovery, nor produce any documents. Instead, it simply asks Defendant to provide the factual support it has purportedly relied on to make the assertion that its "nerve center" moved from Tennessee to Minnesota prior to the filing of Plaintiff's complaint. Additionally, the information Plaintiff seeks is exclusively Defendant's control. If Plaintiff were to solely rely on documents

6

available to the public, it would seem to be obvious that Defendant's "nerve center" is located in Nashville, Tennessee.[4] Because Defendant has contended otherwise—based on information exclusively under its control, Def.'s Reply in Supp. of Def.'s Mtn. to Stay, at 1—Defendant would not be prejudiced in providing such information.

Finally, Plaintiff's request for jurisdictional discovery is in the interests of judicial economy and prevents inequitable treatment. Indeed, use of discovery here will foster the goal of judicial economy. *Sabo v. Dennis Tech., LLC*, 2007 WL 1958591, at *4 (S.D. Ill. July 2, 2007); *see Kirkland v. Morton's of Chicago*, 1996 WL 532118, at *4 (N.D. Cal. Sept. 16, 1996).[5] Similarly, Defendant asked for comparable jurisdictional discovery for the express and stated purpose of removing this case to federal court. Indeed, that is precisely what Defendant said in open court. But that removal cannot happen if the Forum Defendant Rule applies, and so the relevancy of Defendant's already granted discovery is entirely dependent on the discovery Plaintiff seeks here. To hold otherwise would be highly prejudicial to Plaintiff and create an inequitable double standard—one in which Defendant may seek discovery to determine whether removal is proper, but Plaintiff may not seek to determine whether removal is improper. Moreover, understanding whether the Forum Defendant Rule likely applies would allow the Parties to discuss the propriety of removal before removal occurs, thereby avoiding the need for an inefficient motion to remand. As such, Plaintiff also requests that the Parties' responsive deadlines to discovery be coordinated such that the Parties can determine whether the Forum Defendant applies before removal. Otherwise, Defendant will likely attempt to remove this case, and Plaintiff's propounded written discovery will remain unanswered.

---

[4] *See supra* note 1–3.

[5] Although, these cases discuss in terms of Defendant seeking jurisdictional discovery prior to removal, the same principles should hold true, particularly in instances like this, Forum Defendant Rule exists precisely to protect plaintiffs from having their chosen forum stripped away by a defendant who is a local citizen.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests the Court grant Plaintiff's Motion.

Dated: May 27, 2026

Respectfully Submitted,

*/s/ J. Gerard Stranch, IV*
J. Gerard Stranch, IV (BPR # 23045)
Grayson Wells (BPR # 039658)
**STRANCH, JENNINGS & GARVEY, PLLC**
The Freedom Center
223 Rosa. L. Parks Avenue, Suite 200
Nashville, TN 37203
Tel: (615) 254 8801
gstranch@stranchlaw.com
gwells@stranchlaw.com

Tracy W. Houck*
**LAW OFFICE OF TRACY HOUCK, LLC**
301 South Bonner Street
Ruston, LA 71270
Tel: (318) 255-4066
Fax: (318) 255-8520
thouck@suddenlinkmail.com

Landon N. Tooke*
**TOOKE LAW, LLC**
218 Orchard Valley Circle
Ruston, LA 71270
Tel: (318) 955-9730
landon@tookelaw.com

*\*Pro Hac Vice forthcoming*

*Counsel for Plaintiff*

## NOTICE OF HEARING

**PLAINTIFF HEREBY SET THIS MOTION TO BE HEARD ON JUNE 26, 2026 at 9 A.M. PURSUANT TO LOCAL RULE 26.04(g) IF NO RESPONSE TO THIS MOTION IS TIMELY FILED AND SERVED, THE MOTION SHALL BE GRANTED AND COUNSEL NEED NOT APPEAR IN COURT AT THE TIME AND DATE SCHEDULED FOR THE HEARING.**

8

## CERTIFICATE OF SERVICE

I hereby certify that on May 27, 2026, the foregoing Plaintiff's Motion for Leave to Conduct Limited Expedited Discovery Regarding Defendant's Corporate Citizenship was filed with the Clerk of Court using the Court's electronic filing system, which will then serve notice on the following:

E. Todd Presnell (TN BPR 017521)
Kimberly M. Ingram-Hogan (TN BPR 35191)
**BRADLEY ARANT BOULT CUMMINGS, LLP**
One 22 One
1221 Broadway, Suite 2400
Nashville, TN 37203

***Counsel for Defendant***

> */s/ J. Gerard Stranch, IV*
> J. Gerard Stranch, IV (BPR # 23045)

9

# EXHIBIT A

EFILED 05/27/26 03:59 PM CASE NO. 26C525 Joseph P. Day, Clerk

RED HOUSE MEDICAL BILLING MI LLC,

      Plaintiff,

v.

CHANGE HEALTHCARE INC.,

      Defendant.

Case No. 26C525

Judge Lynne T. Ingram

**PLAINTIFF'S LIMITED SET OF INTERROGATORIES DEFENDANT'S CORPORATE CITIZENSHIP**

Plaintiff, by and through counsel, hereby request that Defendant Change Healthcare Inc., answer each and respond to the following Interrogatories and Requests for Production of Documents.

**DEFINITIONS**

1. The terms "Defendant," "Change," "You," or "Your(s)" refer to the party(ies) to which these requests are propounded and any agents, employees, officers, directors, subsidiaries, affiliates, predecessor corporation(s), both present and former, including their attorneys and insurers, except to the extent that a privilege not to answer is specifically stated.

2. The term "UHG or UnitedHealth Group" means UnitedHealth Group and any parent, subsidiary, affiliate, employee, officer, director, agent, representative, contractor, consultant, or person acting on its behalf.

3. The term "Optum" means Optum, Inc. and any parent, subsidiary, affiliate, employee, officer, director, agent, representative, contractor, consultant, or person acting on its behalf.

EFILED 05/27/26 03:59 PM CASE NO. 26C525 Joseph P. Day, Clerk

4. The term(s) "person(s)" and/or "individual(s)" means natural persons, as well as firms, companies, corporations, partnerships, sole proprietorships, joint ventures, organizations, groups of natural persons or other associations or entities separately identifiable, whether or not such associations or entities have a separate legal existence in their own right, unions, associations, federations, employers, or any other kind of entity.

5. The term "Complaint" refer(s) to the operative (most recent version of and/or amendment to) Complaint filed in this action and the collective allegations and parties in each of the consolidated Complaints, if any.

6. "Concerning," "relating to" or "related to" mean, in whole or in part, constituting, containing, embodying, reflecting, describing, discussing, reflecting involving, supporting, contradicting, criticizing, evidencing, analyzing, recording, summarizing, identifying, comprising, mentioning, stating, reporting on, commenting on, mentioning, showing, referring directly or indirectly to, dealing with, or in any way pertaining to.

7. The term(s) "document(s)" or "record(s)" shall mean a writing, as defined under the applicable rules of evidence and shall include writings, handwritten notes, and printed matter of any kind and description, including, by way of illustration and not limitation: electronically-stored data, electronic audio or video recordings and the scripts of same, email or text message communications, embodiments of analytical or monitoring equipment or devices, physical depictions, notes, letters and memoranda, logs, charts, x-rays or other output of radiographic examinations, transcripts, summaries, and statements. It shall also include any additional copy or duplicate of any document as described above which contains any handwriting, typewriting, notation, modification, or other addition thereto of any kind, as well as any rough or preliminary draft(s) of the document. You are directed to produce the information sought herein even where

2

EFILED 05/27/26 03:59 PM CASE NO. 26C525 Joseph P. Day, Clerk

created, maintained, distributed, acquired or otherwise in the possession of any predecessor corporations or business entities, provided that they are within Your care, custody and/or control.

8.      "Network" or "Information System(s)" includes, without limitation, your network environment, any computer system, server (whether physical or virtual), desktop computer, laptop computer, tablet computer, smart phone, cellular telephone, networking equipment, internet site, and the software, firmware, programs, applications, scripts, operating systems, or databases (including cloud storage or service provided by third-party providers).

9.      "Identify," "Identifying" and/or "Identification," when referring to a person, mean(s) to provide an identification or information sufficient to notice a deposition of such person and to serve such person with process to require his or her attendance at a place of examination and shall include, without limitation, his or her full name, present or last known address, present or last known business affiliation, home and business telephone number, email address(es), title or occupation, and each of his or her positions during the most expansive limitations period defined in the Complaint through the present.

10.     "Identify," "Identifying" and/or "Identification," when used in reference to a writing or document, mean(s) to give a sufficient characterization of such writing or document to properly identify it in a request to produce and shall include, without limitation, the following information with respect to teach such document:

    a.   The date appearing on such document and, if it has no date, the answer shall state and shall give the date or approximate date such document was prepared;

    b.   The identity or descriptive code number, file number, title, or label of such document;

    c.   The general nature and description of such document and, if it was not signed, the answer shall state and shall give the name of the person or persons who prepared it;

    d.   The names of the person(s) to whom such document was addressed and the name of each person other than such addressee to whom such document or copies of it, were given or sent;

3

EFILED 05/27/26 03:59 PM CASE NO. 26C525 Joseph P. Day, Clerk

e.  The name(s) of the person(s) having present possession, custody, or control of such document(s); and

f.  Whether or not any draft, copy or reproduction of such document contains any postscripts, notations, changes, or addendum not appearing on the document itself and, if so, the answer shall give the description of each such draft, copy or reproduction.

11.  The term "communication(s)" refers to any transmittal and/or receipt of information, whether such was oral or written, by chance, prearranged, formal or informal, and specifically includes conversations in person, meetings, telephone conversations, facsimile transmissions, telegraphs, electronic communications, emails, instant messages, text messages, group chats, Slack conversations, letters or memoranda, formal statements, press releases, and newspaper stories.

12.  The term(s) "Evidence," "Evidencing," "Relate To," "Relating To," "Concerning," "Pertain," "Pertain(ing) To," "Reference" Or "Regard(ing)" mean(s) consisting of, referring to, reflecting or arising out of, evidencing or in any way legally, logically, or factually connected with the matter discussed, directly or indirectly.

13.  If any requested information is withheld because You claim such information is privileged, provide the following with respect to each item:

a.  the date;

b.  the author and recipient, including the business or legal title or position and the individual(s)' current address and business and residence telephone numbers;

c.  the general subject matter and the number of pages;

d.  the identity of all other persons who received copies thereof or otherwise learned of the document or communication; and

e.  the specific factual basis of the claimed privilege.

14.  The term "Data Breach" shall refer to the cyberattack that is the subject of this action as detailed in the operative (most recent version of and/or amendment to) Complaint filed

4

EFILED  05/27/26 03:59 PM  CASE NO. 26C525  Joseph P. Day, Clerk

in this action and the collective allegations and parties in each of the consolidated Complaints, if any.

15. "Personal Health Information" or "PHI" means information that refers to an individual's medical records and history, which is protected under the Health Insurance Portability and Accountability Act (HIPAA). PHI includes, *inter alia*, test results, procedure descriptions, diagnoses, personal or family medical histories and data points applied to a set of demographic information for a particular patient, medical record numbers, health insurance information, and any other information regarding medical, physical, or mental health.

16. "Personally Identifiable Information" or "PII" means any/all information that can be used to distinguish or trace an individuals' identity, either alone or when combined with other personal or identifying information (as defined in 2 C.F.R. § 200.79). At a minimum, it includes all information that on its face expressly identifies an individual. PII also is generally defined to include certain identifiers that do not, on their face, name an individual, but that are considered to be particularly sensitive and/or valuable if in the wrong hands (for example, names, addresses, identification or account numbers, credit or debit card numbers, Social Security numbers, passport numbers, driver's license numbers, investment information including units owned, issue dates, owner/annuitant designation and other financial account numbers, screen names, biometric records, genetic information, email and/or home addresses, date of birth, digital IDs, etc.).

17. The period covered by these requests shall be three years before the purported discovery of the Data Breach, unless otherwise indicated. Unless so specified, each demand herein requests documents generated or acquired by You and/or within Your possession, custody, and/or control during said period and/or generated prior thereto but remaining in effect or becoming effective at any point in time during said period.

EFILED 05/27/26 03:59 PM CASE NO. 26C525 Joseph P. Day, Clerk

5

18. The conjunctive shall also include the disjunctive and vice versa.

19. The singular shall also include the plural and vice versa.

## INTERROGATORIES

1. **Interrogatory No. 1:** Identify each of Defendant's corporate officers since the occurrence of the Data Breach including but not limited to their title; the roles and responsibilities of each of Defendant's corporate officer; how long they have served in their role; their home address; and their office address.

   **RESPONSE**:

2. **Interrogatory No. 2:** Identify all addresses that Defendant has represented to any state, federal, or local government authority, regulatory body, or court as its principal place of business or headquarters from January 1, 2025 to the present, including the date of each such representation, the identity of the authority to whom the representation was made, and whether Defendant contends that representation was accurate at the time it was made.

   **RESPONSE**:

3. **Interrogatory No. 3:** Identify the location where Defendant's board of directors or equivalent governing body holds its regular meetings, including the city and state of each such meeting held from January 1, 2025, to the present, the date of said meetings, and identify whether those meetings were held in person, virtually, or by hybrid format.

   **RESPONSE**:

4. **Interrogatory No. 4:** Identify the date on which Defendant contends its nerve center relocatedfrom Nashville, Tennessee to Eden, Minnesota, and describe in detail all facts, decisions, actions, and corporate authorizations that Defendant contends effectuated that change, including the identity of all persons involved, including their titles,in making or approving that decision and where the decision was made.

EFILED 05/27/26 03:59 PM CASE NO. 26C525 Joseph P. Day, Clerk

**RESPONSE**:

5. **Interrogatory No. 5:** Identify all office locations, including virtual office locations, Defendant's corporate officers have maintained from January 1, 2025 to the present, including for each location: the address; whether they worked virtually, and if so where they worked virtually from; and the date the location was opened or closed.

    **RESPONSE**:

6. **Interrogatory No. 6:** Identify the date that Defendant's business functions were incorporated into Optum, the legal mechanism by which that integration occurred, including whether it was effectuated through merger, acquisition, restructuring, or otherwise, and if no formal legal mechanism exists, describe how Defendant's business operations are distinguished from Optum's business operations.

    **RESPONSE**:

7. **Interrogatory No. 7:** Identify the location of any offices Defendant or its successor in interest has in Tennessee, and whether or not any of Defendant's employees or its successor in interest has employees who work from the Tennessee office are also Defendant's corporate officers.

    **RESPONSE**:

8. **Interrogatory No. 8:** Identify the date for which Defendant's corporate officers relocated from Nashville, Tennessee, to Eden, Minnesota. Please include whether each corporate officer was provided with an office in Eden, Minnesota and the frequency with which each officer has worked from the office since relocation.

    **RESPONSE**:

7

EFILED 05/27/26 03:59 PM CASE NO. 26C525 Joseph P. Day, Clerk

9. **Interrogatory No. 9:** Explain who is or was responsible for making the Defendant's executive day-to-day decisions from January 2025 onward, including who is in charge of implementing decisions and goals laid out by Defendant's board of directors, their title, and the primary office location(s) where these decisions are or were typically made.

   **RESPONSE**:

Dated: May 27, 2026

Respectfully Submitted,

*/s/ J. Gerard Stranch, IV*
J. Gerard Stranch, IV (BPR #23045)
Grayson Wells (BPR #039658)
**STRANCH, JENNINGS & GARVEY, PLLC**
The Freedom Center
223 Rosa. L. Parks Avenue, Suite 200
Nashville, TN 37203
Tel: (615) 254 8801
gstranch@stranchlaw.com
gwells@stranchlaw.com

Tracy W. Houck*
**LAW OFFICE OF TRACY HOUCK, LLC**
301 South Bonner Street
Ruston, LA 71270
Tel: (318) 255-4066
Fax: (318) 255-8520
thouck@suddenlinkmail.com

Landon N. Tooke*
**TOOKE LAW, LLC**
218 Orchard Valley Circle
Ruston, LA 71270
Tel: (318) 955-9730
landon@tookelaw.com

*Pro Hac Vice forthcoming

***Counsel for Plaintiff***

8

EFILED 05/27/26 03:59 PM CASE NO. 26C525 Joseph P. Day, Clerk

## CERTIFICATE OF SERVICE

I hereby certify that on May 27, 2026, the foregoing was filed with the Clerk of Court using the Court's electronic filing system, which will then serve notice on the following:

E. Todd Presnell (TN BPR 017521)
Kimberly M. Ingram-Hogan (TN BPR 35191)
**BRADLEY ARANT BOULT CUMMINGS, LLP**
One 22 One
1221 Broadway, Suite 2400
Nashville, TN 37203

*Counsel for Defendant*

/s/ *J. Gerard Stranch, IV*
J. Gerard Stranch, IV (TN BPR # 23045)

9

EFILED 05/27/26 03:59 PM CASE NO. 26C525 Joseph P. Day, Clerk

**IN THE CIRCUIT COURT OF DAVIDSON COUNTY, TENNESSEE
AT NASHVILLE**

RED HOUSE MEDICAL BILLING MI LLC,

      Plaintiff,

v.

CHANGE HEALTHCARE INC.,

      Defendant.

Case No. 26C525

## ORDER

Before the Court is Defendant's Motion to Stay and for Limited Jurisdictional Discovery (the "Motion"). The Court has reviewed the record and the Parties' briefing. The Court also conducted a hearing on the Motion on May 15, 2026. After considering the Parties' briefing and argument, the Court finds as follows:

A defendant is generally entitled to defend a case in the manner it sees fit, including the decision whether to remove to federal court. The merits of federal diversity and subject matter jurisdiction are not before this Court, and this Court expresses no opinion on whether the Parties are diverse or whether federal jurisdiction would exist if the action were to be removed. A federal court may decide those questions if Defendant proceeds with removal. This Court will not.

The discovery sought by Defendant is limited in scope as it is confined to information needed to ascertain Plaintiff's citizenship—namely, information about the identity and citizenship of Plaintiff's members sufficient to determine whether diversity of citizenship exists between Plaintiff and Defendant under 28 U.S.C. § 1332. The Court finds that Plaintiff will not be prejudiced by this limited jurisdictional discovery or by a stay of this action while that discovery is obtained. The Court likewise disagrees with Plaintiff's contention that the stay sought by Defendant would cause undue delay. Plaintiff's stated concerns—about this action (if removed)

possibly being transferred to a multidistrict litigation, about the potential timing of potential class certification in the future, and about Plaintiff possibly choosing to opt out of such a class—are speculative and do not weigh against granting a stay.

A stay is appropriate in this action until the jurisdictional discovery sought by Defendant is complete and Defendant obtains information from which it is able to ascertain Plaintiff's citizenship.

For these reasons, it is hereby **ORDERED**, **ADJUDGED**, **AND DECREED** as follows:

1.      Defendant's Motion is **GRANTED**.

2.      Defendant is authorized to serve, and Plaintiff shall respond to, discovery requests regarding the identity and citizenship of Plaintiff's members.  This may include information regarding the identity and citizenship of any members of Plaintiff's members, and so on until all members are identified either as a natural person or a corporation, consistent with the test for determining whether diversity exists under 28 U.S.C. § 1332.  No other discovery is permitted or authorized through this Order.

3.      Except for the discovery authorized by Paragraph 2 of this Order and the responses thereto, this action, including Defendant's deadline to respond to the complaint in this action, is **STAYED** until the completion of the limited jurisdictional discovery authorized herein.  Either party may move to lift the stay on the basis that Plaintiff has responded to the discovery authorized by this Order and Defendant has obtained information sufficient to ascertain Plaintiff's citizenship under 28 U.S.C. § 1332.

**IT IS SO ORDERED.**

Prepared for Entry By:

*/s/ E. Todd Presnell*

E. Todd Presnell (BPR 017521)
Andrew W. Tao (BPR No. 41344)
**BRADLEY ARANT BOULT CUMMINGS LLP**
One 22 One
1221 Broadway, Suite 2400
Nashville, TN 37203
T. (615) 252-2355
F. (615) 252-6355
tpresnell@bradley.com
atao@bradley.com

*Counsel for Defendant Change Healthcare Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document, which was filed with the Court through the

electronic filing system, will be sent electronically to the following parties:

J. Gerard Stranch, IV
Grayson Wells (BPR #039658)
STRANCH, JENNINGS & GARVEY, PLLC
223 Rosa L. Parks Ave., Suite 200
Nashville, TN 37203
Tel: (615) 254-8801
gstranch@stranchlaw.com
gwells@stranchlaw.com

Tracy W. Houck
LAW OFFICE OF TRACY HOUCK, LLC
301 South Bonner Street
Ruston, LA 71270
Tel: (318) 255-4066
Fax: (318) 255-8520
thouck@suddenlinkmail.com

Landon N. Tooke
TOOKE LAW, LLC
218 Orchard Valley Circle
Ruston, LA 71270
Tel: (318) 955-9730
landon@tookelaw.com

Dated: May 19, 2026

*/s/ E. Todd Presnell*
E. Todd Presnell

-4-



**Case Title:**      RED HOUSE MEDICAL BILLING MI LLC V CHANGE HEALTHCARE

**Case Number:**    26C525

**Type:**           ORDER- GENERAL

The foregoing is hereby ORDERED, ADJUDGED AND

DECREED:

_Lynne T. Ingram_

_____

Judge Lynne T. Ingram, Eighth Circuit

Electronically signed on 2026-06-15 13:27:19   page 5 of 5

## IN THE CIRCUIT COURT OF DAVIDSON COUNTY, TENNESSEE
### AT NASHVILLE

RED HOUSE MEDICAL BILLING MI LLC,

      Plaintiff,

v.

CHANGE HEALTHCARE INC.,

      Defendant.

Case No. 26C525

### DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR LEAVE TO CONDUCT LIMITED EXPEDITED DISCOVERY REGARDING DEFENDANT'S CORPORATE CITIZENSHIP

Defendant Change Healthcare Inc. ("Defendant"), by and through counsel, respectfully submits this Response in Opposition to Red House Medical Billing MI LLC's ("Plaintiff") Motion for Leave to Conduct Limited Expedited Discovery Regarding Defendant's Corporate Citizenship (the "Motion") and states as follows:

### INTRODUCTION

Plaintiff frames its Motion as a request for discovery that would be limited, expedited, efficient, and essentially the same as what was granted to Defendant. It is not. This Court permitted Defendant to serve a single, narrow interrogatory to learn the identity and citizenship of Plaintiff's members—the threshold fact that determines whether Defendant can remove the case to federal court. Plaintiff, by contrast, demands nine interrogatories, many with subparts, seeking a comprehensive accounting of the governance, personnel, corporate history, and operations of a national enterprise. The Motion should be denied for three independently sufficient reasons.

First, Plaintiff's proposed discovery is premature and may prove entirely irrelevant as it bears on no issue before this Court and could matter only to a future motion to remand in federal court—if this action is removed at all. Second, the discovery is neither "limited" nor "expedited,"

but an expansive, fact-intensive inquiry into the governance, personnel, corporate history, and operations of a national enterprise and its parent.  Third, the discovery would be inefficient and burdensome as recognized by the recent rulings of the U.S. District Court for the Middle District of Tennessee.  For any or all of these independently sufficient reasons, the Motion should be denied.

## BACKGROUND

In February 2024, Defendant was the victim of a criminal cyberattack ("the Cyberattack"). Despite extensive efforts to restore its systems and support individuals, customers, and providers, Defendant and related entities have been sued in over 200 federal and state court actions relating to the Cyberattack.  Accordingly, on June 7, 2024, the U.S. Judicial Panel on Multidistrict Litigation ("JPML") granted a Motion to Transfer that created the multidistrict litigation captioned *In re: Change Healthcare, Inc. Customer Data Security Breach Litig.*, MDL No. 3108 (June 7, 2024), ECF No. 158 ("Change MDL").

This action is one of fourteen separate actions concerning the Cyberattack that Plaintiff's counsel filed against Defendant between February 22, 2026, and March 6, 2026.  All fourteen actions were originally filed in this court.  Five have since been removed to federal court (the "Federal Actions"), and nine remain pending (the "State Actions").

***The Federal Actions***.  The five Federal Actions were filed by corporations.  This allowed Defendant to ascertain the plaintiffs' citizenship and then remove to federal court based on diversity jurisdiction.[1]  After removal, plaintiffs in all of the Federal Actions moved to remand,

---

[1] *Alamance Eye Center, P.A. v. Change Healthcare Inc.*, No. 3:26-cv-00344 (M.D. Tenn.); *Advanced Billing Consultants, Inc. v. Change Healthcare Inc.*, No. 3:26-cv-00338 (M.D. Tenn.); *DentFirst P.C. v. Change Healthcare Inc.*, No. 3:26-cv-00339 (M.D. Tenn.); *Dexios Corp. v. Change Healthcare Inc.*, No. 3:26-cv-00340 (M.D. Tenn.); *Reus Services Valued Professionals, Inc. v. Change Healthcare Inc.*, No. 3:26-cv-00337 (M.D. Tenn.).

relying on the same arguments presented to the Court in this Motion—including claiming that the forum defendant rule precluded subject matter jurisdiction.  Defendant, for its part, filed motions to stay so that the JPML could decide whether to transfer each action to the MDL.

On April 28 and 29, 2026, the United States District Court for the Middle District of Tennessee denied every motion to remand without prejudice.  The court also granted Defendant's motions to stay pending the JPML's transfer decision and, if transferred, its ultimate ruling on the forum defendant rule.  *See, e.g.*, *Dexios Corp. v. Change Healthcare Inc.*, No. 3:26-cv-00340 (M.D. Tenn. Apr. 29, 2026) (Dkt. 17) (the "Order Denying Remand"), attached hereto as **Exhibit 1**.[2]

The District Court held that the disputed question of Defendant's citizenship should be resolved by **"one entity—the JPML"** to "promote judicial uniformity and avoid the risk of … issuing conflicting rulings as to the citizenship of Defendant." *See, e.g.,* Order Denying Remand at 13 (emphasis added).  Plaintiff's counsel filed a parallel motion to vacate the JPML's conditional transfer order, again arguing that the forum defendant rule precludes jurisdiction; that motion remains pending and will be considered by the JPML without oral argument on July 30, 2026. MDL No. 3108, Dkt. No. 622-1 at 9; Dkt. No. 672 at 10.

***The State Actions***.  The remaining nine State Actions, including this one, were filed by plaintiffs that are unincorporated entities, such as limited liability companies ("LLCs").  The identities of the entities' members were not pled, nor were the members' citizenships.  And their

---

[2] The remaining Orders are substantively identical to the Order Denying Remand.  *Advanced Billing Consultants, Inc. v. Change Healthcare Inc.*, No. 3:26-cv-00338 (M.D. Tenn. Apr. 29, 2026) (Dkt. 19); *Alamance Eye Center, P.A. v. Change Healthcare Inc.*, No. 3:26-cv-00344 (M.D. Tenn. Apr. 29, 2026) (Dkt. 17); *DentFirst P.C. v. Change Healthcare Inc.*, No. 3:26-cv-00339 (M.D. Tenn. Apr. 29, 2026) (Dkt. 18); and *Reus Services Valued Professionals, Inc. v. Change Healthcare Inc.*, No. 3:26-cv-00337 (M.D. Tenn. Apr. 28, 2026) (Dkt. 17).

identity and citizenship information could not be ascertained from publicly available information. Following Defendant's motion for a stay and jurisdictional discovery, the Court ordered that, "[e]xcept for the discovery authorized" to Defendant, "this action … is STAYED until the completion of the limited jurisdictional discovery authorized herein."  *See* Order Granting Motion to Stay and for Limited Jurisdictional Discovery.

***Plaintiff's Current Motion***.  Plaintiff now seeks leave to serve nine interrogatories, with many subparts, casting them as the mirror image of the discovery the Court authorized for Defendant and "relevant for the same reason" that Plaintiff's citizenship was.  Mot. at 1, 5 ("If jurisdictional discovery is relevant for Defendant, it must be relevant for Plaintiff.").  Plaintiff says it is seeking this discovery so "the Parties can determine whether the Forum Defendant [rule] applies *before removal*."  *Id.* at 7 (emphasis added).

### ARGUMENT

The Motion presents two questions: (1) whether the information Plaintiff seeks is discoverable under Tennessee Rule of Civil Procedure 26.02, which permits discovery only of matter "relevant to the subject matter involved in the pending action" and proportional to the needs of the case; and (2) whether the stay this Court entered should be lifted to permit it.  The answer to both is no.

I. **The Expansive Discovery Sought by Plaintiff Does Not Relate to Any Issue Before This Court and Is Not Necessary at This Time.**

The discovery Plaintiff seeks does not relate to any issue presently before this Court and is not necessary at this time.  Rule 26.02 permits discovery only of matter "relevant to the subject matter involved in the pending action," and the discovery Plaintiff seeks is relevant to no such matter.  Tenn. R. Civ. P. 26.02(1).  Plaintiff is seeking discovery for the express purpose of trying to prove the applicability of the forum defendant rule.  The forum defendant rule is merely a

limitation on the removal of cases that are otherwise within the federal courts' diversity jurisdiction if "any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought." *See* 28 U.S.C. § 1441(b)(2). The only court that could ever have occasion to issue a ruling on the applicability of the forum defendant rule would be a federal court on a motion to remand (and only if this action is indeed removed). This issue will never be before this Court in this Action.

Moreover, the Court's grant of limited discovery to Defendant is entirely consistent with denying the Motion here. Defendant's narrow, limited discovery of Plaintiff's citizenship was sought and granted for the purpose of allowing Defendant to ascertain whether the case can be removed at all. And the only court in which Defendant could obtain that discovery is this Court, whereas Plaintiff will be able to seek discovery in federal court if the action is removed. Thus, Plaintiff's central premise that it is merely seeking the same discovery for the same reason is wrong. Because the discovery is not relevant to any issue in this action under Rule 26.02, Plaintiff cannot show the good cause needed to lift the stay this Court entered. That stay halted "all" proceedings except the narrow citizenship discovery the Court authorized for Defendant, and Plaintiff offers no reason to reopen this action for discovery that could matter only in another forum.

The discovery may also prove unnecessary for an independent reason: if Defendant's authorized discovery reveals that Plaintiff shares Defendant's citizenship, complete diversity will be lacking, removal will not occur, and the forum defendant rule will never come into play.

Plaintiff's discovery is also unnecessary at this time because, if it turns out that the action is removed, Plaintiff will be able to seek discovery on jurisdictional issues through the Federal Rules of Civil Procedure. If Defendant removes this action, Plaintiff may move to remand and, if

needed, also seek jurisdictional discovery relating to Defendant's citizenship in a federal forum—a process already explained and endorsed by the District Court.  *See* Order Denying Remand at 13; *see also Chaney v. JUUL Labs, Inc.*, No. 2:19-CV-4145, 2019 WL 13196794, at *2 (S.D. Ohio Oct. 31, 2019) (finding that deferring jurisdictional arguments to the JPML when raised in both a motion to remand and motion to vacate conditional transfer order is in "the interests of judicial [] uniformity").  Federal procedure could be a proper vehicle for a nerve-center inquiry of the type Plaintiff describes—and it is the very vehicle Plaintiff's counsel already has attempted to use in the five Federal Actions, having moved to remand on the same forum defendant theory Plaintiff presses in its Motion here.

If this case is removed, a federal forum will be available to adjudicate any remand motion as well as to preside over any discovery appropriately sought for the purpose of supporting such a motion.  Not so for Defendant.  Defendant is obtaining discovery through this Court because there was nowhere else to do so.  And such discovery is necessary both to determine and exercise its removal rights, because federal law is clear that Defendant cannot "remove first, and ask questions later."  *Avery Outdoors, LLC v. Peak Rock Cap., LLC*, No. 2:16-cv-02229-SHL-tmp, 2018 WL 11416674, at *2 (W.D. Tenn. May 14, 2018) (ordering defendants to show cause as to why sanctions should not be imposed).  That is, a defendant may not remove an action on the basis of diversity without a good-faith basis to allege complete diversity.  And, here, the citizenship of Plaintiff's members—the threshold fact that determines whether diversity exists—was not pled or ascertainable from public sources.  *See Lindemann v. CEC Ent., Inc.*, No. 3:24-cv-00908, 2025 WL 284632, at *3–5 (M.D. Tenn. Jan. 23, 2025).  Defendant therefore cannot obtain a federal forum—or the federal mechanism for jurisdictional discovery—until it learns who Plaintiff's members are and where they are citizens.  Unlike Plaintiff, Defendant has no alternative forum in

which to obtain that information, and its only remedy is limited discovery in this Court, which is precisely what the Court allowed.  Conversely, Plaintiff already has a federal vehicle for its discovery, while Defendant's sole avenue for its threshold citizenship discovery is the narrow inquiry this Court authorized.

**II.     The Discovery Sought by Plaintiff Is Not "Limited" or "Expedited" But Rather Would Be an Expansive Inquiry of Defendant's Operations.**

Plaintiff styles its motion as a request for "limited" and "expedited" discovery, but it is neither.  What Plaintiff seeks is an expansive, fact-intensive inquiry into the governance, personnel, corporate history, and operations of a national enterprise and its parent entity.  It is the antithesis of the narrow, tailored discovery the Court authorized for Defendant.

Defendant's authorized discovery is a single interrogatory asking Plaintiff to merely identify its own members and their citizenship, the basic, party-identity information that determines whether complete diversity exists.  The test for an LLC's citizenship is mechanical.  *US Framing Int'l LLC v. Cont'l Bldg. Co.*, 134 F.4th 423, 428 (6th Cir. 2025).  Answering it merely requires Plaintiff to inform Defendant who owns the LLC and where they are a citizen.

In contrast, Plaintiff's proposed discovery into Defendant's principal place of business is far reaching and intricate.  A corporation is a citizen of both its state of incorporation and the state of its principal place of business, which the Supreme Court has defined as the corporation's "nerve center," which is "the place where a corporation's officers direct, control, and coordinate the corporation's activities."  *Hertz Corp. v. Friend*, 559 U.S. 77, 92–93 (2010).  This is "a question of fact," *Bauer Found. Corp. v. IMI Tenn., Inc.*, No. 3:19-cv-00849, 2019 WL 6273253, at *4 (M.D. Tenn. Nov. 25, 2019), that will involve a factual record that is neither limited nor expedited.

Plaintiff's discovery requests, on their face, demonstrate how the inquiry is anything but "limited."  Plaintiff has proposed nine interrogatories, many with multiple subparts, demanding

expansive sworn statements about Defendant's operations, including:

- all representations Defendant has made to any state, federal, or local government authority, regulatory body, or court regarding its principal place of business (Mot., Ex. A, Interrog. No. 2);

- "all facts, decisions, actions, and corporate authorizations" related to Defendant's "nerve center" being in Minnesota (Mot., Ex. A, Interrog. No. 4);

- the identities of all of Def's corporate officers, their addresses, their business affiliations, their phone numbers, their email addresses, and all of the positions they've held (Mot., Ex. A, Interrog. No. 1; *id.* Definition No. 9);

- every office location, including every virtual location, from which every corporate officer has worked, and where each officer worked (Mot., Ex. A, Interrog. No. 5);

- a full description of the date and legal mechanism by which Defendant's business functions were incorporated into Optum (Mot., Ex. A, Interrog. No. 6);

- a full description of how Defendant's operations are distinguished from those of Optum (Mot., Ex. A, Interrog. No. 6); and

- a full explanation of who made each and every one of Defendant's "executive day-to-day decisions," including who implements the board's decisions and where those decisions are made (Mot., Ex. A, Interrog. No. 9).

This is not simple party-identity discovery, and it is neither "limited" nor capable of being "expedited."  If permitted, it likely will entangle this Court in complex, lengthy, and burdensome discovery, even though it does not relate to any issue before this Court.

## III. Contrary to Plaintiff's Contention, the Discovery Sought Would be Highly Inefficient and Burdensome.

Plaintiff contends that its proposed discovery will "prevent unnecessary inefficiencies, delay, and burden upon the Plaintiff and the Courts."  Mot. at 3.  But the opposite is true.  Rule 26.02 independently bars the Motion on this ground, because it permits only discovery that is proportional to the needs of the case by weighing, among other things, the importance of the issues

at stake, the burden of the proposed discovery, and whether its likely benefit outweighs that burden. Tenn. R. Civ. P. 26.02(1). Plaintiff's sprawling, premature inquiry fails each of those measures. The discovery Plaintiff seeks would generate fragmented, duplicative, and costly litigation of the kind the MDL process, as recognized by this Court and the District Court, is intended to prevent, and it would impose a substantial burden on Defendant and the Court. The MDL process exists to streamline and make efficient exactly the kind of pretrial proceedings Plaintiff's Motion seeks. *See Beal v. Merck & Co.*, No. 05-1344-T/AN, 2005 WL 3279285, at *2 (W.D. Tenn. Dec. 1, 2005) ("The Court finds that having the jurisdictional issues decided in one proceeding will promote judicial economy and conserve judicial resources."); *see also* Order Denying Remand at 12. Recognizing this, the District Court explained how "[t]he JPML created the MDL specifically to avoid this kind of fragmented, duplicative, and costly parallel litigation," and that "[a] stay pending the JPML's transfer decision is precisely the tool Congress and the JPML envisioned for this situation." Order Denying Remand at 9. It therefore deferred the citizenship question to a single entity—the JPML—reasoning that having "one entity—the JPML—consider jurisdictional issues … will promote judicial uniformity and avoid the risk of this Court and the JPML issuing conflicting rulings as to the citizenship of Defendant." *Id.* at 13.

Plaintiff's Motion asks this Court to chart the opposite course and take up, through expansive discovery, the very citizenship question the District Court deliberately declined to resolve. The risks it identified apply with at least equal force here. If this Court permits Plaintiff's nerve-center discovery, it will be deciding the same issue the District Court has already ruled to be appropriate for the JPML to ensure consistent resolution across related cases—exactly the "risk of … issuing conflicting rulings as to the citizenship of Defendant" that the District Court sought to avoid. *Id.*

Tellingly, Plaintiff never explains why its proposed process would be efficient.  Plaintiff says only that it wants this discovery now.  But Plaintiff does not dispute that it will have an opportunity to obtain discovery into Defendant's citizenship and to litigate the forum defendant rule later, on a motion to remand, if and when this case is removed.  A bare preference to litigate the issue immediately and to avoid the coordinated federal proceedings is not a reason to authorize sprawling, premature discovery into the whole of Defendant's operations.  Worse, that discovery would force Defendant to marshal and verify sworn narratives about its officers, operations, and corporate integration in discovery proceedings before this Court, only to risk repeating the same exercise in a federal forum.[3]  This is the very duplication, expense, and risk of inconsistent results that the coordinated proceedings were designed to avoid.  Instead of preventing inefficiency, delay, and burden, Plaintiff's Motion would exacerbate all three.

**IV.     The Factors Governing Jurisdictional Discovery Weigh Against Plaintiff's Motion.**

Plaintiff invokes the five-factor framework Tennessee courts apply to requests for jurisdictional discovery, drawn from *First Community Bank, N.A. v. First Tennessee Bank, N.A.*, 489 S.W.3d 369, 406 (Tenn. 2015): (1) the likelihood that discovery will yield facts that influence the jurisdictional determination; (2) whether the requesting party has identified the evidence sought with particularity; (3) whether the evidence sought is normally within the exclusive control of the responding party; (4) whether the case is particularly complex; and (5) whether the requesting party's interest in discovery outweighs the burden of subjecting the responding party to broad discovery at an early stage, while guarding against a "fishing expedition."  Applied to

---

[3] Discovery is ongoing in the Change MDL, and Defendants have produced over 170,000 pages of discovery to Plaintiffs already. Plaintiffs will have access to these materials if and when their case is transferred to the Change MDL, which could decrease or even eliminate their need for additional jurisdictional discovery at all.

10

Plaintiff's request, the balance of these factors weighs decisively against the Motion.

First, there is no concrete likelihood that the discovery will yield determinative facts.  As explained above, the nerve-center facts Plaintiff seeks will never become relevant unless this action is both removable and removed—contingencies that may never occur—whereas the citizenship of Plaintiff's members is dispositive of the threshold removal question now.

Second, Plaintiff has not identified the evidence it seeks with particularity.  Plaintiff's nine interrogatories, many with subparts (and amplified by sweeping definitions reaching parent entities, Optum and UnitedHealth Group) demand open-ended narratives about "all facts, decisions, actions, and corporate authorizations" bearing on Defendant's nerve center, the work history and home addresses of every corporate officer, the legal mechanics of a corporate integration, and the identity of every person who made executive decisions for Defendant.

Third, the exclusive control factor is the only factor on which Plaintiff has any footing, but it does not carry the Motion.  Some information about Defendant's operations is within Defendant's control, but that is true of nearly any operational discovery and does not justify a premature, expansive inquiry into matters that can be litigated later, in the proper forum, on a motion to remand.

Fourth, the fact that the underlying controversy relating to the Cyberattack is complex does not favor discovery here.  Facing a complex case, it makes sense to permit discovery of facts that may eliminate jurisdiction.  But that is not the case here.  The facts sought by the Motion could only preserve this Court's jurisdiction (in contrast to the discovery that was granted to Defendant).  Moreover, the complexity of this litigation, and the existence of coordinated federal proceedings addressing the very citizenship question Plaintiff raises, counsels against duplicative, fact-intensive discovery in this Court.  The District Court reached the same conclusion when it deferred

that question to the JPML to avoid "conflicting rulings as to the citizenship of Defendant."  Order Denying Remand at 13.

Fifth, Plaintiff's discovery would impose a significant burden on Defendant and would be the exact type of "fishing expedition" courts should not allow.  Plaintiff seeks any and all facts that could support a future motion to remand that is not before this Court and will never be decided by this (or potentially any) Court.  Moreover, Plaintiff has no legitimate interest in immediate discovery.  Plaintiff will have an opportunity to seek discovery and argue the forum defendant rule on a motion to remand if the case is removed.

Taken together, the governing factors weigh decisively against Plaintiff's Motion.  Because Plaintiff cannot satisfy these factors or the threshold relevance and proportionality requirements of Rule 26.02, it has not carried its burden to justify lifting the stay and reopening this action for the discovery it seeks.

## CONCLUSION

Accordingly, Defendant respectfully requests that the Court deny Plaintiff's Motion for Leave to Conduct Limited Expedited Discovery Regarding Defendant's Corporate Citizenship and leave the stay in place pending completion of the limited jurisdictional discovery this Court already authorized.

Dated: June 22, 2026

Respectfully submitted,

*/s/ E. Todd Presnell*
E. Todd Presnell (BPR 017521)
Andrew W. Tao (BPR No. 41344)
**BRADLEY ARANT BOULT CUMMINGS LLP**
One 22 One
1221 Broadway, Suite 2400
Nashville, TN 37203
T. (615) 252-2355
F. (615) 252-6355
tpresnell@bradley.com
atao@bradley.com

*Counsel for Defendant Change Healthcare Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document, which was filed with the Court through the

electronic filing system, will be sent electronically to the following parties:

J. Gerard Stranch, IV
Grayson Wells
STRANCH, JENNINGS & GARVEY, PLLC
223 Rosa L. Parks Ave., Suite 200
Nashville, TN 37203
Tel: (615) 254-8801
gstranch@stranchlaw.com
gwells@stranchlaw.com

Tracy W. Houck
LAW OFFICE OF TRACY HOUCK, LLC
301 South Bonner Street
Ruston, LA 71270
Tel: (318) 255-4066
Fax: (318) 255-8520
thouck@suddenlinkmail.com

Landon N. Tooke
TOOKE LAW, LLC
218 Orchard Valley Circle
Ruston, LA 71270
Tel: (318) 955-9730
landon@tookelaw.com

Dated: June 22, 2026

/s/ E. Todd Presnell
E. Todd Presnell

# EXHIBIT 1

EFILED 06/22/26 03:08 PM CASE NO. 26C525 Joseph P. Day, Clerk

| | | |
|---|---|---|
| DEXIOS CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | NO. 3:26-cv-00340 |
| v. | ) | |
| | ) | JUDGE RICHARDSON |
| CHANGE HEALTHCARE INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## **MEMORANDUM OPINION AND ORDER**

Pending before the Court in this action are two motions. The first is a motion to remand (Doc. No. 7, "Motion to Remand"), filed by Plaintiff, Dexios Corporation. Via the Motion to Remand, Plaintiff seeks an order "remanding this case to Davidson County Circuit Court for lack of complete diversity and improper removal by Defendant." (Doc. No. 7 at 1). Plaintiff has filed a brief (Doc. No. 8) in support of the Motion to Remand. Defendant, Change Healthcare Inc., has filed a response (Doc. No. 13, "Remand-Motion Response") in opposition to the Motion to Remand. Plaintiff has filed a reply (Doc. No. 15) in further support of the Motion to Remand.

The second Motion is a motion to stay (Doc. No. 11, "Motion to Stay") filed by Defendant. Via the Motion to Stay, Defendant seeks:

> an order staying all proceedings in the above-captioned matter pending a decision by the United States Judicial Panel on Multidistrict Litigation ("JPML") on Defendant's notice identifying this action as a potential tag-along action in the related multidistrict litigation captioned *In re: Change Healthcare Inc., Customer Data Security Breach Litig.*, MDL No. 3108. ECF No. 588 (J.P.M.L. March 25, 2026).

EFILED 06/22/26 03:08 PM CASE NO. 26C525 Joseph P. Day, Clerk

(Doc. No. 11 at 1). Defendant has filed a brief (Doc. No. 12) in support of the Motion to Stay. Plaintiff has filed a response (Doc. No. 14) in opposition to the Motion to Stay. Defendant has filed a reply (Doc. No. 16) in further support of the Motion to Stay.

For the reasons described below, the Motion to Remand (Doc. No. 7) is **DENIED** and the Motion to Stay (Doc. No. 11) is **GRANTED**.

<u>BACKGROUND</u>

On March 20, 2026, Defendant removed this action from the Davidson County Circuit Court. (Doc. No. 1). On March 25, 2026, Plaintiff filed its Motion to Remand, contending that Defendant's removal of this action is an "improper attempt to force this state court case into the federal Multidistrict Litigation against Defendant that is pending in the United States District Court for the District of Minnesota[: *In re: Change Healthcare Inc., Customer Data Security Breach Litig.*, Case No. 0:24-md-03108-DWF-DJF. (D. Minn.)]." (Doc. No. 8 at 1-2). Plaintiff argues that removal to federal court is improper because (according to Plaintiff) Defendant is a citizen of Tennessee by virtue of Defendant's principal place of business being located (according to Plaintiff) in Tennessee, and so removal is prohibited based on the so-called "Forum Defendant Rule."[1] (Doc. No. 8 at 3-5). Defendant, of course, disagrees that remand is warranted, contending in the Remand-Motion Response that Defendant is a citizen of Delaware (given that Delaware is the state of Defendant's incorporation—something that Plaintiff does not dispute) and a citizen of Minnesota (on account of Defendant's principal place of business being located (according to Defendant) in Minnesota (rather than Tennessee)). (Doc. No. 13 at 4-8).

---

[1] 28 U.S.C. § 1441(b)(2) provides that cases in which federal jurisdiction is based solely on complete diversity of citizenship "may not be removed if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought." This provision is known colloquially as the Forum Defendant Rule. *See e.g., Madden v. Berea Healthcare, LLC*, No. CV 5:23-223-DCR, 2023 WL 8654369, at *6 (E.D. Ky. Dec. 14, 2023).

EFILED 06/22/26 03:08 PM CASE NO. 26C525 Joseph P. Day, Clerk

Meanwhile, on March 25, 2026, Defendant filed a "Notice of Potential Tag-Along Actions" (JPML Change MDL Doc. No. 588, "Tag-Along Notice") in the multidistrict litigation ("MDL") ongoing before the Judicial Panel on Multidistrict Litigation ("JPML") captioned *In re: Change Healthcare Inc., Customer Data Security Breach Litig.*, MDL No. 3108. (J.P.M.L) ("JPML Change MDL").[2] On March 30, 2026, the Acting Clerk of the JPML entered a conditional transfer order (JPML Change MDL Doc. No. 591, "Conditional Transfer Order") therein conditionally transferring this action to the multidistrict litigation ongoing in the United States District Court for the District of Minnesota captioned *In re: Change Healthcare Inc., Customer Data Security Breach Litig.*, Case No. 0:24-md-03108-DWF-DJF. (D. Minn.) ("Minn. Change MDL").[3] Plaintiff filed an objection (JPML Change MDL Doc. No. 599, "Objection") to the Conditional Transfer Order in the JPML Change MDL on April 6, 2026, and filed a motion to vacate (JPML Change MDL Doc. No. 622, "Motion to Vacate") the Conditional Transfer Order in the JPML Change MDL on April 21, 2026, asserting in its memorandum in support of the Motion to Vacate, in part, that transfer of this action to the Minn. Change MDL is improper because "the Forum Defendant Rule applies, eliminating the ability for the federal courts to exercise subject matter jurisdiction solely on diversity of citizenship." (JPML Change MDL Doc. No. 622-1 at 9).[4] Briefing on the

---

[2] When referring to filings in the JPML Change MDL, the Court will use the following format (for textual references and for citations, respectively): "JPML Change MDL Docket No. ___" or "(JPML Change MDL Doc. No. ___)"

[3] When referring to filings in the Minn. Change MDL, the Court will use the following format (for textual references and for citations, respectively): "Minn. Change MDL Docket No. ___" or "(Minn. Change MDL Doc. No. ___)"

[4] Plaintiff filed a corrected version of the Motion to Vacate and memorandum at JPML Change MDL Docket Nos. 635 and 635-1, respectively. Herein, the Court will refer to and cite the originally filed Motion to Vacate and memorandum filed at JPML Change MDL Docket Nos. 622 and 622-1, respectively.

EFILED  06/22/26 03:08 PM  CASE NO. 26C525  Joseph P. Day, Clerk

Motion to Vacate is ongoing. The Motion to Vacate remains pending for decision by the JPML, as does the decision of whether to conclusively transfer this action to the Minn. Change MDL.

Subsequent to the filing of the Tag-Along Notice, on March 27, 2026, Defendant filed the Motion to Stay, contending that this action, including any decision on the Motion to Remand, should be stayed pending the JPML's decision on the Tag-Along Notice—i.e., stayed pending the JPML's decision on whether to transfer this action unconditionally to the Minn. Change MDL. (Doc. No. 12 at 1, 3-7). Plaintiff contends in opposition:

> The Court should deny Defendant's request for a stay, which is nothing more than a ploy to use an improper removal to force state court litigants into a federal multidistrict class action pending in Minnesota—a class action Defendant knows Plaintiff will opt out of. Indeed, though a stay is extremely prejudicial to Plaintiff, denying the stay offers no prejudice to Defendant because being required to defend a case is not prejudicial.

(Doc. No. 14 at 3).

Below, the Court will consider the Motion to Stay and the Motion to Remand. For the reasons stated below, the Court concludes that the Motion to Stay will be granted, that a substantive decision on the merits of the Motion to Remand will be deferred, and that the Motion to Remand will be denied without prejudice.

LEGAL STANDARD

A district court has wide discretion when considering whether to stay a matter. *See Clinton v. Jones*, 520 U.S. 681, 706 (1997) ("The District Court has broad discretion to stay proceedings as an incident to its power to control its own docket."). Indeed, the power to stay proceedings is "incidental to the power inherent in every court to control the disposition of the causes in its docket with economy of time and effort for itself, for counsel and for litigants," and "the entry of [] an order [implementing a stay] ordinarily rests with the sound discretion of the District Court." *F.T.C. v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 626–27 (6th Cir. 2014) (quoting *Ohio Envtl. Council v.*

EFILED 06/22/26 03:08 PM CASE NO. 26C525 Joseph P. Day, Clerk

*U.S. Dist. Court, S. Dist. of Ohio, E. Div.*, 565 F.2d 393, 396 (6th Cir.1977)). This discretion extends to a district court considering whether to "grant a stay of proceedings pending a final ruling of the [JPML] on the transfer of a case [to the MDL]." *Fox v. Depuy Orthopaedics, Inc.*, 3:11–cv–387–CRS, 2011 WL 6057509, at *1 (W.D. Ky. Dec. 6, 2011).

When considering whether to grant a stay pending the resolution of the transfer of a case into a MDL, courts generally consider three factors: "(1) potential prejudice to the non-moving party; (2) hardship and inequity to the moving party if the action is not stayed; and (3) the judicial resources that would be saved by avoiding duplicative litigation if the case[] [is in fact transferred to the MDL]." *Dunaway v. Purdue Pharma L.P.*, 391 F. Supp. 802, 807 (M.D. Tenn. 2019) (quoting *Glazer v. Whirlpool Corp.*, No. 1:08-CV-1624, 2008 WL 4534133, at *2 (N.D. Ohio Oct. 6, 2008)).

Notably, the Rules of Procedure of the JPML provide that "pendency of a [] conditional transfer order [] before the Panel pursuant to 28 U.S.C. § 1407 does not affect or suspend orders and pretrial proceedings in any pending federal district court action and does not limit the pretrial jurisdiction of that court." JPML Rule 2.1(d). However—and as relevant for the instant action wherein the Court is faced with a pending motion to remand and a pending motion to stay—the "general rule is for federal courts to defer ruling on pending motions to remand in MDL litigation until after the [JPML] has [determined whether to] transfer[] the case." *Beshear v. Volkswagen Grp. of America, Inc.*, No. 16-CV-27-GFVT, 2016 WL 3040492, at *8 (E.D. Ky. May 25, 2016) (quoting *Kelly v. Aultman Physician Center*, 2013 WL 2358583, *2 (N.D. Ohio May 29, 2013)). This general rule is especially applicable in instances where "jurisdiction issues 'are complex and their resolution is uncertain' and where such issues 'are common to other cases pending before the

EFILED 06/22/26 03:08 PM CASE NO. 26C525 Joseph P. Day, Clerk

MDL court.'" *Beshear*, 2016 WL 3040492, at *8 (quoting *Curtis v. BP Am., Inc.*, 808 F. Supp. 2d 976, 981 (S.D. Tex. 2011)).

<u>DISCUSSION</u>

Turning to the Motions, the Court finds that granting the Motion to Stay, deferring a substantive decision on the merits of the Motion to Remand, and denying the Motion to Remand without prejudice are warranted.[5]

An analysis of the aforementioned three applicable factors reveals that a stay is warranted in this action.

Turning to the first factor—the potential prejudice to the nonmovant—Defendant argues that Plaintiff (the nonmovant with respect to the Motion to Stay) will not be prejudiced by a stay because "[i]n the event that the JPML declines to consolidate the pending case[] [into the Minn. Change MDL], this case will have been delayed for only a short time, and even then, the delay will have occurred in the earliest stages of litigation." (Doc. No. 12 at 4).

Plaintiff argues, by contrast:

Plaintiff would be severely prejudiced. Defendant is asking the Court to forego its obligation to determine its own jurisdiction long enough to allow the JPML to transfer this case to the District of Minnesota where it will be joined with the pending class action MDL where the MDL court's appointed class counsel would take over. It is an attempt to strip Plaintiff of its chosen forum and its chosen counsel until Plaintiff can opt out. Further still, Defendant knows full well that if a class is certified in the MDL, Plaintiff will opt out of that class to pursue separate litigation. In other words, this is nothing more than another delay tactic designed to make Plaintiff wait for the slow-moving MDL to proceed to the stage where Plaintiff can opt out so that Plaintiff can finally restart this litigation right where it is now— potentially years down the road.

Moreover, that delay would only exist after the JPML ruled on the attempted transfer, which itself could take months. . . . There is no indication as to the timeline

---

[5] Naturally, and as shown by the analysis below, the decision on whether to grant the Motion to Stay and the decision on whether to defer a decision on the merits of the Motion to Remand are intertwined insofar as the granting of the Motion to Stay would naturally result in a deferral of a decision on the merits of the Motion to Remand.

EFILED 06/22/26 03:08 PM CASE NO. 26C525 Joseph P. Day, Clerk

> for which the JPML will issue a decision as to the [Conditional Transfer Order], but such decisions have thus far taken anywhere from four months to as long as eight months from the filing of a plaintiff's notice of opposition to conditional transfer order for the JPML to resolve.

(Doc. No. 14 at 6-7).[6] At base, Plaintiff's argument boils down to a contention that Plaintiff will be prejudiced by the delay that it will suffer as a result of the Court staying this action (thereby deferring a substantive ruling on the Motion to Remand) pending the decision of the JPML on whether to transfer this action conclusively to the Minn. Change MDL. Although the Court understands that Plaintiff might be frustrated by a stay of this action resulting from the granting of the Motion to Stay, mere delay is not sufficient to prevent such a stay. *See Watson v. Progressive Direct Ins. Co.*, No. CV 5:22-203-DCR, 2024 WL 3092373, at *3 (E.D. Ky. June 21, 2024) (noting in considering a stay (in a non-MDL context) that although plaintiff contends that "she will . . . be prejudiced by a delay" as a result of a stay, "'delay alone is generally not sufficient to prevent a stay, as it is inherent in any stay.'" (quoting *Sec'y of U.S. Dep't of Lab. v. Kavalec*, No. 1:19-CV-00968, 2019 WL 5684462, at *3 (N.D. Ohio Nov. 1, 2019))); *Semiconductor Energy Lab'y Co. v. Chimei Innolux Corp.*, No. SACV 12-21-JST JPRX, 2012 WL 7170593, at *3 (C.D. Cal. Dec. 19, 2012) ("the mere fact and length of any delay . . . does not demonstrate prejudice sufficient to deny [a] request for a stay."). *Cf. Allied Erecting & Dismantling Co., Inc. v. Genesis Equipment & Mfg.,*

---

[6] Moreover, the Court notes that although Plaintiff's argument refers to the Court's obligation to determine its own jurisdiction over this action, the Court notes that such obligation does not require the Court to determine its jurisdiction prior to the decision of the JPML on whether to conclusively transfer this action to the Minn. Change MDL. It is without question that the Court would certainly have an obligation to determine its subject-matter jurisdiction over this action if this action did in fact remain before this Court (rather than being transferred to the Minn. Change MDL). *See Strategic Assets, Inc. v. Fed. Express Corp.*, 190 F. Supp. 2d 1065, 1067 (M.D. Tenn. 2001) ("a district court's first obligation is to determine whether the court has subject matter jurisdiction"). However, this obligation does not require the Court to determine its jurisdiction *prior* to the decision of the JPML as to whether to conclusively transfer this action to the Minn. Change MDL. If this obligation did in fact require a court to determine its jurisdiction *prior* to the decision of the JPML on whether to conclusively transfer an action to an MDL, it would be impossible for district courts to adhere to the general rule of "defer[ring] ruling on pending motions to remand in MDL litigation until after the [JPML] has [determined whether to] transfer[] the case." *Beshear*, 2016 WL 3040492, at *8.

EFILED 06/22/26 03:08 PM CASE NO. 26C525 Joseph P. Day, Clerk

*Inc.*, No. 4:08CV589, 2010 WL 3239001, at *2 (N.D. Ohio Aug. 16, 2010) (noting in the context of a requested stay to permit reexamination of patents that "[w]hile some prejudice to Plaintiffs is inherent in any delay, this alone is not sufficient to prevent a stay."). Put another way, the Court finds that the delay that Plaintiff purportedly will suffer as a result of the Motion to Stay does not weigh against granting the Motion to Stay. Given that the Court can discern little other harm that Plaintiff would suffer if the Motion to Stay were granted, the Court finds that this factor weighs in favor of the Court granting the Motion to Stay (and therefore deferring a substantive decision on the merits of the Motion to Remand).

Turning to the second factor—the hardship and inequity to the moving party if the action is not stayed—the Court does not agree with Plaintiff's contention that Defendant has not shown hardship or inequity that would result were a stay not granted. Defendant contends that absent a stay, it will be harmed by being forced "'to engage in parallel proceedings in numerous courts [(e.g., before this Court and the JPML Change MDL)] while being temporarily denied the [potential] full benefit of the highly organized process of the MDL proceedings'" (Doc. No. 12 at 5 (quoting *Abshire v. Davol, Inc.*, No. 2:18-cv-268, 2018 WL 2538746, at *2 (S.D. Ohio June 4, 2018))), and that "[l]itigating the individual cases across different fora will cost Defendant 'an excessive amount of time, money and energy' that might otherwise be avoided." (Doc. No. 12 at 5 (quoting *U.S. Bank, Nat'l Assoc. v. Royal Indem. Co.*, 2002 WL 31114069, at *2 (N.D. Tex. Sept. 23, 2002))). Defendant's argument here is well-taken, and indeed district courts frequently find that a movant—in the context of a motion to stay—faces hardship or inequity if forced to litigate an action while awaiting a decision from the JPML on whether to transfer an action to a multidistrict case. *See e.g., Ates v. Delta Air Lines, Inc.*, No. CIV.A. 15-3228, 2015 WL 5774979, at *3 (E.D. La. Sept. 30, 2015) ("The Court is convinced by Defendants' argument that continuing

EFILED 06/22/26 03:08 PM CASE NO. 26C525 Joseph P. Day, Clerk

to litigate this case while waiting for a decision from the JPML that is likely to come in the near future would prove a substantial hardship and inequity to Defendants."). *But see Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1112 (9th Cir. 2005) (noting that "being required to defend a suit, without more, does not constitute a 'clear case of hardship or inequity'" for a stay to issue). Indeed, as Defendant argues, its burden is not merely one of having to litigate this case, but also to litigate:

> over 190 federal and state court cases arising from the same cyberattack, all at varying stages of litigation, across the country. Without a stay, Defendant must simultaneously navigate different discovery schedules, motions practice, and pretrial orders here while the same issues are being coordinated in the Change MDL. The JPML created the MDL specifically to avoid this kind of fragmented, duplicative, and costly parallel litigation. A stay pending the JPML's transfer decision is precisely the tool Congress and the JPML envisioned for this situation.

(Doc. No. 16 at 4). Thus, the Court discerns that Defendant would face substantial hardship were it required to litigate an action in this Court pending the JPML's transfer decision, and so this factor weighs in favor of granting the Motion to Stay (and therefore deferring, for the time being, a substantive decision on the merits of the Motion to Remand). *Cf. Pace v. Merck & Co.*, No. CIV 04-1356MCA/ACT, 2005 WL 6125457, at *2 (D.N.M. Jan. 10, 2005) (noting, when granting a motion to stay, the risk that a defendant-movant faced of "duplicative motion practice and redundant discovery proceedings absent a stay").[7]

The third stay factor—the judicial resources that would be saved by avoiding duplicative litigation if the case ultimately is transferred to the MDL—weighs strongly in favor of granting

---

[7] The Court does feel compelled to note that, naturally, Plaintiff might contend that Defendant would not face a burden of litigating (at least in this Court) if the Motion to Remand were to be considered and granted. Still this (hypothetical argument) is at this point unconvincing. The Court is not convinced that the Motion to Remand would in fact be granted so as to prevent Defendant from facing the burden of litigating in this Court (and preclude the transfer of this action to the Minn. Change MDL). Moreover, as will be discussed below—the Court discerns that at this juncture it would be misguided and premature to consider the Motion to Remand as a threshold matter.

EFILED  06/22/26 03:08 PM  CASE NO. 26C525  Joseph P. Day, Clerk

the Motion to Stay (and thus avoiding, at this juncture, a ruling on the merits of the Motion to Remand).

As an initial matter, the Court notes that in the briefing on the Motion to Remand (which the Court would naturally consider on the merits if the Motion to Stay was to be denied), Plaintiff and Defendant have presented the Court with various exhibits comprised of competing evidence as to the location of Defendant's citizenship. For example, Defendant has filed a copy of a "Rule 7.1(b)(2) Supplemental Corporate Disclosure Statement" (Doc. No. 13-2), which Defendant originally filed in the Minn. Change MDL (Minn. Change MDL Doc. No. 493), wherein Defendant asserts that its "principal place of business is now Minnesota[, and] [a]s a result, [Defendant] is now a citizen of Minnesota and Delaware." (Doc. No. 13-2 at 2).

This indicates that if the Court were to decline to grant the Motion to Stay (and thus in turn consider the Motion to Remand), the Court would be required to make a substantive determination as to the citizenship of Defendant, a determination that promises to be a complex one given the breadth of the briefing filed in connection with the Motion to Remand. This determination would involve not just weighing the various competing arguments and evidence that the parties have submitted in connection with the Motion to Remand, but also the weight to be afforded to the filings that Defendant has made in the Minn. Change MDL (namely the "Rule 7.1(b)(2) Supplemental Corporate Disclosure Statement"). The Court is convinced that embarking on this course of action would not only be a poor use of judicial resources but would also pose a substantial risk of inconsistent judicial orders, as will be explained in more depth below. *See Spaeth v. TJM Medical, Inc.*, No. 1:21-CV-02160-PAB, 2021 WL 5936462, at *3 (N.D. Ohio Dec. 16, 2021) (weighing—in the context of the third stay factor—the interests of judicial economy and

EFILED 06/22/26 03:08 PM CASE NO. 26C525 Joseph P. Day, Clerk

efficiency, as well as the possibility of inconsistent rulings in considering whether a stay is warranted).[8]

With respect to preserving judicial resources, the Court notes that ruling on the Motion to Remand now risks wasting judicial resources. Consider, for example, a situation in which (1) the Court ultimately denies the Motion to Stay, promptly considers the Motion to Remand, and ultimately denies the Motion to Remand on the merits by finding that Defendant is a citizen of Minnesota rather than Tennessee (which at present certainly remains a potential outcome), and (2) this case is ultimately transferred to the Minn. Change MDL—via the JPML denying the Motion to Vacate and perhaps ruling conclusively that Defendant is a citizen of Minnesota rather than Tennessee. In that scenario, two judicial bodies—this Court and the JPML— would have expended judicial resources in considering the same issue: Defendant's citizenship. The Court discerns that such a duplicative expenditure of judicial resources would be inefficient and antithetical to the preservation of scarce judicial resources.

Furthermore, even if this action is *not* in fact transferred conclusively to the Minn. Change MDL (i.e., if the JPML ultimately grants the Motion to Vacate and remands the case back to this Court), judicial resources would be best served by deferring a decision on the Motion to Remand and granting the Motion to Stay. The Court observes that in Plaintiff's memorandum in support of the Motion to Vacate filed in the JPML Change MDL, Plaintiff has raised many of the same arguments that it has raised in the Motion to Remand, namely that the federal courts lack jurisdiction over this action because "the Forum Defendant Rule applies, eliminating the ability

---

[8] Put another way, although aware that the Rules of Procedure of the JPML provide that "pendency of a [ ] conditional transfer order [] before the Panel pursuant to 28 U.S.C. § 1407 does not affect or suspend orders and pretrial proceedings in any pending federal district court action and does not limit the pretrial jurisdiction of that court," JPML Rule 2.1(d), the Court (for the reasons stated above and below) does not believe it would be a wise use of its jurisdiction to consider the merits of the Motion to Remand at this juncture.

EFILED  06/22/26 03:08 PM  CASE NO. 26C525  Joseph P. Day, Clerk

for the federal courts to exercise subject matter jurisdiction solely on diversity of citizenship." (JPML Change MDL Doc. No. 622-1 at 9). Put another way, Plaintiff is now (understandably) contending before two judicial bodies—this Court and the JPML—that the exercise of jurisdiction over this action is improper based on the Forum Defendant Rule. With this in mind, the Court finds that it would be a much better use of judicial resources to defer a decision on the status of Defendant's citizenship to the JPML because the JPML is likely to already have a familiarity with the issues and evidence relevant to a determination of Defendant's citizenship. For the same reason, even if the JPML ultimately grants Plaintiff's Motion to Vacate (JPML Change MDL Doc. No. 622), and permits this action to remain in this Court, the Court finds it plausible that the JPML's analysis in its ruling on the Motion to Vacate would likely be informative of this Court's ruling on any motion to remand.

Thus, the Court discerns that it would be a more efficient use of judicial resources to grant the Motion to Stay (and thus defer a decision on the merits of the Motion to Remand) pending the decision of the JPML on whether to transfer this action to the Minn. Change MDL (via a decision on the Motion to Vacate). *See Chaney v. JUUL Labs, Inc.*, No. 2:19-CV-4145, 2019 WL 13196794, at *2 (S.D. Ohio Oct. 31, 2019) (deferring consideration of a plaintiff's motion to remand, stating that because the plaintiff raised the same jurisdictional arguments in both the motion to remand and the motion to vacate a conditional transfer order, "the Court finds that the interests of judicial consistency, economy, and uniformity are best served by deferring ruling on Plaintiff's Motion to Remand pending the MDL's decision on transfer."); *Beal v. Merck & Co.*, No. 05-1344-T/AN, 2005 WL 3279285, at *2 (W.D. Tenn. Dec. 1, 2005) ("The Court finds that having the jurisdictional issues decided in one proceeding will promote judicial economy and conserve judicial resources.").

EFILED 06/22/26 03:08 PM CASE NO. 26C525 Joseph P. Day, Clerk

As suggested above, in considering the third stay factor, the Court considers a risk of inconsistent judicial orders. This risk weighs in favor of the Court granting the Motion to Stay, for many of the same reasons that concerns over judicial resources weigh in favor of the Court granting the Motion to Stay (and thus declining to consider the merits of the Motion to Remand). Indeed, the Court discerns that having one entity—the JPML—consider jurisdictional issues, like those raised in the Motion to Remand and Motion to Vacate, will promote judicial uniformity and avoid the risk of this Court and the JPML issuing conflicting rulings as to the citizenship of Defendant. *See Chaney*, 2019 WL 13196794, at \*2 (finding that deferring jurisdictional arguments to the JPML when raised in both a motion to remand and motion to vacate conditional transfer order is in "the interests of judicial [] uniformity").

All told, the third factor weighs strongly in favor of the Court granting the Motion to Stay (and accordingly deferring a ruling on the Motion to Remand). This means that all three of the factors the Court has considered herein weigh in favor of the Court granting the Motion to Stay. So, the Court will grant the Motion to Stay.

Given that the Court is granting the Motion to Stay and thus deferring a decision on the merits of the Motion to Remand, the Court will deny the Motion to Remand without prejudice to Plaintiff refiling a motion to remand in the event that the JPML does not ultimately transfer this action to the Minn. Change MDL.

CONCLUSION

For the reasons stated herein, the Motion to Remand (Doc. No. 7) is **DENIED** without prejudice to Plaintiff refiling the Motion to Remand if this action is ultimately not transferred to the Minn. Change MDL. Moreover, the Motion to Stay (Doc. No. 11) is **GRANTED**. All deadlines and proceedings in this matter are **STAYED** pending a decision by the JPML on whether to

EFILED 06/22/26 03:08 PM CASE NO. 26C525 Joseph P. Day, Clerk

transfer this action to the Minn. Change MDL. Within seven (7) days of the JPML determining whether to transfer this action to the Minn. Change MDL, the parties shall file a status update with the Court detailing the decision of the JPML, therein indicating the reasons, if any, that the stay should be lifted. Alternatively, at any point prior to any transfer of this case, any party may move to lift the stay in this case for good cause.[9]

IT IS SO ORDERED.

_Eli Richardson_

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

---

[9] In an order (Doc. No. 10), the Court indicated that it would "rule promptly on the Motion to Remand once briefing on the Motion to Remand is concluded." (Doc. No. 10 at 1). Plaintiff may take umbrage with the Court's decision herein given that the Court has not ruled on the merits of the Motion to Remand and instead denied the Motion to Remand without prejudice. Nevertheless, the Court stresses that it has expedited its decision on both the Motion to Remand (insofar as it has determined that it is inadvisable to reach the merits of the Motion to Remand and denied the Motion to Remand without prejudice within two weeks of briefing on the Motion to Remand concluding) and the Motion to Stay—putting numerous older pending motions on the metaphorical backburner to do so.

EFILED  06/22/26 03:08 PM  CASE NO. 26C525  Joseph P. Day, Clerk

**THE CIRCUIT COURT FOR DAVIDSON COUNTY, TENNESSEE**
**TWENTIETH JUDICIAL DISTRICT, AT NASHVILLE**

| | |
|---|---|
| RED HOUSE MEDICAL BILLING MI LLC, | Case No. 26C525 |
| Plaintiff, | |
| v. | JURY TRIAL DEMANDED |
| CHANGE HEALTHCARE INC., | Judge Lynne T. Ingram |
| Defendant. | |

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR LEAVE TO CONDUCT LIMITED EXPEDITED DISCOVERY REGARDING DEFENDANT'S CORPORATE CITIZENSHIP**

Plaintiff Red House Medical Billing MI LLC, ("Plaintiff") respectfully moves this Court for entry of an order permitting Plaintiff to conduct limited jurisdictional discovery regarding Defendant Change Healthcare Inc.'s ("Defendant") citizenship for the purpose of assessing whether the Forum Defendant Rule is applicable, thereby making any attempt to remove under 28 U.S.C. § 1332 improper. What is good for the goose is good for the gander. Having persuaded this Court to grant jurisdictional discovery to test whether this case can be removed, Defendant now insists that Plaintiff may not take the very same discovery to test the very same question. Defendant cannot have it both ways. This is improper, and this Motion should be granted.

After motion practice and argument by both parties, the Court authorized Defendant to serve jurisdictional discovery and ordered Plaintiff to respond to the same for the purposes of determining whether diversity exists under 28 U.S.C. § 1332. *See* Order dated June 15, 2026. Yet now that Plaintiff seeks reciprocal jurisdictional discovery, Defendant argues that the jurisdictional discovery into its own citizenship is irrelevant. That position cannot be reconciled with the discovery the Court authorized Defendant to seek, because Plaintiff's citizenship discovery bears

1

only on removal if the Forum-Defendant Rule does not bar it and if diversity between the Parties exists. That is, the only way to find that discovery into Defendant's citizenship is irrelevant, while simultaneously finding Plaintiff's citizenship relevant, is to presume the Forum-Defendant Rule does not apply. Because this Court allowed Defendant to serve jurisdictional discovery to determine whether diversity existed under 28 U.S.C. § 1332, the principles of justice are only served if the Court authorizes Plaintiff to serve jurisdictional discovery and requires Defendant to respond so that a complete diversity analysis can be conducted.

Defendant argues that Plaintiff's proposed discovery is unduly burdensome and expansive. That is wrong. Plaintiff's interrogatories follow directly from Defendant's refusal to provide any factual basis for its asserted nerve-center move. Indeed, the majority of publicly available information at the time of filing Plaintiff's complaint pointed squarely to Defendant being a citizen of Tennessee. There are facts here that need testing. It is not burdensome to ask Defendant to supply the factual support for its jurisdictional assertions. As such, Plaintiff respectfully requests the Court grant Plaintiff's Motion, authorize Plaintiff to propound the proposed jurisdictional discovery, and require Defendant to respond accordingly.

## ARGUMENT

### I.      Defendant's Relevance Argument Contradicts Its Own Previous Motion

In Defendant's Response in Opposition, Defendant argues that Plaintiff's proposed jurisdictional discovery is irrelevant because the Forum Defendant Rule cannot be at issue before this Court. Def.'s Opp. at 5. In the same light, Defendant claims their own jurisdictional discovery is relevant as it allows "Defendant to ascertain whether the case can be removed at all." *Id*. Of course, both Parties seek exactly the same thing—to ascertain whether this case can be removed at all—and the distinction Defendant tries to draw between the two inquiries is illusory.

2

Whether this case is removable does not depend solely on Plaintiff's citizenship, but rather on Plaintiff's citizenship *and* Defendant's citizenship. Complete diversity is necessary under 28 U.S.C. § 1332, but is not sufficient, because even if the parties are diverse, the Forum Defendant Rule bars removal if the Defendant is a citizen of the forum state, 28 U.S.C. § 1441. As such, Defendant's citizenship is just as relevant as Plaintiff's citizenship. If Defendant is a citizen of Tennessee, then the Forum-Defendant Rule applies and the case cannot be removed. That is true regardless of Plaintiff's citizenship. As such, Defendant's citizenship is "logically prior" and always relevant to whether the case may be removed, but Plaintiff's citizenship is only relevant if the Forum Defendant Rule does not apply. In reality, Defendant's position is not that its citizenship is irrelevant—because it assumes its citizenship is relevant by seeking to determine whether diversity of citizenship exists—but rather that the Forum-Defendant Rule should be resolved in its favor based solely on Defendant's conclusory statements that lack any evidentiary support.

Defendant's argument that Plaintiff can seek jurisdictional discovery in federal court assumes that this case will be removed, or that removal is proper. Again, this contradicts Defendant's assertion that its citizenship is irrelevant because its citizenship is essential to determine whether removal is proper. Moreover, Defendant's proposed solution requires Plaintiff to stand down while Defendant moves forward with improper removal. Defendant defends this solution by stating that the issues can be addressed in federal court. But, just because federal vehicle may *eventually* be available to address the problem does not make it the *adequate* or *efficient* avenue to address the issue at hand. Indeed, if discovery reveals that the Forum-Defendant Rule applies, the harms Plaintiff seeks to avoid—the unnecessary delay caused by an improper removal to federal court—have already been done. Requiring Defendant to provide evidence to

support its alleged citizenship now will allow both parties to obtain the answer to the overarching issue, i.e., whether removal is proper.

## II.     The Discovery Sought by Plaintiff is Limited and Would not Unduly Burden Defendant.

Next, Defendant argues that Plaintiff's proposed discovery is expansive and unduly burdensome. Plaintiff's proposed discovery is neither, and the "breadth" Defendant complains of is largely a product of its own doing.

Plaintiff first sought to resolve Defendant's citizenship with informal discovery, asking Defendant to substantiate its alleged move of its "nerve center." However, Defendant declined, asserting its citizenship to be "irrelevant." Plaintiff's proposed jurisdictional discovery seeks to ascertain information solely in Defendant's possession and control . Defendant now argues its previous public assertions that Defendant's principal place of business is located in Nashville, Tennessee, is incorrect. This leaves Plaintiff with no choice but to seek formal discovery to require Defendant to provide clarification on a dispute Defendant created through its own contradictory and inconsistent positions. Here, Plaintiff's proposed discovery is limited to Defendant's nerve center and nothing more. It only asks for sworn answers sufficient to show whether, when, and how Defendant moved its headquarters. These are facts that Defendant would have to have affirmative knowledge of in order to remove on a good-faith basis. Indeed, Defendant provides no specific reason it cannot provide the responses to Plaintiff's nine proposed interrogatories, but instead only offers conclusory allegations that answering would be burdensome. These conclusory allegations are hard to reconcile with Defendant's representation that it has already produced 170,000 pages in the MDL.

Defendant's objection that the requested discovery is duplicative and undue burdensome is incorrect, and the Court need not defer to the MDL or JPML. Here, unlike Defendant, Plaintiff is

not asking the Court to rule on the Forum-Defendant Rule but asks that the Court permit discovery sufficient for the Parties to assess that question themselves. Allowing the Parties to develop those facts creates no risk of inconsistent rulings, because no ruling is sought. Nor is the requested discovery inefficient or burdensome. Plaintiff does not ask Defendant to produce documents already produced in the MDL, and only asks that Defendant provide responses, under oath, to support Defendant's assertion that it relocated its headquarters. Repeating an answer Defendant already should possess does not create an unduly burden. Additionally, should similar interrogatories arise in the MDL, Defendant will only need to repeat its interrogatory responses.

Lastly, should the Defendant remove Plaintiff's case after the court orders discovery, the discovery is unlikely to be repeated, as 28 U.S.C. § 1450 provides that "[a]ll injunctions, orders, and other proceedings had in [an action removed to federal court] prior to its removal shall remain in full force and effect until dissolved or modified by the district court." 28 U.S.C. § 1450; *see Weimar v. Geico Advantage Ins. Co.*, 2020 WL 249992, at \*3 (W.D. Tenn. Jan. 16, 2020). Thus, the court ordering discovery now promotes judicial economy and efficiency even if the case is subsequently removed.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests the Court grant Plaintiff's Motion.

Dated: June 24, 2026

Respectfully Submitted,

/s/ J. Gerard Stranch, IV
J. Gerard Stranch, IV (BPR # 23045)
Grayson Wells (BPR # 039658)
**STRANCH, JENNINGS & GARVEY, PLLC**
The Freedom Center
223 Rosa. L. Parks Avenue, Suite 200
Nashville, TN 37203
Tel: (615) 254 8801
gstranch@stranchlaw.com
gwells@stranchlaw.com

5

Tracy W. Houck*
**LAW OFFICE OF TRACY HOUCK, LLC**
301 South Bonner Street
Ruston, LA 71270
Tel: (318) 255-4066
Fax: (318) 255-8520
thouck@suddenlinkmail.com

Landon N. Tooke*
**TOOKE LAW, LLC**
218 Orchard Valley Circle
Ruston, LA 71270
Tel: (318) 955-9730
landon@tookelaw.com

*Pro Hac Vice forthcoming*

*Counsel for Plaintiff*

6

## CERTIFICATE OF SERVICE

I hereby certify that on June 24, 2026, the foregoing Plaintiff's Reply in Support of Motion for Leave to Conduct Limited Expedited Discovery Regarding Defendant's Corporate Citizenship was filed with the Clerk of Court using the Court's electronic filing system, which will then serve notice on the following:

E. Todd Presnell (TN BPR 017521)
Andrew W. Tao (BPR 41344)
**BRADLEY ARANT BOULT CUMMINGS, LLP**
One 22 One
1221 Broadway, Suite 2400
Nashville, TN 37203

*Counsel for Defendant*

/s/ J. Gerard Stranch, IV
J. Gerard Stranch, IV (BPR # 23045)

7

**IN THE EIGHTH CIRCUIT COURT FOR DAVIDSON COUNTY, TENNESSEE
TWENTIETH JUDICIAL DISTRICT, AT NASHVILLE**

| | |
|---|---|
| RED HOUSE MEDICAL BILLING MI, LLC, <br><br> Plaintiff, <br><br> v. <br><br> CHANGE HEALTHCARE, INC., <br><br> Defendant. | Case No. 26C525 <br><br> Judge Lynne T. Ingram |

## AGREED ORDER

This matter is before the Court upon an agreement of the parties on Plaintiff's limited jurisdictional discovery responses.

For these reasons, it is hereby **ORDERED**, **ADJUDGED**, **AND DECREED** as follows:

1.      Plaintiff's deadline to respond to Limited Jurisdictional Discovery shall be extended to July 6, 2026.

**IT IS SO ORDERED.**

_____
CIRCUIT JUDGE LYNNE T. INGRAM

1

Dated: June 23, 2026                    Respectfully submitted for entry by,

/s/ J. Gerard Stranch, IV                /s/ Andrew W. Tao
J. Gerard Stranch, IV (BPR # 23045)      E. Todd Presnell (BPR 017521)
Grayson Wells (BPR # 039658)             Andrew W. Tao (BPR 41344)
**STRANCH, JENNINGS & GARVEY,**          **BRADLEY ARANT BOULT CUMMINGS**
**PLLC**                                 **LLP**
223 Rosa L. Parks Avenue, Suite 200      One 22 One
Nashville, TN 37203                      1221 Broadway, Suite 2400
Tel: (615) 254-8801                      Nashville, TN 37203
gstranch@stranchlaw.com                  T. (615) 252-2355
gwells@stranchlaw.com                    F. (615) 252-6355
                                         tpresnell@bradley.com
Tracy W. Houck*                          atao@bradley.com
**LAW OFFICE OF**
**TRACY HOUCK, LLC**
301 South Bonner Street                  *Counsel for Defendant*
Ruston, LA 71270
Tel: (318) 255-4066
Fax: (318) 255-8520
thouck@suddenlinkmail.com

Landon N. Tooke*
**TOOKE LAW, LLC**
218 Orchard Valley Circle
Ruston, LA 71270
Tel: (318) 955-9730
landon@tookelaw.com

*Pro Hac Vice forthcoming*

*Counsel for Plaintiff*

2

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of June 2026, the foregoing was filed with the Clerk of Court using the Court's electronic filing system, which will then serve notice on the following:

E. Todd Presnell (BPR 017521)
Andrew W. Tao (BPR 41344)
**BRADLEY ARANT BOULT CUMMINGS LLP**
One 22 One
1221 Broadway, Suite 2400
Nashville, TN 37203
T. (615) 252-2355
F. (615) 252-6355
tpresnell@bradley.com
atao@bradley.com

***Counsel for Defendant***

*/s/ J. Gerard Stranch, IV*
J. Gerard Stranch, IV (BPR # 23045)

3



**Case Title:**    RED HOUSE MEDICAL BILLING MI LLC V CHANGE HEALTHCARE

**Case Number:**    26C525

**Type:**    AGREED ORDER


The foregoing is hereby ORDERED, ADJUDGED AND

DECREED:


*Lynne T. Ingram*

_____

Judge Lynne T. Ingram, Eighth Circuit


Electronically signed on 2026-06-26 11:03:22    page 4 of 4